# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Twin Metals Minnesota LLC
400 Miners Drive East
P.O. Box 329
Ely, MN 55731

Franconia Minerals (US) LLC
400 Miners Drive East
P.O. Box 329
Ely, MN 55731

                Plaintiffs,

     -against-

United States of America

U.S. Department of the Interior
1849 C Street NW
Washington, D.C. 20240

Debra Ann Haaland, *in her official capacity* as
Secretary of the Interior
1849 C Street NW
Washington, D.C. 20240

Ann Marie Bledsoe Downes, *in her official capacity*
as Principal Deputy Solicitor of the Interior
1849 C Street NW
Washington, D.C. 20240

Bureau of Land Management
1849 C Street NW
Washington, D.C. 20240

Tracy Stone-Manning, *in her official capacity* as
Director of the Bureau of Land Management
1849 C Street NW
Washington, D.C. 20240

Mitchell Leverette, *in his official capacity* as the
Bureau of Land Management Eastern States Office
State Director
5275 Leesburg Pike
Falls Church, VA 22041

                Defendants.

No. _____

Complaint for Declaratory Relief

## INTRODUCTION

1.      Plaintiffs Twin Metals Minnesota LLC and Franconia Minerals (US) LLC (together "Twin Metals") bring this case to challenge the Defendant federal agencies' and officials' arbitrary, capricious, and unlawful evisceration of Twin Metals' mineral rights.

2.      In 2019, an Assistant Secretary for the U.S. Department of the Interior, on behalf of the United States, executed two Lease Agreements with Twin Metals.  Those 2019 Leases were part of a complex of mineral rights that Twin Metals and its predecessors had acquired in northeastern Minnesota through more than 70 years of development and the investment of hundreds of millions of dollars.

3.      Twin Metals then redoubled its efforts to progress a state-of-the-art, environmentally sound mine.  But after presidential administrations changed in 2021, the Defendant officials within the Department of the Interior exacted a tightly coordinated set of unlawful actions targeting Twin Metals' rights and property interests, which culminated in the revocation of the 2019 Leases and the rejection of its pending preference right lease applications ("PRLAs").  This coordinated campaign constituted nothing less than an unlawful attempt to rewrite the policy choices that Congress has made about the proper balance between environmental concerns and the availability of mining on public lands.  Defendants' actions should be set aside, and Twin Metals should be allowed to engage in the environmental and regulatory review process.

4.      Congress possesses near-plenary authority to "make all needful Rules and Regulations respecting the . . . Property belonging to the United States," U.S. Const., art. IV, § 3, cl. 2.  For 175 years, Congress has exercised that power by passing statutes allowing mining in the area where Twin Metals possesses mineral rights.

5.      Congress first authorized mining in the area in 1847 across all of what is now the Superior National Forest.  Over a century later, in 1964 and 1978—following great deliberation over how to balance environmental conservation and mineral development—Congress passed two statutes that removed 1.1 million acres of the Forest from mining eligibility by designating the Boundary Waters Canoe Area ("BWCA") and a buffer zone within the Forest as wilderness. But those statutes did not change Congress's longstanding authorization of mining on the more than 1.9 million acres of the Forest that are *outside* the BWCA and the buffer zone.  Congress put in place a careful compromise between environmental concerns and the economic interests of northeastern Minnesota's towns, businesses, and people:  pursuant to federal law, mining would be prohibited in the BWCA and the defined buffer zone but permitted in the rest of the Forest.

6.      Following this direction from Congress, Twin Metals and its predecessors have devoted decades of work and hundreds of millions of dollars to developing a highly responsible, modern, low-impact underground mine—one that will be built on land, including federally leased land, that is entirely outside the protected areas and inside the area that Congress has reserved for mining.  Twin Metals has spent approximately $550 million in developing the project, of which approximately $135 million was spent from 2017 to 2021 in reliance on the Government's encouraging statements leading up to and including the lease renewals.

7.      Twin Metals' mine will also further important U.S. economic and strategic goals. The mine will provide thousands of well-paying direct and indirect jobs to a region that is in need of investment.  It will produce minerals like copper, nickel, cobalt, platinum, and palladium that are essential to wind turbines, electric cars, smartphones, medical equipment, and everything else requiring rechargeable batteries or an electrical grid; it will do so from the

largest undeveloped deposit of those minerals in the United States; and it will supply these minerals during a time when the world will need to quadruple its production of cobalt and obtain in 25 years more copper than has been mined in all of recorded human history.

8.     Given its confidence in the merits of its mine, and after having drilled more footage of core samples and conducted more studies than any other mine in Minnesota's history, Twin Metals sought only a fair and evenhanded application of the federal environmental-review and permitting processes.  Yet, beginning in the fall of 2021—in disregard of applicable laws, regulations, and even the Government's own express representations to this Court in a previous related case—Defendants launched a campaign to shut down Twin Metals' mining project without even considering an environmental review.

9.     *First*, in October 2021, Defendant Bureau of Land Management ("BLM") Eastern States Director Mitchell Leverette published a Notice of Application for Withdrawal and Segregation of Federal Lands ("Segregation Notice") announcing that USFS's application to withdraw land within the Superior National Forest had triggered an immediate segregation of the land from "operation of the United States mineral and geothermal leasing laws" for up to two years, subject to valid existing rights.

10.     *Second*, that same day, Leverette sent a letter to Twin Metals to reject its PRLAs to mine lands adjacent to the Leases based on an erroneous assertion that the Segregation Notice required him to reject supposedly "discretionary" applications.  This sudden rejection came after the PRLAs had been pending for many years—and after BLM had issued in 2018 and 2020 Preliminary Valuable Deposit Determinations, a prerequisite to perfecting the PRLAs into preference right leases.

11.     *Third*, in December 2021, Leverette rejected Twin Metals' 2019 mine plan of operations (the "MPO") because it mentioned land covered by the wrongly rejected PRLA, despite Twin Metals having submitted an amended MPO earlier in November that excluded such land from the project.  Leverette refused to consider the amended MPO, unreasonably deeming the November amendment to be an entirely new MPO that required a separate review, despite ongoing dialogue with Twin Metals about the MPO.

12.     *Fourth*, in January 2022, Defendant Principal Deputy Solicitor of the Department of the Interior Ann Marie Bledsoe Downes issued an opinion (the "Downes Opinion") "rescind[ing] and replac[ing]" a 2017 opinion authored by her predecessor.  The Downes Opinion concluded that Interior's decision to renew the Twin Metals Leases in 2019—a decision the Government, including Interior, successfully defended in this Court—was "improper[]."  Downes pretextually based her decision on three supposed procedural mistakes that the Government had made, each of which was in the Government's control at the time of the renewal, and none of which was an actual mistake.

13.     *Fifth*, just one day later, Deputy Secretary of the Interior Tommy Beaudreau retroactively cancelled Twin Metals' Leases with the United States ("Lease Cancellation"), citing the day-old Downes Opinion.  In doing so, Downes and Beaudreau effectively disavowed the Government's earlier representations to this Court defending the 2017 opinion and 2019 lease renewal and disregarded this Court's decision upholding the validity of that 2017 opinion and 2019 lease renewal in the *Voyageur Outward Bound School v. United States* case.

14.     *Sixth*, in April 2022, the Interior Board of Land Appeals ("IBLA") dismissed the administrative appeal that Twin Metals had filed following Leverette's rejection of its MPO because, it reasoned, the Lease Cancellation had rendered the appeal moot.

15.     Thus, through a coordinated series of unjustified actions, the Government undercut Twin Metals' efforts to develop a mine specifically designed to protect northeastern Minnesota's environment, without the Government ever assessing the environmental impact of the proposed project.

16.     These concerted actions by the Government are contrary to Congress's mandate to allow mining in the area of the Superior National Forest that is outside the BWCA and the buffer zone, and are arbitrary and capricious even if they had been the kind of decisions the agencies were authorized to make.  Under federal law, the Government is required to evaluate individual projects through a science-backed analysis, and if a project can meet the applicable state and federal standards, issue permits to mine.  Instead of performing their authorized function, Defendants have abused their administrative power to achieve political goals.

17.     Federal law, and in particular the Administrative Procedure Act, forbids this kind of arbitrary and capricious political whipsawing.  The APA is a vital check on any bureaucratic abuse of power, but it is particularly vital when it comes to projects like Twin Metals' mine, which involve a long-term investment of time, capital, and highly skilled labor.  Safe and environmentally protective mining requires predictable Government oversight based on law, not political whim.

18.     Accordingly, Twin Metals respectfully urges this Court to vacate and set aside Defendants' illegal actions.  Twin Metals requests that a declaration be issued, stating that the 2019 Leases remain valid and in force, the PRLAs must be granted, the MPO remains pending, and the Downes Opinion must be rescinded, thereby allowing Twin Metals to proceed with the environmental review and permitting processes established by law.

## PARTIES

19.     Plaintiff Twin Metals Minnesota LLC ("TMM") is a privately owned limited liability company organized under the laws of Delaware with its principal place of business in Minnesota.  The aim of TMM's business is to design, construct, operate, close, and reclaim a copper, nickel, cobalt, platinum, palladium, gold, and silver mine in northern Minnesota.  TMM is the owner of all rights, titles, and interests in one of the two PRLAs.

20.     Plaintiff Franconia Minerals (US) LLC ("Franconia"), a wholly owned subsidiary of TMM, is a limited liability company organized under the laws of Minnesota with its principal place of business in Minnesota.  Franconia engages in the discovery and development of base metals and platinum-group metals in the United States.  It is the owner by assignment of any and all rights, titles, and interests in the two federal hardrock mineral leases at issue here, MNES-01352 and MNES-01353 (the "Leases").  Franconia is the owner of all rights, titles, and interests in the second of the two PRLAs.

21.     Defendant United States owns the real property covered by the Leases and PRLAs.

22.     Defendant U.S. Department of the Interior ("Interior") is responsible for the management of certain federal lands and natural resources, including the lands subject to Twin Metals' Leases and PRLAs.  Interior is headquartered in Washington, D.C.

23.     Defendant Debra Anne Haaland is the Secretary of the Interior and is sued in her official capacity.  Haaland has the authority to permit prospecting, development, and use of mineral resources in the subject lands.  Haaland maintains her office at Interior's headquarters in Washington, D.C.

24.     Defendant Ann Marie Bledsoe Downes is the Principal Deputy Solicitor of the Interior and is sued in her official capacity.  In the course of her duties, Downes has authority to

"issue final legal interpretations, in the form of M-Opinions." *See* Department of the Interior, *Department Manual*, Part 209, § 3.2(11) (2020). Such opinions are "binding . . . on all other Departmental offices and officials and . . . may be overruled or modified only by the Solicitor, the Deputy Secretary, or the Secretary." *Id*. Downes authored the January 25, 2022 Downes Opinion at issue in this case. Downes maintains her office at Interior's headquarters in Washington, D.C.

25.    Defendant Bureau of Land Management is an agency within Interior. It has responsibility over the subsurface and mineral rights subject to the Leases and PRLAs. BLM is headquartered in Washington, D.C.

26.    Defendant Tracy Stone-Manning is the Director of BLM and is sued in her official capacity. Stone-Manning maintains her office at Interior's headquarters in Washington, D.C.

27.    Defendant Mitchell Leverette is BLM Eastern States Director and is sued in his official capacity. Leverette issued the decision rejecting the PRLAs and the decision rejecting Plaintiffs' MPO as incomplete. This Court has personal jurisdiction over Leverette under 28 U.S.C. § 1391(e).

## JURISDICTION AND VENUE

28.    This Court has jurisdiction over this action under 28 U.S.C. § 1331, as well as 5 U.S.C. § 702.

29.    Venue is proper in this Court under 28 U.S.C. § 1391(b) and § 1391(e)(1). Defendants are officers or employees of the United States or agencies thereof, acting in their official capacities, and certain Defendants reside in this district. In addition, a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this district.

30.     Twin Metals' claims under the Administrative Procedure Act ("APA") are timely under 28 U.S.C. § 2401(a) because they are brought within six years of each of Defendants' relevant actions.

## BACKGROUND

**I.   Mining has long been permissible in designated areas of United States public lands, including in the Superior National Forest.**

31.     For 175 years, the United States has consistently allowed regulated mining in what is now the Superior National Forest.  Mining in the U.S. public domain was initially prohibited, but following a wave of trespassing miners beginning with the 1849 Gold Rush, Congress concluded that the public interest would be better served if regulated mining were permitted.

32.     Congress adopted that approach nationally beginning with the Lode Law of 1866, 14 Stat. 251.  Then, through statutes such as the General Mining Act of 1872, the Mineral Leasing Act of 1920, and the Federal Land Policy and Management Act of 1976 ("FLPMA"), the current mining-regulation regime was established:  minerals on certain public lands may be mined, subject to extensive regulation, but specified public lands are withdrawn from mining eligibility for the sake of conservation.

33.     The history of mining in northern Minnesota followed a similar path toward regulated mining but with a region-specific overlay:

34.     Congress first authorized mining in the area in 1847, when northeastern Minnesota was part of the Wisconsin Territory's Chippewa Land District.  9 Stat. 179.  The next year, valuable deposits were discovered during the public land survey.  Miners moved in, and by the end of the 19th century, iron ore was being successfully mined across Minnesota's

Vermillion and Mesabi Iron Ranges.  Minnesota remains the largest producer of iron ore and taconite in the United States today.

35.     While the federal government ("Government") promoted the growing industrial activity in the area, it also took steps to conserve the area's natural beauty.  In 1926, for instance, U.S. Forest Service ("USFS") designated 640,000 acres in the Superior National Forest as a "roadless area."  John Helland, *Chronology of Historical Actions for Boundary Waters Canoe Area Wilderness within Minnesota's Superior National Forest* 2 (2004).[1]  As time passed and Minnesota's population increased, the Government continued to take this balanced approach in the Superior National Forest:  it permitted and encouraged mining in much of the Superior National Forest while maintaining and strengthening protections for, and expanding the size of, the roadless area.

36.     In 1950, to protect miners who had invested time and capital in their projects from potential arbitrary administrative action, Congress expressly authorized "leases" for "prospecting" and the "development and utilization" of "mineral resources" within the Superior National Forest.  16 U.S.C. § 508b; *see also* S. Rep. 81-1778, at 2 (1950) ("The Senate committee desires to emphasize the fact that this is special legislation to meet a special situation existing with respect to investment losses resulting from cancellation of mining permits in the Minnesota forests."); H.R. Rep. 81-795, at 2 (1950) ("[T]hose . . . who have made investments for the mining and removal of mineral substances from the described lands should be given the privilege of renewing or retaining their permits or leases.").  In 1958, the roadless area was officially re-designated as the "Boundary Waters Canoe Area," and, in 1978, Congress set aside and prohibited mining in the BWCA, as well as in the buffer zone abutting the BWCA, called

---

[1]     https://www.house.leg.state.mn.us/hrd/pubs/bwcawild.pdf.

the Mining Protection Area ("MPA").  BWCA Wilderness Act of 1978, Pub. L. No. 95-495, § 10, 92 Stat. 1649, 1655 (1978).  Under this approach, mining was prohibited within the BWCA and the MPA but remained permissible under 16 U.S.C. § 508b in the areas of the Superior National Forest outside them.  USFS's current Superior National Forest management plan explicitly acknowledges this legislative balance, stating:  "[e]xploration and development of mineral and mineral material resources" is a "[d]esired [c]ondition" that "the Forest Service will strive to achieve" in the Forest areas outside the BWCA and the MPA.  USFS, *Land and Resource Management Plan:  Superior National Forest* 1-7, 2-9 (2004).[2]

37.    Because Twin Metals' project lies within the Superior National Forest, but outside of the BWCA and the MPA, it sits on land that Congress specifically made eligible for mining under federal law.

---

[2]    https://www.lrl.mn.gov/docs/2015/other/150681/PFEISref_2/USFS%202004b.pdf.



**II.   Since 1951, Twin Metals and its predecessors have worked to develop the project pursuant to U.S. mining law and regulations.**

38.     It is in this regulatory context that Twin Metals and its predecessors have worked for more than 70 years to develop a mining project, and Twin Metals in particular has worked for over a dozen years to develop what will be a modern, model mine.

39.     In 1951, Twin Metals' predecessor, International Nickel Company ("INCO"), first applied for prospecting permits to explore the Superior National Forest for hardrock minerals. Interior granted INCO's applications with the consent of USFS.  Then, following prospecting activities and investment, INCO discovered deposits of copper and nickel in quantities legally sufficient to establish preference rights to a lease.  Having discovered a valuable mineral deposit on federal land pursuant to a prospecting permit, INCO was "entitled," as a "[r]eward for [the] discovery," "to a preference right lease for the mineral[s] [it had discovered]," along with "a right of renewal for successive periods," *i.e.*, a right to complete the task of removing the minerals.  43 C.F.R. § 3221.4(a), (f) (1966).

40.     The ensuing negotiations over lease terms memorializing those rights were mediated by Democratic Congressman John Blatnik.  Blatnik, the U.S. representative from northeastern Minnesota, "act[ed] as a catalyst for getting INCO . . . to take up its Federal leases and create a copper-nickel mine operation."  J.A. at 165, *Voyageur Outward Bound Sch. v. United States*, No. 1:18-cv-01463 (D.D.C. 2020), ECF No. 73-1 ("*Voyageur* J.A.") (Memorandum from W.T. Pecora, Dir., Geological Surv. to the Sec'y of the Interior (Jan. 10, 1966)).  Blatnik, who stated his "primary[] interest[]" was to "obtain[] employment for more people in Minnesota," hosted negotiations between INCO and Government officials in his office.  *Id.* at 220 (Memorandum from J.D. Turner, Chief, Branch of Mining Operations, Geological Surv. (Jul. 12, 1965)).  Also heavily involved was Blatnik's then-administrative

assistant Jim Oberstar, who succeeded Blatnik in 1975 and represented the Iron Range in Congress until 2011.

41.     INCO and the United States agreed to lease terms in 1966 during the Johnson Administration.  Ex. A (1966 Leases).  The terms of the Leases gave INCO the "exclusive right to mine, remove, and dispose of all the copper and/or nickel minerals and associated minerals and . . . any other minerals," with the exception of "oil, gas, oil shale, coal, phosphate, potassium, sodium, or sulphur."  *Id.* at MNES-01352 § 1(a); *id.* at MNES-01353 § 1(a).  While the Leases had an initial term of twenty years, INCO had a "right . . . to renew . . . for successive periods of ten . . . years."  *Id.*  USFS consented to the Leases.

42.     Thereafter, INCO continued exploration, collecting information about the deposits through geological mapping, geophysical surveys, and other surveys.  INCO also conducted large-scale sampling.  Based on that exploration campaign, in the 1970s, INCO proposed a 1,000 foot-deep copper mine.

43.     Around this time, the State of Minnesota initiated an environmental review of copper-nickel mining in northeastern Minnesota.  Following five years of review, in 1979 the State published the Minnesota Regional Copper-Nickel Study, which was based on "over 180 technical reports."  *Copper-Nickel Studies and Non-Ferrous Mining*, Minn. Legis. Reference Libr. (2022).[3]  The Study concluded that "copper-nickel mining in the region could meet environment standards if available technology was used wisely."  *Id.*

44.     As INCO's project continued to develop through additional exploration work, in 1986, INCO timely applied for the first renewal of the Leases, which BLM granted in 1989. BLM executed the renewal using Standard Form 3520-7 (Dec. 1984), to which it attached the

---

[3]     https://www.lrl.mn.gov/guides/guides?issue=coppernickel.

1966 Leases.  Ex. B (1989 Lease Renewals).  A letter from BLM to INCO transmitting the forms stated that USFS and BLM "have agreed" to the renewal of the Leases "under the existing terms and conditions of the original Leases."  *Voyageur* J.A., ECF No. 73-1 at 81 (Letter from Stuart Carlson, Deputy State Dir. for Min. Res., BLM, to INCO (Apr. 25, 1989)).  USFS concluded that the terms and conditions of the existing Leases were "adequate" to protect the surface estate, with no "new restrictions" being necessary.  *Id.* at 94 (U.S. Forest Service, Finding of Categorical Exclusion:  Conditions of Extending Bureau of Land Management Leases (Feb. 6, 1987)).  In 1988, INCO sold its interest to the American Copper and Nickel Company, Inc. ("American Copper").  Development activities continued with the deposits.

45.     The second renewal process began in 1999, when American Copper applied for another ten-year renewal of the Leases.  By this time, decades of exploration had happened across the Duluth Complex—the region's underlying rock formation—from 1948 through 2000.  That exploration resulted in the drilling of more than 2,800 holes and the extraction of over 1.4 million feet of mineral core (*i.e.*, cylinder-shaped rock samples) for testing.  In 2000, USFS completed an environmental assessment of the potential effect that further exploration could have on the leased lands and found there would be no significant impact after considering factors such as public health and safety, effects to the environment, and compliance with environmental protection laws and requirements.

46.     In 2004, BLM renewed the Leases with the same forms used for the 1989 renewal.  Ex. C (2004 Lease Renewals).  As it did for the first renewal, USFS again informed BLM that it had "no objection to the renewal" because it had "reviewed" the Leases' "terms, conditions[,] and stipulations" and "determined that they are sufficient to protect the resources

of the United States." *Voyageur* J.A., ECF No. 73-1 at 63 (Memorandum from Randy Moore, Reg'l Forester, USFS, to Dir., Eastern States Off., BLM (Jul. 18, 2003)).

47.     In parallel, Twin Metals' predecessors sought to further explore nearby parcels that were not covered by the Leases.  In 2000 and 2001, BLM issued prospecting permits for some of the project lands to Twin Metals' predecessors, and USFS consented to prospecting operations there.  The prospecting permits gave Twin Metals' predecessors an exclusive right to explore those lands "to determine if a valuable deposit [of hardrock minerals] exists." 43 C.F.R. § 3505.10(a)(6).

48.     Twin Metals' predecessors, and later Twin Metals itself, fulfilled the promise of these prospecting permits by conducting extensive exploration.  Between 2006 and 2014, Twin Metals and its predecessor conducted an eight-year, 500-hole drilling campaign in the area of the project designated for mining (and more exploration was done on lands outside the current project's scope).  Twin Metals also took on numerous scientific studies, including on:  the baseline hydrogeological conditions across the project area; the impacts to the surrounding wetlands areas; sensitive plants and vegetation communities, including wild rice, in the proposed mine site area and surrounding waterways; wildlife; air quality; and noise.

49.     The extensive exploration proved that valuable deposits existed in the project area.  Accordingly, for certain lands in the area, Twin Metals and its predecessors submitted two PRLAs—one in 2006 and another in 2013.

### III.     During the Obama Administration, the Government changed position and for the first time reinterpreted the Leases to permit nonrenewal.

50.     Based on the extensive exploration work that had taken place in the preceding years, by the late 2000s and early 2010s, a mining project was coming into focus.  TMM was created in 2010 and formally entered the project in 2011 by acquiring Franconia, which owned

the Leases.  And with the Leases due to expire in 2014, in October 2012 Twin Metals filed a

lease-renewal application seeking a third ten-year term.

      51.     However, with a viable mining project now on the horizon, and with publicity

arising from the mine's progress, opponents of Twin Metals' mining project began a movement

to lobby the Government to cancel the project.  In 2013, a campaign that calls itself "Save the

Boundary Waters" was founded with the stated purpose of persuading the Government "to deny

the mining leases that would give Twin Metals access to the ore."  Josephine Marcotty, *Loved*

*and Loathed, Longtime Activist Has Drawn Line in BWCA*, Star Trib. (Nov. 26, 2016).[4]  Other

organizations also began to publicly criticize the Twin Metals project.[5]  Some began "regular

---

[4]    https://www.startribune.com/bwca-girl-guide-is-now-a-woman-warrior/403115576.

[5]    *See also* Purbita Saha, *Stirring the Waters*, Nat'l Audubon Soc'y (Dec. 11, 2014),
https://www.audubon.org/news/stirring-waters (chronicling Boundary Waters activists'
journey to Washington, D.C. to bring attention to the "threat[]" to the Boundary Waters by
mine projects, including Twin Metals); Hilary Lewis, *Boundary Waters Canoe Area*
*Wilderness*, Earthworks (Oct. 22, 2014), https://earthworks.org/blog/boundary-waters-
canoe-area-wilderness ("The proposed Twin Metals Mine poses a significant and persistent
risk to water quality and, in turn, the economic and ecological health of the region."); *Twin*
*Metals*, Sierra Club, North Star Chapter (Feb. 1, 2014),
https://www.sierraclub.org/minnesota/mining/twin-metals (stating that the Twin Metals'
mine "create[s] a potential for environmental destruction on an unprecedented level" due to
the "close proximity of the deposits to key water bodies"); *Sulfide Mining & Voyageurs*
*National Park*, Voyageurs Conservancy, https://www.voyageurs.org/advocacy/sulfide-
mining (last visited Aug. 20, 2022) (stating "[r]ecent proposals to mine copper, gold[,] and
nickel in the sulfide ore deposits of Northern Minnesota represent a significant threat to
Voyageurs [National Park]" and repeatedly mentioning Twin Metals in the timeline); Peter
McBride, *America's Most Endangered Rivers 2013* at 13-14 (2013), American Rivers,
https://www.americanrivers.org/wp-content/uploads/2016/02/2013-mer-report.pdf (detailing
the purported dangers of the project and demanding that "President Obama, Congress, and
Minnesota's Governor Dayton must oppose the development of the massive Twin Metals
Minnesota mine"); *Great Lakes Mining*, Ctr. for Biological Diversity,
https://www.biologicaldiversity.org/programs/public_lands/mining/Minnesota_mining/index
.html (last visited Aug. 20, 2022) (characterizing the Twin Metals project as part of "a major
threat of toxic pollution"); Save the Boundary Waters,
https://www.savetheboundarywaters.org (last visited Aug. 20, 2022) (opining that sulfide-

pilgrimages" to Washington to meet with and lobby officials at Interior, BLM, the Department of Agriculture, and USFS, as well as members of Congress. Marcotty, *supra*. At these meetings, Twin Metals' opponents openly lobbied for the denial of Twin Metals' Leases.

52.     Bowing to this political pressure, when considering Twin Metals' third lease renewal application, BLM did something it had not done in the 1989 or 2004 lease renewals—it asked the Solicitor of the Department of the Interior, then Hilary Tompkins, to opine on whether BLM had discretion to deny the application. On March 8, 2016, Tompkins issued an opinion (the "Tompkins Opinion") concluding that BLM did have discretion to either grant or deny the pending renewal application. *See* Ex. D (Tompkins Opinion). In particular, the Tompkins Opinion erroneously concluded that Twin Metals' right to renew the Leases was controlled not by the Leases themselves but by language included in the boilerplate administrative form to which the 2004 Leases were attached. According to this novel interpretation, the form gave Twin Metals only "a preference over other potential lessees to lease the lands in question" and not a right to "non-discretionary renewal of the leases." *Id.* at 13. In addition, the Tompkins Opinion stated that if the 1966 Leases did govern the renewal question, they conferred a right to renew only if "production" (*i.e.*, actual mining) had commenced during the initial 20-year lease term. *Id.* at 10. Since production had not yet begun, Tompkins concluded that Twin Metals had no right to renew: rather, "BLM has the same discretion regarding whether to renew the lease for a third time as it had in determining whether to grant the initial lease." *Id.* at 13.

53.     On the same day that Tompkins issued her Opinion, BLM sent Twin Metals a letter stating that the Tompkins Opinion was binding on BLM, and that BLM would therefore—

---

ore copper mining will cause "irreversible harm to water quality, wildlife, public health, and a sustainable outdoor recreation-based economy" in the Boundary Waters).

in a break from its practice during the two prior lease renewals—review the 2012 renewal application using the same criteria applied to decide whether to grant an initial lease in 1966. BLM further stated that it would ask USFS whether it consented to renewing the Leases.

54.     In November 2016, the United States elected a new president whose administration would assume office on January 20, 2017.  After the election, but a little over a month before the inauguration of the president-elect, on December 14, 2016, the outgoing USFS Chief, Thomas L. Tidwell, finally responded to the consent request that BLM had submitted to USFS six months earlier.  Tidwell sent a letter to then-BLM Director Neil Kornze refusing to consent to Twin Metals' lease renewal.  *Voyageur* J.A., ECF No. 73 at 56 (Letter from Thomas L. Tidwell, Chief, USFS, to Neil Kornze, Dir., BLM (Dec. 14, 2016)).

55.     Despite USFS having already consented for decades to the exploration and potential mining of copper, nickel, and other metals on this very plot of land, Tidwell stated that "[he] [found] unacceptable the inherent potential risk that development of a regionally-untested copper-nickel sulfide ore mine within the same watershed as the BWCAW might cause serious and irreplaceable harm to . . . [the] wilderness area" and that USFS therefore "[did] not consent to renewal of" the Leases.  *Id.*  Tidwell had not previously conferred with Twin Metals to raise any such concerns about an "inherent potential risk" or how it could be mitigated.  He cited no project-specific or scientific data validating any of these supposed concerns.  And he conceded USFS had conducted no environmental review of the potential impacts of renewing the leases. *Id.* at 64 ("As it is my determination not to consent to issuance of lease renewals based on the application before the agency at this time, preparation of an environmental analysis is not required.").  Instead, he simply asserted "absolute discretion" to withhold consent.  *Id.* at 63.

56.     The next day, on December 15, 2016, BLM Eastern States Director Karen E.
Mouritsen denied Twin Metals' renewal application, reasoning that BLM was required to do so
because USFS had withheld its consent.

57.     During the same window of time between the 2016 election and the 2017
inauguration, members of the outgoing administration hurriedly tried to use administrative
action to withdraw a large swath of land, including Twin Metals' project land, from new
mining.  On January 5, 2017, USFS submitted an application to BLM requesting to withdraw
234,328 acres of the Superior National Forest from disposition under U.S. mineral and
geothermal leasing laws, subject to valid existing rights, for a 20-year term.  On January 13,
2017, USFS published a notice of intent to prepare an environmental impact statement
regarding the proposed withdrawal, initiating a comment period.  And, on January 19, 2017—
just one day before the new administration came into office—BLM published a notice in the
Federal Register announcing its receipt of USFS's withdrawal application, initiating a
segregation of the lands from disposal for up to two years.

## IV.    In 2017, the new administration restored the Twin Metals project, then renewed the Leases.

58.     In 2017, after the change in administrations, Interior promptly restored the Twin
Metals project by reversing the prior administration's eleventh-hour attempt to destroy it.

59.     On December 22, 2017, Principal Deputy Solicitor Daniel Jorjani issued a new
opinion (the "Jorjani Opinion") "withdraw[ing] and replac[ing]" the Tompkins Opinion.  *See*
Ex. E (Jorjani Opinion) at 1.  Reviewing the history and language of the Leases, as well as the
two renewals, the Jorjani Opinion concluded that the Tompkins Opinion "improperly
interpreted the leases" and that both the Leases and the applicable regulations gave Twin Metals
"a non-discretionary right to a third renewal." *Id.* at 19.  The Jorjani Opinion rightly stated that,

"while the United States maintains discretion to impose reasonable new terms and conditions in the lease renewal agreements, the BLM does not have the discretion to deny the renewal application." *Id.* at 1.  As a corollary, BLM could not have denied the renewal of the Leases on the basis that USFS had not consented.

60.     Consistent with the Jorjani Opinion, in May 2018, BLM resumed consideration of Twin Metals' applications to renew the Leases.  Even though Twin Metals had a right to renewal, and the 2004 lease terms did not require the completion of any environmental studies prior to BLM granting Twin Metals' application, BLM chose to conduct an environmental assessment.  *See* Ex. F (BLM, Decision Record:  Addition of Terms, Conditions, and Stipulations for Renewal of Hardrock Mineral Leases MNES-01352 & MNES-01353 at 2 (May 15, 2019)).

61.     BLM's environmental assessment resulted in a finding that renewal of the Leases "would not have a significant impact [on] the human environment or result in unnecessary or undue degradation of public lands and resources." *See id.* at 7.  That conclusion was plainly correct (and was consistent with USFS's finding in 2000 that exploration in the region would have no significant impact).  Renewal of the Leases did not, itself, authorize commercial mining operations.  Actual mining remained subject to further BLM approval of an MPO and additional environmental review.  BLM, Environmental Assessment:  Addition of Terms, Conditions, and Stipulations for Renewal of Hardrock Mineral Leases MNES-01352 & MNES-01353 at 22-23 (May 15, 2019) ("Additional authorizations for mineral exploration or development operations would require the lessee to submit additional plans and information for BLM approval and would be subject to additional environmental review.").

62.    Then, on September 6, 2018, USFS announced the cancellation of its January

2017 withdrawal application.  USFS clarified that this decision was based on "a thorough

review on th[e] issue and listen[ing] to thousands of citizens" over "the last 15 months."  USFS,

*USDA Removes Roadblock to Mineral Exploration in Rainy River Watershed* (Sept. 6, 2018).[6]

The cancellation of the 2017 withdrawal application ended the temporary segregation of the

land by BLM.

63.    Consequently, the impermissibly motivated impediments that had temporarily

interrupted decades of continued progress on the mine were removed.  And on June 1, 2019, the

United States executed valid agreements with Twin Metals renewing the Leases for another ten-

year term.  *See* Ex. G (Lease Renewal with New Terms, Conditions, and Stipulations (June 1,

2019)).

64.    The renewed Leases—signed by the Assistant Secretary of the Interior for Land

and Minerals Management on behalf of the United States—were the product of careful

consideration by the Government and arms-length negotiation with Twin Metals.  Those Leases

continued many of the 2004 Lease terms but also imposed additional terms that were less

favorable to Twin Metals.  These new terms required, among other things, that Twin Metals pay

increased royalties, that all mining be underground, and that Twin Metals complete certain

milestones within the ten-year term.  In particular, within those ten years, Twin Metals would be

required to submit a complete MPO, obtain "all necessary permits," and meet the first project

milestones for "mine construction."  *Id.* at MNES-01352 § 14(b); *see also id.* at MNES-01353

§ 14(b) (incorporating by reference MNES-01352 § 14(b) and (c)).  The running of the ten-year

_____

6    https://www.fs.usda.gov/news/releases/usda-removes-roadblock-mineral-exploration-rainy-
      river-watershed.

term would be suspended, however, during certain periods of Government review, the pendency

of environmental studies, and periods when Twin Metals is collecting information in response

to the Government's requests.  *See id.* at MNES-01352 § 14(c)(2); *see also id.* at MNES-01353

§ 14(b).

65.     USFS consented to the 2019 renewals by jointly, with BLM, "exercis[ing] [its]

discretion to impose reasonable new terms and conditions in this third lease renewal."  Ex. F at

2 (2019 Lease Renewal Decision Record).

**V.     This Court, at the Government's urging, affirmed the status quo by approving
the withdrawal of the Tompkins Opinion and endorsed as "reasonable" the
longstanding interpretation of the Leases as granting nondiscretionary renewal.**

66.     In June 2018, opponents of Twin Metals' mine filed APA actions in the U.S.

District Court for the District of Columbia to set aside the 2017 Jorjani Opinion.[7]  Twin Metals

intervened, and the cases were consolidated into the *Voyageur* litigation.  *See Voyageur*

*Outward Bound Sch. v. United States*, No. 1:18-CV-01463 (D.D.C. June 28 and July 25, 2018)

(granting Twin Metals' motion to intervene and the parties' request to consolidate the cases).

67.     In *Voyageur*, Twin Metals and the Government answered the plaintiff groups'

complaints and denied the allegation that the Jorjani Opinion was arbitrary or capricious.  *See*

Def. Answers, *Voyageur*, ECF Nos. 34–35, 37–40.  Following the submission of the

administrative record, the *Voyageur* plaintiffs, the Government, and Twin Metals each filed

motions for summary judgment.  *See* Mots. for Summ. J. and Mems. of Law, *Voyageur*, ECF

Nos. 61, 64–67, 69–72, 76–80.

---

[7]     *See Voyageur Outward Bound Sch. v. United States*, No. 1:18-CV-01463 (D.D.C. 2018);
*Wilderness Soc'y v. United States*, No. 1:18-CV-01496 (D.D.C. 2018); *Friends of the
Boundary Waters Wilderness v. United States*, No. 1:18-CV-01499 (D.D.C. 2018).

68.     The Government's statements to this Court were nearly synonymous with Twin Metals' position today.  Characterizing the Jorjani Opinion, the Government asserted that it "reach[ed] the correct interpretation of the leases" and "la[id] out a well-reasoned explanation of . . . how the parties evinced their intent to preserve the unique, bargained-for right to three successive renewals in the 1966 leases" and "why the right to a third renewal in the 1966 leases is unambiguous and comports with the intent of the parties."  Gov't Br. in Supp. of Mot. for Summ. J. at 19, *Voyageur* (D.D.C. May 28, 2019), ECF No. 66.

69.     The Government recognized that the 1966 lease terms providing for nondiscretionary renewal had been incorporated into the 2004 Leases, requiring a third renewal upon Twin Metals' request.  *See id.* at 1.  The Government's brief stated that the 1966 lease terms were "the result of aggressive, arms-length negotiations," and included "a twenty-year primary term with a right to successive, ten-year renewals, subject to reasonably readjusted terms and conditions."  *Id.* at 3.  Regarding the first renewal in 1989, the Government recounted to the Court that it had "renewed the leases under the original 1966 terms and conditions." *Id.* at 1.  The Government further stated that "BLM issued the second renewals utilizing the same format, issuing identical standard forms and again including the entirety of the 1966 leases as attachments," and underscored that "[t]here is no record evidence that BLM intended a different result in 2004, nor any analysis of how granting renewal on different terms might alter the rights of the parties."  *Id.*

70.     On March 17, 2020, the Court granted the Government's motion for summary judgment, and adopted the Government's position that the Jorjani Opinion embodied "the correct interpretation" of the Leases.  *Voyageur*, 444 F. Supp. 3d at 203–04.  The Court sided with Twin Metals—and the Government—on the two key issues raised for summary judgment:

*First*, the Court held that Interior acted within its authority to reconsider and correct the Tompkins Opinion for "legal errors," because it had done so "within a short and reasonable period." *Id.* at 194–96 (internal quotation omitted). Although Interior's delay was "perhaps longer than would have been ideal," the Court concluded that the Government's reconsideration "was timely" because the single year that had passed between BLM Eastern States Director Mouritsen's denial of Twin Metals' renewal application and the issuance of the Jorjani Opinion was not "unreasonable" in light of the decision's "complexity," "the amount of evidence" requiring review, "the change in Administrations," and "the significant adverse impact" to Twin Metals from an "allegedly erroneous decision." *Id.* at 196.

71.    *Second*, the Court determined that the Jorjani Opinion's interpretation of the Leases was "reasonable." *Id.* at 200. Specifically, the Court concluded it was "reasonable" for the Jorjani Opinion to conclude, based on the text of the Leases and the cover forms attached to them, that the 2004 Leases had, like the 1989 Leases and the 1966 Leases before them, provided "a non-discretionary right to [a] third renewal." *Id.* at 199–204. The Court further reasoned that the "plain language" of the relevant provisions of the lease agreements, "properly read," provided Twin Metals with a right to "three ten-year renewals." *Id.* at 203.

## VI.    Twin Metals invested significant resources to develop, construct, and operate a modern and environmentally protective mine.

72.    Following the Jorjani Opinion's restoration of the status quo, the Government's successful defense of that opinion in this Court, and BLM's execution of the 2019 lease renewal, Twin Metals relied on the Government's actions by responsibly progressing the project towards an operating mine before the completion of the Leases' ten-year terms.

73.    Among other things, Twin Metals prepared a proposed MPO. An MPO is a prerequisite to conducting any mining operations under a mining permit, license, or lease. *See*

43 C.F.R. § 3592.1(a).  MPOs describe "the area where mining is to be conducted," any

"surface or underground mining methods," and "the size and location of structures and facilities

to be built," and contain an "estimate of the quantity and quality of the mineral resources" and a

"reclamation schedule."  *Id.* § 3592.1(c).  MPOs must also provide information on the "water to

be used and pollutants that may enter any receiving waters," how "all runoff water and

drainage" will be addressed, and the proposed "measures . . . to prevent or control fire, soil

erosion, subsidence, pollution of surface and ground water, pollution of air, damage to fish or

wildlife or other natural resources and hazards to public health and safety."  *Id.* § 3592.1(c)(8).

74.     Twin Metals met all of these requirements in December 2019, six months after the

third renewal of the Leases, when it submitted a 465-page MPO to BLM.  *See* Twin Metals

Minnesota, Mine Plan of Operations (Dec. 18, 2019).  The MPO reflected "a decade of

engineering, environmental and engagement work including the evaluation of dozens of Project

configurations and technologies that maximize environmental protection."  *Id.*, Cover Letter

at 1.  It included details on (i) operator information, (ii) the operations, (iii) environmental

setting, (iv) environmental protection measures, and (v) operating plans, among other things.

The MPO also included detailed plans for reclamation, water management, transportation, spill

contingency, environmental quality assurance, and interim management for unplanned

temporary closure.

75.     The MPO emphasized the project's importance, noting that, with seven billion

tons of ore, the subject land contains "one of the largest undeveloped deposits" of "copper,

nickel, cobalt and platinum group metals" not only in the United States but "in the world."

*Id.*, Cover Letter at 2.  The MPO also explained that market demand for these critical minerals

has been "growing" due to their critical role in new technologies, ranging from "cell phones" to "clean energy production." *Id.*

76.     In March 2020, BLM requested additional information regarding Twin Metals' MPO.  BLM asked for a "list of the federal leases, lease applications, and permits within the Project area of the MPO, or otherwise affected by the MPO," with an accompanying map. Twin Metals Minnesota, Mine Plan of Operations:  Addendum 1 (Apr. 9, 2020).  Twin Metals promptly furnished that information in April 2020, noting that one of its PRLAs (MNES-57965) covers land within the MPO's project area. *See id*. at tbl. 1 & fig. 1.

77.     On June 30, 2020, BLM published in the Federal Register its notice of intent to prepare an environmental impact statement, under the National Environmental Policy Act ("NEPA"), regarding Twin Metals' MPO.  *See* Notice of Intent to Prepare an Environmental Impact Statement for the Twin Metals Project in the Superior National Forest, Lake and St. Louis Counties, Minnesota, 85 Fed. Reg. 39206 (June 30, 2020).  According to the notice, BLM planned to review any potential environmental impacts of the plans described in Twin Metals' MPO, and determine any necessary and appropriate mitigation measures.  The proposed statement would review Twin Metals' proposed activities on the lands subject to both the Leases and the PRLA.  Press Release, BLM, BLM to Prepare an Environmental Impact Statement for Proposed Twin Metals Project (June 30, 2020).[8]  Twin Metals welcomed the opportunity to address any environmental concerns head on.

78.     Meanwhile, Twin Metals' PRLAs remained under consideration.  Although the PRLAs concerned federal lands that had been temporarily segregated between January 2017 and

---

[8]     https://www.blm.gov/press-release/blm-prepare-environmental-impact-statement-proposed-twin-metals-project.

27

September 2018 pursuant to USFS's withdrawal application, BLM did not reject the PRLAs based on that temporary segregation.  In 2018 and 2020, the BLM Eastern States Director issued "Preliminary Valuable Deposit Determination[s]" for the two PRLAs, finding that there was "a reasonable prospect of success in developing a profitable mine."  BLM, *Notice of Preliminary Valuable Deposit*, 3507 (930) SH, MNES-57965 (Oct. 2, 2018); *see also* BLM, *Notice of Preliminary Valuable Deposit Determination*, 3507 (930) SH, MNES 50264-1 (May 13, 2020), as amended in BLM, *Amended Notice of Preliminary Valuable Deposit Determination*, 3507 (930) SM, MNES 50264-1 (June 10, 2020).  A preliminary valuable deposit determination is a prerequisite to perfecting a PRLA into a preference right lease.  *See* 43 C.F.R. § 3507.11(a).

### VII.    Twin Metals' project is a modern, environmentally protective mine.

79.    Twin Metals' planned project would employ modern technology and industry practices to build a safe and environmentally protective mine.

80.    The proposed mine targets copper, nickel, cobalt, platinum, palladium, gold, and silver, all important minerals necessary for a clean-energy future.  They are the minerals needed to manufacture wind turbines, electric cars, smartphones, rechargeable batteries, energy storage and electrical infrastructure, and virtually all technologies used in our modern-day society.  And their importance is growing:  the World Bank projects that by 2050, global annual demand for nickel used *solely in clean energy technology* will be nearly equal to today's *total* nickel production.  For cobalt, that number is a staggering 460%.  *See* World Bank, Minerals for Climate Action:  The Mineral Intensity of the Clean Energy Transition 103 (2020).[9]  Copper

---

[9]    https://pubdocs.worldbank.org/en/961711588875536384/Minerals-for-Climate-Action-The-Mineral-Intensity-of-the-Clean-Energy-Transition.pdf.

demand will increase significantly, too—in the last 5,000 years, about 550 million tons of copper has been produced; the world will need about the same amount of copper in the *next 25 years* to meet global demand.  World Bank, Climate-Smart Mining:  Minerals for Climate Action (2020);[10] *see also* Press Release, Dep't of Energy, Biden-Harris Administration Launches $675 Million Bipartisan Infrastructure Law Program to Expand Domestic Critical Materials Supply Chains (Aug. 9, 2022) ("Global demand for critical materials [e.g., nickel and cobalt] is expected to increase by 400-600% over the next several decades.").[11]  Meanwhile, according to 2022 data, the United States is currently dependent on imports for 45% to 76% of these minerals to meet domestic consumption.  U.S. Geological Survey, Dep't of Interior, *Minerals Commodity Summaries 2022*, at 52, 54, 114 (Jan. 31, 2022).  In response, the Department of Energy recently called to increase domestic mineral production in order to "reduce [the United States'] dependence on foreign sources of critical materials, secure America's clean energy supply chain, and introduce more jobs associated with the clean energy transition."  Press Release, Dep't of Energy.

81.     Twin Metals' mine will also lead to the direct or indirect employment of thousands of people.  Construction of the mine will generate a tremendous number of union-labor hours under a Project Labor Agreement Twin Metals signed in 2019 with the Iron Range Building and Construction Trades Council.

82.     But what really sets apart Twin Metals' mine is its environmentally conscious design.  After extensive consultations with stakeholders (including with local community

---

[10]   https://www.worldbank.org/en/news/infographic/2019/02/26/climate-smart-mining.

[11]   https://www.energy.gov/articles/biden-harris-administration-launches-675-million-bipartisan-infrastructure-law-program.

members, conservation groups, and labor leaders), in addition to years of gathering scientific data on the surrounding environment, Twin Metals specifically designed a mine to be protective of the BWCA and northeastern Minnesota's environment.

83.     Twin Metals was, and remains, confident that any fair and thorough study would conclude that the project's environmental impact would be minimal and would validate Twin Metals' approach to development.  Consequently, throughout much of 2020, Twin Metals eagerly awaited the promised commencement of the environmental impact statement process.

## VIII.     In 2021, the new administration reversed the Government's position, resurrected the legally erroneous Tompkins Opinion, and resumed its campaign against Twin Metals.

84.     Unfortunately, when the new administration took office in 2021, certain officials—the Defendants in this case—turned back the clock to resume the 2016 efforts to eradicate Twin Metals' project based on impermissible, scientifically baseless, and policy-laden motives.

85.     In September 2021, the USFS Regional Forester submitted a new application to withdraw from mining 225,378 acres of the Superior National Forest that had previously been proposed for withdrawal in January 2017 ("2021 Withdrawal Application").  *See* Ex. H (2021 Withdrawal Application).  The application requested that the lands be withdrawn from disposition under the mineral and geothermal leasing laws for twenty years, subject to valid existing rights.  *See id.* at 1.  Without conducting any environmental review of the Twin Metals project or the impact of any other mining project in the area, the 2021 Withdrawal Application speculated about "[p]otential impacts from mining" on the "water quality" and "the wilderness ecosystem," as well as "the recreation economy and native culture and food systems."  *Id.* at 3.

86.     As in the January 2017 application, the lands proposed to be withdrawn were outside of the BWCA and MPA and in the area where Congress authorizes mining.  *See id.* at 2. And as with the first application, Twin Metals was the only mining project located on the land covered by the 2021 Withdrawal Application that had a pending MPO.

87.     Acting on the 2021 Withdrawal Application, on October 21, 2021, BLM Eastern States Director Mitchell Leverette published the Segregation Notice in the Federal Register, announcing that the application triggered the segregation of the approximately 225,378 acres "from operation of the United States mineral and geothermal leasing laws, subject to valid existing rights."  Ex. I (Segregation Notice, 86 Fed. Reg. 58299 (Oct. 21, 2021)).  The segregation would last up to two years.  *See id*.

88.     Executing a carefully choreographed plan to destroy Twin Metals' project, Leverette then used his Segregation Notice as justification to take two actions adverse to Twin Metals:

89.     *First*, the same day that Leverette published the Segregation Notice, he sent Twin Metals a letter "reject[ing]" its PRLAs.  Ex. J at 1 (PRLAs Decision Letter (Oct. 21, 2021)) ("PRLAs Rejection").  He concluded that in light of the Segregation Notice and 43 C.F.R. § 2310.2(d), he was required to "reject[]" the PRLAs because the "allowance" of them were "discretionary."  *Id*.  This decision contradicted the Government's actions in 2017 and 2018, when the PRLAs remained pending despite the temporary segregation following the 2017 withdrawal application.  Leverette's precipitous denial of the two PRLAs also followed years of egregious delay by the Government:  BLM had been considering the two PRLAs for eight and fifteen years, respectively, and had even issued Preliminary Valuable Deposit Determinations in

2018 and 2020, respectively.  Given the confirmed valuable deposits, which required BLM to grant Twin Metals a lease, Leverette lacked discretion to reject the PRLAs.

90.     *Second*, on December 8, 2021, Leverette invoked his own rejection of the PRLAs to also reject Twin Metals' MPO ("MPO Rejection").  *See* Ex. K (MPO Decision Letter (Dec. 8, 2021)).  He concluded Twin Metals' MPO was "incomplete" because it included land subject to one of the freshly rejected PRLAs.  *Id.* at 1.  Thus, Leverette thought the MPO "no longer accurately reflect[ed] the lands that could be included in a proposed mine plan of operations." *Id*.  Leverette then refused even to consider Twin Metals' amended MPO that had removed the PRLA from Twin Metals' plans.  Although the amendment made limited changes to the MPO, Leverette concluded that the amended MPO constituted an entirely new plan that must be separately reviewed.  *See id.* at 2.  These were the only reasons Leverette gave for the MPO Rejection.

91.     Leverette's refusal to consider Twin Metals' amendment as part of its original MPO completely ignored the dialogue that BLM had initiated with Twin Metals, as contemplated by Interior's own promulgated regulations.  *See* 43 C.F.R. § 3592.1(a) ("The authorized officer shall . . . promptly approve the plans or indicate what additional information is necessary to conform to the provisions of the established requirements.").  After Twin Metals submitted its MPO, in May 2021, BLM sent the company a letter requesting certain changes to the plans.  BLM and Twin Metals conferred and agreed that BLM's requested changes would be made in the form of an updated project description that would supersede one section of the MPO.  Twin Metals promptly submitted to BLM the agreed-upon updated project description.  Then, after Leverette rejected the PRLAs, Twin Metals promptly addressed the issue by filing an amended MPO that excluded the lands subject to the PRLAs.  On information and belief,

BLM did not even substantively review the amended MPO before rejecting it; it merely assumed there were significant changes without verifying as much.

92.     The MPO Rejection and refusal to consider the amended MPO as part of the existing MPO was motivated by Defendants' desire to run out the clock on the ten-year term for Twin Metals' Leases.  Prior to the MPO Rejection, pursuant to the Leases, the running of the ten-year period had been suspended so long as the MPO was under review.  *Supra* ¶ 64.  By rejecting the MPO, Defendants believed their actions would cause the ten-year term to begin running again.  BLM's Resp. to Stay Petition at 5–6, Twin Metals Minnesota LLC and Franconia Minerals (US) LLC, IBLA 2022-75.

93.     Twin Metals timely appealed BLM's rejections of the PRLAs and the MPO to IBLA.  It petitioned for stays of those rejections, pending the outcome of the IBLA appeals.  IBLA denied both stay requests on January 25, 2022.

94.     Having undermined Twin Metals' PRLAs and MPO, Defendants next attacked its Leases.  On January 25, 2022, Defendant Principal Deputy Solicitor of the Department of the Interior Ann Marie Bledsoe Downes set the course to cancel the Leases by issuing an opinion "rescind[ing] and replac[ing]" the 2017 Jorjani Opinion.  *See* Ex. L at 16 (Downes Opinion (Jan. 25, 2022)).  Downes concluded the Leases had been "improperly renewed" in May 2019, *id.*  In truth, Interior reconsidered the Jorjani Opinion because it desired to change the existing policy that Congress established in the statutes discussed above with regard to the appropriate balance between mining and conservation in the Superior National Forest.

95.     The Government revealed its impermissible policy-based motive in numerous public statements:  Interior's press release on the Lease Cancellation placed its actions in the context of "actions to protect the Boundary Waters and surrounding watershed."  Dep't of

Interior, *Interior Department Takes Action on Mineral Leases Improperly Renewed in the Watershed of the Boundary Waters Wilderness* (Jan. 26, 2022).[12]  It further indicated that the Lease Cancellation was coordinated with BLM's "two-year segregation," in a joint effort to protect the BWCA, even though the Downes Opinion does not purport to consider environmental policy objectives.  *Id.*  Interior Solicitor Robert Anderson separately stated that since the new administration came into office, Interior has "spent a significant amount of time reviewing [its] legal position in cases, *and in some instances ha[s] changed the position of the government*."  David Colburn, *Ely Native Takes the Legal Reins at U.S. Interior Department*, Timber Jay (Nov. 4, 2021) (emphasis added).[13]  And Secretary of Agriculture Tom Vilsack—whose Department submitted the 2021 Withdrawal Application to BLM—made his hostility toward the Twin Metals project explicit even before taking office, stating, "[a] project like the proposed Antofagasta Twin Metals mine . . . threatens the fundamental character and integrity of the Boundary Waters."  Tom Vilsack, *How to Both Protect the BWCA and Support a Sustainable Economy in Northern Minnesota*, Minn. Post (Dec. 6, 2018).[14]  None of these assertions concerning environmental priorities were supported by administrative findings—indeed, the Government's strategy has been to ensure that Twin Metals' MPO would never be assessed on its merits.

---

[12]  https://www.doi.gov/pressreleases/interior-department-takes-action-mineral-leases-improperly-renewed-watershed-boundary.

[13]  http://www.timberjay.com/stories/ely-native-takes-the-legal-reins-at-us-interior-department,18320.

[14]  https://www.minnpost.com/community-voices/2018/12/how-to-both-protect-the-bwca-and-support-a-sustainable-economy-in-northern-minnesota.

96.     To mask these policy-driven motives, Downes gave three wholly flawed reasons why the Leases had been "improperly renewed."  Ex. L at 16.  *First*, Downes determined that the Leases' "customized" terms requiring nondiscretionary renewal "depart[ed] from the standard lease form established in regulations" (form 3570-2) because those terms "ignor[ed] . . . the scheme of discretionary renewal provided for in the regulations."  *Id.* at 1–2, 8–12 (citing 43 C.F.R. §§ 3511.12, 3511.15, 3511.25, 3514.25).  But no law prohibited the "customized" terms, and the Leases had been issued based on the Jorjani Opinion's binding conclusions—conclusions this Court found to be reasonable in the *Voyageur* litigation.

97.     *Second*, Downes concluded that Interior should have obtained USFS's consent before executing the Leases, stating:  "[Interior] may not diminish or bypass the Forest Service's statutory consent authority over federal solid mineral leasing decisions in Minnesota." *Id.* at 2.  But the third renewal was not conditioned on USFS consent, and USFS had in any event already consented to the Leases.  *Supra* ¶ 65.

98.     This pretextual reliance on alleged lack of USFS consent again reflects the coordinated nature of the Government's attack on Twin Metals.  In the days leading up to the issuance of the Downes Opinion, BLM resuscitated the long-resolved issue of USFS's consent to the Lease renewal application.  On Friday, January 21, 2022, Defendant BLM Director Tracy Stone-Manning had asked USFS to clarify whether USFS had ever withdrawn a letter it sent *more than five years earlier*, on December 14, 2016, which purported to decline consent to the Leases.  *See* Letter from Randy Moore, Chief, USFS, to Tracy-Stone Manning, Dir., BLM (Jan. 24, 2022).  USFS Chief Randy Moore responded the next business day, Monday, January 24, 2022, stating that "[t]he 2016 consent denial was not withdrawn and continues to remain the

position of the Agency." *Id.* at 1.  Moore simply ignored the fact that USFS had actually consented to the Leases on their renewal terms in 2019 as part of the Lease renewal process.

99.    *Third*, Downes concluded that BLM's 2019 environmental assessment—which had not been legally required and which BLM performed voluntarily—should have included "a no-renewal, no-action alternative" or "properly describe[d] the environmental baseline."  Ex. L at 1, 16.  Again, Downes did not resolve why the consideration of such an option was mandatory, given that the then-binding Jorjani Opinion had concluded that Twin Metals had a right to renewal, eliminating the legal possibility of any no-renewal, no-action alternative.

100.    Because of these perceived errors, Downes concluded the Leases were "subject to cancelation" under 43 C.F.R. § 3514.30.  *Id.* at 16.

101.    But none of the reasons cited by Downes were based on facts unknown either at the time that the Government renewed the Leases or the *Voyageur* summary judgment decision. All of the purported errors identified by Downes were attributable to the Government, and the Government alone possessed the authority to remedy the purported errors before it signed the Leases.  None of the relevant law had changed either.  And even if the claimed errors were errors (which they were not), other remedies short of cancellation of the leases were available, such as re-issuance of corrected lease agreements.

102.    On January 26, 2022, just *one day* after the Downes Opinion was issued, Deputy Secretary of the Interior Tommy Beaudreau "cancel[led]" Twin Metals' Leases, citing the day-old Downes Opinion and the same three reasons indicated in that Opinion.  *See* Ex. M (Lease Cancellation Decision (Jan. 26, 2022)).

103.    Capping a string of five consecutive business days on which different Government officials and agencies took concerted action to frustrate development of the Twin

Metals mine, on January 27, 2022, the Government moved to dismiss the *Voyageur* appeal in

the D.C. Circuit, arguing that its cancellation of the Leases the day before had rendered the case

moot.  Gov't Mot. to Dismiss, *Voyageur Outward Bound Sch. v. United States*, No. 20-5097

(D.C. Cir. Jan. 27, 2022).  The *Voyageur* plaintiff-appellants supported the motion.  A motions

panel of the D.C. Circuit granted the motion, dismissed the appeal, vacated the district court's

decision, and ordered that the case be remanded to the district court and then dismissed.

*Voyageur Outward Bound Sch. v. United States*, No. 20-5097, 2022 WL 829754, at *1 (D.C.

Cir. Mar. 17, 2022).  Judge Karen L. Henderson voted with the panel to dismiss the appeal, but

against "the request for vacatur" of the district court's decision.  *Id.* at *1.  Upon receipt of the

D.C. Circuit's mandate, the district court dismissed *Voyageur* as "moot."  *Voyageur*, No. 1:18-

1463 (D.D.C. May 11, 2022).

104.    Then on April 20, 2022, IBLA cited the Lease Cancellation to dismiss Twin

Metals' administrative appeal of the MPO rejection as "moot."  Ex. N (Order, *Twin Metals*

*Minnesota*, No. 2022-75 (IBLA Apr. 20, 2022)).  IBLA's entire rationale was that Twin Metals'

MPO "depended on the canceled lease," which IBLA could not review.  *Id.* at 7.

105.    Thus, in just six months, the Government completely reversed course and

eliminated the federal rights on which Twin Metals and its predecessors had, for decades, based

detailed mining plans and substantial investments.  The Leases—renewed in 2019—were

retroactively cancelled based on the untimely and erroneous Downes Opinion, which relied on

incorrect assertions about the customized lease terms, the false report about USFS's lack of

consent to the lease renewal, and the claim that an illegal no-renewal, no-action request should

have been considered in BLM's voluntary environmental assessment.  All of this was in direct

contradiction to the positions the Government advocated and Court adopted in *Voyageur*.  For

the PRLAs, after having been left to languish inappropriately for a number of years, and despite BLM's acknowledgement that Twin Metals had made discoveries that created vested rights, requiring BLM to grant a lease, the PRLAs were suddenly rejected on the pretext of the interim land segregation. Twin Metals' MPO application and administrative appeal were rejected purportedly because they depended on the validity of the Leases and the PRLAs.

106. Through these acts, the Defendants have turned the statutory and regulatory scheme on its head. Instead of properly reviewing and regulating mining in the area where it is permitted in the Superior National Forest, the Defendants used arbitrary and capricious means to usurp congressional authority and *prevent* mining altogether. Instead of proceeding with the environmental impact statement that could have accurately and scientifically assessed environmental risks and identified attendant mitigation techniques, Government decisions have been based on speculation about "potential impacts"—plainly motivated by impermissible policy goals—that no one has sought to examine or measure with any rigor. Instead of honoring the Government's prior positions expressed to this Court and the Court's earlier decision, the Defendants have now asserted the exact opposite position and sought vacatur of the very decision they urged this Court to issue.

107. The Government's conduct in this case contravenes the law and perverts the proper function of regulatory agencies, entitling Twin Metals to redress under the APA.

## CLAIMS FOR RELIEF

108.   For each of the below-alleged claims, Twin Metals incorporates by reference the allegations in all preceding paragraphs.

## FIRST CLAIM FOR RELIEF
## DEFENDANTS' LEASE CANCELLATION VIOLATED THE APA BECAUSE THE RECONSIDERATION OF THE JORJANI OPINION WAS UNTIMELY AND BASED ON IMPROPER POLITICAL AND POLICY FACTORS, THE JORJANI OPINION WAS ITSELF REASONABLE, AND THE DOWNES OPINION AND LEASE CANCELLATION WERE OTHERWISE ERRONEOUS AND CONTRARY TO LAW.

109.   Defendants' Lease Cancellation—which was premised entirely on the Downes Opinion—was arbitrary, capricious, in excess of agency authority, or otherwise contrary to law, in violation of the APA for six reasons:

110.   *First*, the 2022 Downes Opinion exceeded Interior's inherent authority to reconsider the 2017 Jorjani Opinion because the reconsideration was untimely, as it revisited and changed the Government's position over four years after the Jorjani Opinion was issued, and more than two-and-a-half years after the Leases were renewed.  The Downes Opinion was based on neither new law nor new facts, and ignored Twin Metals' reasonable reliance on the 2017 Jorjani Opinion and the 2019 lease renewal.

111.   *Second*, Interior lacked inherent authority to reconsider the Jorjani Opinion because the Jorjani Opinion's conclusions were reasonable.

112.   *Third*, the Downes Opinion's stated reasoning was a guise for the Interior's shift in policy toward mining against Twin Metals.  The Downes Opinion's reasoning was purportedly grounded in adherence to regulations regarding agency forms, consent, and the failure to consider a certain alternative or include a certain description in the 2019 environmental assessment.  But all of those stated reasons were pretextual.

113.   *Fourth*, the Downes Opinion's legal conclusions were clearly erroneous.  The 2019 Leases' purported "customized lease terms" did not violate any law or regulation; in fact, federal law and the Leases expressly permit them.  The Downes Opinion also wrongly concluded BLM was required to obtain USFS's consent to the 2019 renewal, although, in any event, USFS in fact had already consented.  And the Downes Opinion was wrong in its assertion that BLM's environmental assessment needed to consider a "no-renewal, no-action alternative"; such an alternative was not an option under the 2004 Leases, which granted Twin Metals a right to renewal that was not conditioned on environmental review, according to the Jorjani Opinion's correct and reasonable interpretation, as this Court confirmed.

114.   *Fifth*, the Lease Cancellation and the Downes Opinion are each contrary to law because they deny Twin Metals the right to successive renewals of the Leases, to which Twin Metals continues to be entitled under federal law as it was interpreted at the time the United States executed the original Leases with Twin Metals' predecessors.  *See* 43 C.F.R. § 3221.4(f) (1966).

115.   *Sixth*, even if the "errors" that the Downes Opinion purported to identify had been based on a legitimate concern about violation of some law or regulation, 43 C.F.R. § 3514.30(b) would still not authorize lease cancellation because the alleged errors identified by the Downes Opinion did not predate the Leases, were entirely within the Government's control, were ministerial, and were not prejudicial to the Government.  Additionally, administrative cancellation was not available because Interior did not timely seek administrative cancellation, and Twin Metals substantially relied on the Leases as renewed.

116.   The Lease Cancellation is subject to judicial review under 5 U.S.C. § 702 and § 704 because it marks the consummation of Interior's decision-making process and purports to

finally determine Twin Metals' rights with respect to the Leases.  It describes itself as "Final Agency Action."  Ex. M at 3.

117.    The Downes Opinion is subject to judicial review under the same sections as an "intermediary" action on which the Lease Cancellation was based.

118.    Because the Lease Cancellation and the Downes Opinion are arbitrary, capricious, in excess of statutory authority, or otherwise contrary to law, they should be set aside under 5 U.S.C. § 706(2)(A) and (C).

**SECOND CLAIM FOR RELIEF**
**DEFENDANTS' PRLAS REJECTION VIOLATED THE APA BECAUSE TWIN METALS' RIGHTS HAD VESTED.**

119.    Defendants' rejection of the PRLAs was arbitrary, capricious, in excess of agency authority, or otherwise contrary to law, in violation of the APA, for three reasons.

120.    *First*, although BLM's PRLAs Rejection stated that BLM was acting pursuant to 43 C.F.R. § 2310.2(d), that regulatory section does not permit rejection of Twin Metals' PRLAs because the PRLAs are not discretionary, and Twin Metals' rights have vested.  Given that Twin Metals' rights have vested, USFS consent to the PRLAs is not required.  Regardless, USFS has already consented to the PRLAs.

121.    *Second*, BLM's 2021 Segregation Notice likewise did not permit rejection of the PRLAs because Twin Metals' rights in the minerals subject to the PRLAs had vested.  The notice expressly states that the segregation does not apply to "valid existing rights." 86 Fed. Reg. 58299.  Thus, the notice did not authorize the PRLAs Rejection.

122.    *Third*, 43 C.F.R. § 2310.2(d) directs only the denial of new applications that are submitted after lands have been temporarily segregated under 43 U.S.C. § 1714(a).  It does not permit the denial of pending applications submitted prior to the temporary segregation.  Indeed,

the purpose of temporary segregation is to maintain the status quo on the temporarily segregated portion of land while the withdrawal application is pending.  Temporary segregation is not meant to apply retroactively to exclude preexisting applications and rights.

123.  The PRLAs Rejection is subject to judicial review under 5 U.S.C. § 702 and § 704 because it marks the consummation of Interior's decision-making process and purports to finally determine Twin Metals' rights with respect to the PRLAs.  Twin Metals is pursuing an administrative appeal of the decision, but Interior denied Twin Metals' request to stay its enforcement during the pendency of the administrative appeal, rendering the PRLAs Rejection operative and subject to judicial review under the APA.

124.  Because the PRLAs Rejection was arbitrary, capricious, in excess of statutory authority, or otherwise not in accordance with law, it should be set aside under 5 U.S.C. § 706(2)(A) and (C).

### THIRD CLAIM FOR RELIEF
### DEFENDANTS' MPO REJECTION VIOLATED THE APA BECAUSE IT VIOLATED GOVERNING REGULATIONS AND WAS PREMISED ENTIRELY ON THE INVALID PRLAS REJECTION.

125.  Defendants' rejection of Twin Metals' MPO violates the APA for two reasons.

126.  *First*, BLM's rejection of the MPO reasoned that the version of Twin Metals' MPO that had been submitted in December 2019 could not be approved because it included land covered by the PRLAs, which had since been rejected.  In BLM's view, because the PRLAs could not be included in any future mining operations, the 2019 version of the MPO was neither accurate nor complete.  This conclusion was incorrect because the PRLAs Rejection was not legally valid.

127.  *Second*, BLM refused to consider Twin Metals' MPO as including its 2021 revision, which excised the PRLAs from the proposed project.  In doing so, BLM incorrectly

concluded that the revised plan constituted an entirely new MPO that must be reviewed as a new request for approval in its own process, rather than considering the amendment merely as an edit to the existing MPO that was already pending.  Its conclusion was contrary to the governing regulations, which require a dialogue between BLM and an applicant and for the government to provide feedback to allow the applicant to "conform" their applications.  43 C.F.R. § 3592.1(a).  It was also contrary to past practice, where Twin Metals had revised the MPO based on agency feedback.  The unsustainable implication of BLM's interpretation of those regulations is that every edit to a pending mine plan renders it entirely new, requiring the applicant to restart at square one.

128.   The MPO Rejection is subject to judicial review under 5 U.S.C. § 702 and § 704 because it marks the consummation of Interior's decision-making process and purports to finally determine Twin Metals' rights with respect to the MPO.  Twin Metals pursued an administrative appeal of the decision, but Interior denied Twin Metals' request to stay the decision's enforcement during the pendency of the administrative appeal, rendering the MPO Rejection operative and subject to judicial review under the APA.

129.   Because the MPO Rejection was arbitrary, capricious, in excess of statutory authority, or otherwise contrary to law, it should be set aside under 5 U.S.C. § 706(2)(A) and (C).

**FOURTH CLAIM FOR RELIEF**
**DEFENDANTS' DISMISSAL OF TWIN METALS' MPO IBLA APPEAL VIOLATED THE APA BECAUSE IT WAS BASED ENTIRELY ON THE INVALID LEASE CANCELLATION.**

130.   Interior's dismissal of Twin Metals' administrative appeal of the MPO Rejection was based entirely on the rationale that the appeal was moot in light of the Lease Cancellation.

Because the Lease Cancellation was not legally valid, neither was the dismissal of the MPO administrative appeal.

131.   The dismissal of the MPO administrative appeal is subject to judicial review under 5 U.S.C. § 702 and § 704 because it marks the consummation of Interior's decision-making process and purports to finally determine Twin Metals' rights with respect to its appeal of the MPO Rejection.

132.   Because the dismissal was entirely based on the invalid Lease Cancellation, it should also be set aside under 5 U.S.C. § 706(2)(A) and (C) as arbitrary, capricious, in excess of statutory authority, or otherwise contrary to law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

133.   Declare that Defendants' following actions were invalid because they were arbitrary, capricious, in excess of statutory authority, and otherwise contrary to law, and are therefore vacated and set aside:

     a.   BLM Eastern States Director's October 21, 2021 rejection of Twin Metals' PRLAs;

     b.   BLM Eastern States Director's December 8, 2021 rejection of Twin Metals' MPO;

     c.   the Principal Deputy Solicitor of the Interior's January 25, 2022 Downes Opinion;

     d.   the Deputy Secretary of the Interior's January 26, 2022 lease cancellation; and

     e.   Interior's April 20, 2022 dismissal of Twin Metals' IBLA appeal of the MPO rejection.

134.   Declare that Plaintiffs' Leases remain valid.

135.   Declare that Plaintiffs' PRLAs are still pending, Twin Metals' relevant mineral rights have vested, and Twin Metals is entitled to preference right leases as related to those minerals.

136.   Declare that Plaintiffs' MPO is still pending or, in the alternative, Interior's dismissal of Twin Metals' administrative appeal challenging the rejection of Twin Metals' MPO is vacated and the agency is instructed to consider the appeal in light of the Court's decision.

137.   Declare that Plaintiffs' obligation under the 2019 Leases to obtain, within ten years, necessary permits and meet project milestones, was suspended from June 2021, one year after BLM filed its notice of intent to prepare an environmental impact study to evaluate Twin Metals' MPO.

138.   Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and other authority.

139.   Grant such other and further relief to Plaintiffs as the Court may deem just and proper.

Dated:  New York, New York          Respectfully submitted,
        August 22, 2022

                                    /s/ Mark W. Friedman

                                    Mark W. Friedman (D.C. Bar No. NY0328)
                                    William W. Taft V*
                                    DEBEVOISE & PLIMPTON LLP
                                    New York, NY 10022
                                    (212) 909-6000
                                    mwfriedman@debevoise.com
                                    whtaft@debevoise.com

*Pro hac vice application forthcoming      Attorneys for Plaintiffs