**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TWIN METALS MINNESOTA LLC & FRANCONIA MINERALS (US) LLC, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) |
| Defendants, | ) ) ) |
| and | ) ) ) |
| PIRAGIS NORTHWOODS COMPANY 105 N Central Avenue Ely, MN 55731-1210 | ) ) ) ) ) |
| NORTHEASTERN MINNESOTANS FOR WILDERNESS 16 North First Avenue East Ely, MN 55731 | ) ) ) ) ) ) |
| FRIENDS OF THE BOUNDARY WATERS WILDERNESS 8 E. Sheridan St. Ely, MN 55731 | ) ) ) ) ) |
| CENTER FOR BIOLOGICAL DIVERSITY 378 N. Main Ave. Tucson, AZ 85701 | ) ) ) ) |
| THE WILDERNESS SOCIETY 1801 Pennsylvania Ave. NW #200 Washington, DC 20006 | ) ) ) ) ) |
| IZAAK WALTON LEAGUE OF AMERICA 707 Conservation Lane Gaithersburg, MD 20878 | ) ) ) ) ) ) ) ) |

Case No. 1:22-cv-2506-CRC

VOYAGEUR OUTWARD BOUND SCHOOL )
1007 Spruce Road )
Ely, MN 55731 )
 )
ELY OUTFITTING COMPANY & )
BOUNDARY WATERS GUIDE SERVICE )
529 East Sheridan Street )
Ely, MN 55731 )
 )
WENONAH CANOE, INC. )
1252 Bundy Blvd )
Winona, MN 55987-4872 )
 )
NORTHSTAR CANOE )
1506 14th Street S )
Princeton, MN 55371-2317 )
 )
SAWBILL CANOE OUTFITTERS, INC. )
4620 Sawbill Trail )
Tofte, MN 55615 )
 )
HUNGRY JACK OUTFITTERS )
318 S Hungry Jack Road )
Grand Marais, MN 55604 )
 )
WOMEN'S WILDERNESS DISCOVERY )
429 East Sheridan Street )
Ely, MN 55731 )
 )
RIVER POINT RESORT AND OUTFITTING )
COMPANY )
PO Box 397 )
Ely, MN 55731-0397 )
 )
FREEMANS EXPLORE, LLC )
PO Box 1454 )
Grand Marais, MN 55604 )
 )

Defendant-Intervenor Applicants.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICANTS'**

**MOTION TO INTERVENE AS DEFENDANTS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................... ii

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................3

    I.      Twin Metals' Destructive Mining Threatens the Boundary Waters...............................3

    II.     Twin Metals' Mineral Leases .....................................................................................4

    III.    Twin Metals' Leases Are Reinstated and its Lease Applications Are Renewed.............5

    IV.    Federal Agencies Correct Course .................................................................................7

    V.     Applicants and Their Interests in this Case ..................................................................8

    VI.    Applicants' Specific Interests.....................................................................................17

ARGUMENT.....................................................................................................................21

    I.      Applicants Are Entitled to Intervene as a Matter of Right............................................22

        A.     Applicants' Motion to Intervene Is Timely......................................................22

        B.     Applicants Have Substantial Legally Protected Interests at Stake .........................24

        C.     Applicants' Interests May be Impaired as a Result of this Litigation ....................26

        D.     The Existing Parties Do Not Adequately Represent Applicants' Interests..............28

    II.     In the Alternative, the Court Should Grant Applicants' Request for Permissive Intervention ................................................................................................................31

    III.    Applicants Have Standing to Intervene as Defendants.................................................32

CONCLUSION..................................................................................................................35

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Akiachak Native Cmty. v. U.S. Dep't of Interior,*
 584 F. Supp. 2d 1 (D.D.C. 2008) ...................................................................................22

*Cowtown Found., Inc. v. U.S. Dep't of Agric.,*
 No. CV 22-1258 (RC), 2022 WL 16571189 (D.D.C. Nov. 1, 2022)...................................33

*Crossroads Grassroots Policy Strategies v. FEC,*
 788 F.3d 312 (D.C. Cir. 2015) ......................................................................... 29, 30, 34

*Dimond v. District of Columbia,*
 792 F.2d 179 (D.C. Cir. 1986) ......................................................................................29

*Forest Conservation Council v. U.S. Forest Serv.,*
 66 F.3d 1489 (9th Cir 1995) .........................................................................................26

*Foster v. Gueory,*
 655 F.2d 1319 (D.C. Cir. 1981) .....................................................................................27

*Franconia Minerals (US) LLC and Twin Metals Minnesota LLC v. United States et al.,*
 Case No. 16-cv-03042-SRN-LIB (D. Minn. Sept. 12, 2016)..................................................5

*Friends of Animals v. Kempthorne,*
 452 F. Supp. 2d (D.D.C. 2006) ............................................................................... 24, 29

*Friends of Animals v. Salazar,*
 626 F. Supp. 2d 102 (D.D.C. 2009) ...............................................................................35

*Friends of the Boundary Waters Wilderness v. Bosworth,*
 437 F.3d 815 (8th Cir. 2006) ..........................................................................................3

*Friends of the Boundary Waters Wilderness v. Bureau of Land Management,*
 Case No. 20-cv-00438 (D. Minn. Feb. 4, 2020) ...............................................................31

*Friends of the Boundary Waters Wilderness v. Bureau of Land Management et al.,*
 No. 18-cv-01499 (D.D.C. June 25, 2018) ..........................................................................7

*Friends of Earth v. Haaland,*
 No. CV 21-2317 (RC), 2022 WL 136763 (D.D.C. Jan. 15, 2022) .......................................31

*Fund for Animals v. Norton,*
 322 F.3d 728 (D.C. Cir. 2003) ......................................................................... 27, 28, 29

*Jones v. Prince George's Cnty., Md.,*
348 F.3d 1014 (D.C. Cir. 2003) .................................................................... 21, 33

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ................................................................... 33, 34, 35

*Mausolf v. Babbitt,*
85 F.2d 1295 (8th Cir. 1996) ................................................................. 26, 29, 30

*Mil. Toxics Project v. EPA,*
146 F.3d 948 (D.C. Cir. 1998) ........................................................................ 33

*Nat'l Taxpayers Union, Inc. v. United States,*
68 F.3d 1428 (D.C. Cir. 1995) ........................................................................ 30

*Nat. Res. Def. Council v. EPA,*
489 F.3d 1364 (D.C. Cir. 2007) ...................................................................... 33

*Nat. Res. Def. Council v. EPA,*
99 F.R.D. 607 (D.D.C. 1983) ..................................................................... 26, 28

*Navistar, Inc. v. Jackson,*
840 F. Supp. 2d 357 (D.D.C. 2012) ............................................................... 23

*Nuesse v. Camp,*
385 F.2d 694 (D.C. Cir. 1967) .................................................................. 24, 32

*Roane v. Leonhart,*
741 F.3d 147 (D.C. Cir. 2014) .................................................................. 22, 23

*Roeder v. Islamic Republic of Iran,*
333 F.3d 228 (D.C. Cir. 2003) .................................................................. 21, 32

*Safari Club Int'l v. Salazar,*
281 F.R.D. 32 (D.D.C. 2012) ................................................................... 29, 31

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt,*
331 F.R.D. 5 (D.D.C. 2019) ................................................................ 21, 23, 32

*SEC v. Prudential Sec. Inc.,*
136 F.3d 153 (D.C. Cir. 1998) ........................................................................ 22

*Seminole Nation of Okla. v. Norton,*
206 F.R.D. 1 (D.D.C. 2001) ............................................................................ 23

*Sierra Club v. EPA,*
755 F.3d 968 (D.C. Cir. 2014) ....................................................................... 33

iii

*Sierra Club v. Van Antwerp*,
    523 F. Supp. 2d 5 (D.D.C. 2007) ....................................................................................32

*Smuck v. Hobson*,
    408 F.2d 175 (D.C. Cir. 1989) .......................................................................................29

*The Wilderness Society, et al. v. Bernhardt, et al.*,
    Case No. 20-cv-01176 (D.D.C. May 6, 2020) ............................................................ 7, 31

*The Wilderness Society et al. v. Zinke et al.*,
    No. 18-cv-01496 (D.D.C. June 25, 2018) ..................................................................6, 7

*Twin Metals Minnesota LLC and Franconia Minerals (US) LLC*,
    IBLA 2022-0075 ..............................................................................................................8

*Twin Metals Minnesota LLC and Franconia Minerals (US) LLC*,
    IBLA 2022-32 ..................................................................................................................8

*Voyageur Outward Bound School, et al. v. United States, et al.*,
    Case No. 20-5097 (D.C. Cir. April 20, 2020).................................................................31

*Voyageur Outward Bound v. United States*,
    No. 18-cv-1463 (D.D.C. June 21, 2018) ..........................................................................6

*WildEarth Guardians v. Jewell*,
    320 F.R.D. 1 (D.D.C. 2017)...........................................................................................22

**Statutes, Rules, And Regulations**

43 C.F.R. § 3511.25(b)......................................................................................................4

28 U.S.C. § 1331.............................................................................................................26

* Fed. R. Civ. P. 24 ...................................................................................................*passim*

**INTRODUCTION**

The Boundary Waters Canoe Area Wilderness ("Boundary Waters") is one of the country's most beautiful and remote wilderness regions. Located within Superior National Forest, the Boundary Waters is renowned for its healthy forests, extremely high water quality, and networks of pristine lakes, streams, wetlands, and canoe routes, attracting outdoor enthusiasts from across the country each year to explore and visit the local sites, scenery, and nearby small towns. With nearly 250,000 visitors annually, the Boundary Waters is the most visited Wilderness Area in the country. Downstream from the Boundary Waters, and in the path of pollution from any sulfide-ore copper mining in the watershed of the Boundary Waters, is Voyageurs National Park ("Voyageurs"), Minnesota's only national park.

In recognition of the ecological, recreational, and economic significance of the Boundary Waters, the Department of the Interior lawfully cancelled two mineral leases on federal land in the Superior National Forest. Plaintiffs in this matter, Twin Metals Minnesota LLC and Franconia Minerals (US) LLC (collectively, "Twin Metals"), filed this lawsuit to challenge the lease cancellation and other related actions in furtherance of their plan to develop a large copper and nickel mine within the watershed of the Superior National Forest and the Boundary Waters— America's only significant lakeland Wilderness area.[1] Industrial mineral exploration and mining on this land could devastate this pristine ecosystem and the livelihoods that depend upon it.

---

[1] "Federal Defendants" are collectively defined herein as the United States, Department of the Interior, Debra Anne Haaland in her official capacity as Secretary of the Interior, Ann Marie Bledsoe Downes in her official capacity as Principal Deputy Solicitor of the Interior, BLM, Tracy Stone-Manning in her official capacity as the Director of BLM, and Mitchell Leverette in his official capacity as BLM Eastern States Director.

Defendant-Intervenor Applicants ("Applicants")[2] respectfully move to intervene in this action to ensure a robust defense of their interests in the Boundary Waters and the Superior National Forest. If Twin Metals successfully overturns the Federal Defendants' cancellation of its invalid leases and the rejection of its Mine Plan of Operations ("MPO"), prospecting permits, and Preference Rights Lease Applications ("PRLAs"), the Superior National Forest and Boundary Waters will face environmental contamination and degradation due to industrial mining and mineral exploration activities. This mining activity is antithetical to the wilderness values that make the Superior National Forest and Boundary Waters a protected national treasure and threatens the economic livelihood of the outfitters and other business operators that rely on this pristine environment.

This Court should grant Applicants' motion to intervene as a matter of right pursuant to Federal Rule of Civil Procedure Rule 24(a)(2). The motion is timely, and Applicants have specific, demonstrable interests in the Superior National Forest and the Boundary Waters that may be impaired by this lawsuit. While Applicants' interests in this matter may be aligned with those of the Federal Defendants in some respects, their specific interests are not adequately represented by any current party to this litigation. Applicants' interests are rooted in each organization's long-standing, varied advocacy efforts to protect the Boundary Waters and Superior National Forest and their individual members' interests and investment in, and frequent usage of, this unique waterway environment. Applicants have also demonstrated Article III standing. Accordingly, and

---

[2] "Applicants" are collectively defined herein as Piragis Northwoods Company, Inc., Northeastern Minnesotans for Wilderness, Friends of the Boundary Waters Wilderness, Center for Biological Diversity, The Wilderness Society, Izaak Walton League of America, Voyageur Outward Bound School, Ely Outfitting Company & Boundary Waters Guide Service, Wenonah Canoe Inc., Northstar Canoe, Sawbill Canoe Outfitters, Inc., Hungry Jack Outfitters, Women's Wilderness Discovery, River Point Resort and Outfitting Company, and Freemans Explore, LLC.

2

due to their specific aesthetic, business, property, recreational, and environmental interests in the Boundary Waters and Superior National Forest, Applicants are entitled to intervention as of right. *See* Fed. R. Civ. P. 24(a).

Alternatively, the Court should permit the Applicants to intervene pursuant to Rule 24(b). As explained below, this motion is timely and Applicants' defenses against Twin Metals' erroneous claims share common questions of law and fact. *See* Fed. R. Civ. P. 24(b). Intervention is therefore appropriate, and Applicants' motion to intervene should be granted.

## BACKGROUND

**I.     Twin Metals' Destructive Mining Threatens the Boundary Waters**

At 1,086,953 acres, the Boundary Waters is "the largest Wilderness Area east of the Rocky Mountains and north of Everglades National Park." *Friends of the Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 818 (8th Cir. 2006) (citation omitted). According to the Forest Service,[3] the surface waters in the Superior National Forest, of which the Boundary Waters is a substantial part, contain twenty percent of all the fresh water in the entire National Forest System.

The Boundary Waters is a uniquely interconnected network of more than 1,000 lakes and 1,200 miles of rivers and streams in a mosaic of northern forest, lakes, and wetlands, rolling hills, and cliffs. On the very edge of the Boundary Waters is the South Kawishiwi River which flows out of the Boundary Waters, through Birch Lake, re-enters the Boundary Waters downstream, and then flows through the heart of the Boundary Waters into Voyageurs National Park and Ontario's Quetico Park ("South Kawishiwi River Area"). The non-Wilderness portions of the South Kawishiwi River Area provide exceptional and important recreational opportunities on public

---

[3] *See* U.S. Forest Service, *Water Resources of the Superior National Forest* (last visited Dec. 6, 2022), https://www.fs.usda.gov/detail/superior/about-forest/?cid=fsm91_049844.

lands, including popular Forest Service campgrounds. *See* Declaration of Collette Adkins ("Adkins Decl.") ¶¶ 5-6; Declaration of Alison C. Flint ("Flint Decl.") ¶¶ 10-11, 14; Declaration of John Ipsen ("Ipsen Decl.") ¶¶ 14, 17; Declaration of Deborah Huskins ("Huskins Decl.") ¶ 16. This area also provides critical, heavily used entry points to the Boundary Waters. Adkins Decl. ¶¶ 4-6; Flint Decl. ¶ 10; Ipsen Decl. ¶ 14; Declaration of Jon Nelson ("Nelson Decl.") ¶¶ 9, 11; Declaration of Betsy LePlatt ("LePlatt Decl.") ¶ 7. Crucially, this area of the Superior National Forest is adjacent to, and thus most affected by, Twin Metals' proposed mining activities.

The sulfide-ore copper mining that Twin Metals has proposed adjacent to the Boundary Waters and in the Boundary Waters and Voyageurs watershed threatens to pollute clean water and damage the important forest habitat used by many types of wildlife. Sulfide-ore copper mining has a consistent record of devastating environmental harm, including contaminating waters, degrading forests, and unpredictable, catastrophic spills of toxic materials.

## II.    Twin Metals' Mineral Leases

The now-cancelled leases at issue in Twin Metals' complaint were first issued to Twin Metals' predecessor in 1966. Between 1966 and 2012, Twin Metals sought renewal of its leases, negotiated the terms of each successive renewal as it occurred and, in 1989 and 2004, the Forest Service consented to renewal. Twin Metals submitted a third renewal application in 2012. Neither Twin Metals nor its predecessors had commenced mineral production at the time this third renewal application was submitted—and they have not done so to date. When Twin Metals sought a third renewal in 2012, it claimed that the renewal of its leases was mandatory. In truth, Twin Metals

and its predecessors forfeited any right to mandatory renewal by failing to begin production during the leases' initial term.

Solicitor of the Interior Hilary Tompkins rejected Twin Metals' argument, issuing a legal opinion (the "Tompkins Opinion") that concluded that renewal was discretionary under both the original 1966 leases and the 2004 renewal. The Tompkins Opinion reasoned that the 2004 lease terms governed and provided for a discretionary, not mandatory, right to renew. In accordance with federal law, the Bureau of Land Management ("BLM") then asked the Forest Service whether it consented to renewal, and the Forest Service declined to provide its consent on the basis that drainage from any mine on the leases could cause extreme and irreparable harm to the downstream Boundary Waters. The Forest Service concluded that failing to prevent such harm would be inconsistent with its statutory obligations. As a result, the BLM rejected Twin Metals' renewal application in December 2016, and the rejection of the renewal application terminated the leases. 43 C.F.R. § 3511.25(b).

Twin Metals filed suit in the U.S. District Court for the District of Minnesota to challenge BLM's refusal to renew the leases. *Franconia Minerals (US) LLC and Twin Metals Minnesota LLC v. United States et al.*, Case No. 16-cv-03042-SRN-LIB (D. Minn. Sept. 12, 2016). Over Twin Metals' opposition, the court granted Northeastern Minnesotans for Wilderness leave to intervene. *Id.* at Dkts. 25-28; Dkt. 71.

## III.    Twin Metals' Leases Are Reinstated and its Lease Applications Are Renewed

While Twin Metals' lawsuit was pending, and following a change in presidential administrations, a new Principal Deputy Solicitor of the Interior was appointed. After aggressive lobbying by Twin Metals and a political pressure campaign, Principal Deputy Solicitor Daniel Jorjani issued a new opinion in December 2017 (the "Jorjani Opinion"). The Jorjani Opinion

5

reversed the Tompkins Opinion and erroneously concluded that it was necessary to look outside the plain language of the 2004 Leases to determine whether the BLM had discretion to deny Twin Metals' 2012 renewal application. Looking only to evidence extrinsic to the 2004 Leases, the Jorjani Opinion concluded that the terms of the original 1966 leases controlled and that the 1966 lease terms granted Twin Metals an unlimited right to successive ten-year renewals. On the day the Jorjani Opinion was issued, Twin Metals voluntarily dismissed its suit. *Id. at* Dkt. 130. Due to the dismissal, the Court did not reach the jurisdictional question of whether Twin Metals' claims belonged in the Court of Federal Claims.

On May 2, 2018, more than eighteen months after the Leases expired, the BLM issued a decision that purported to rescind its December 15, 2016, decision denying Twin Metals' 2012 application to renew the Leases. At the same time, the BLM reinstated the Leases as written in 2004, as well as Twin Metals' 2012 application to renew the Leases. The BLM adopted the conclusions in the Jorjani Opinion as the basis for these actions. On May 15, 2019, the BLM renewed the Leases for an additional ten-year period and, in conjunction with its decision to renew the Leases, the BLM prepared a faulty Environmental Assessment.

Several third parties challenged BLM's actions. On June 21, 2018, Intervenor-Applicant Northeastern Minnesotans for Wilderness, and nine Boundary Waters-dependent businesses, filed a lawsuit in the United States District Court for the District of Columbia challenging the issuance of the Jorjani Opinion and reinstatement of the leases. *Voyageur Outward Bound v. United States*, No. 18-cv-1463 (D.D.C. June 21, 2018). On June 25, 2018, Intervenor-Applicants Izaak Walton League, The Wilderness Society and Center for Biological Diversity filed a separate lawsuit in the same court making similar claims. *The Wilderness Society et al. v. Zinke et al.*, No. 18-cv-01496 (D.D.C. June 25, 2018). Intervenor-Applicant Friends of the Boundary Waters Wilderness

likewise filed suit the same day. *Friends of the Boundary Waters Wilderness v. Bureau of Land Management et al.*, No. 18-cv-01499 (D.D.C. June 25, 2018). All lawsuits were subsequently consolidated. *The Wilderness Society et al. v. Zinke et al.*, No. 18-cv-01496 (D.D.C. June 25, 2018) (July 25, 2018 Minute Order granting the parties' Joint Motion to Consolidate). Twin Metals participated as a Defendant-Intervenor. *See id.* (June 28, 2018 Minute Order granting Motion to Intervene). Additionally, the Izaak Walton League, The Wilderness Society, Center for Biological Diversity, Friends of the Boundary Waters Wilderness, Northeastern Minnesotans for Wilderness, and other interested businesses, filed a lawsuit challenging the issuance of two hardrock mineral lease renewals to Twin Metals. *The Wilderness Society et al. v. Bernhardt et al.*, No. 20-cv-01176 (D.D.C. May 6, 2020). Twin Metals again sought and was granted intervention status. *Id.* at Dkt. 35 (June 15, 2020 Minute Order granting Motion to Intervene).

## IV.    Federal Agencies Correct Course

In October 2021, while the above-cited cases remained pending, Defendant BLM Eastern States Director Mitchell Leverette published a Notice of Application for Withdrawal and Segregation of Federal Lands ("Segregation Notice") announcing that the Forest Service's application to withdraw land within the Superior National Forest had triggered an immediate segregation of the land from operation of the United States mineral and geothermal leasing laws for up to two years, subject to valid existing rights. The Applicants submitted public comments in support of the Application for Withdrawal of Superior National Forest Land & Minerals in the Rainy River Watershed which detailed their interests, statutory basis, and scientific evidence that supported the withdrawal for the protection of the Boundary Waters.

Following issuance of the Segregation Notice, BLM correctly rejected Twin Metals' PRLAs and prospecting permit applications and Twin Metals' 2019 MPO. Twin Metals

7

challenged these decisions in separate appeals to the Interior Board of Land Appeals ("IBLA"). *Twin Metals Minnesota LLC and Franconia Minerals (US) LLC*, IBLA 2022-32; *Twin Metals Minnesota LLC and Franconia Minerals (US) LLC*, IBLA 2022-0075. Its appeal regarding the rejected MPO was unsuccessful. Dkt. 1-14. Meanwhile, the appeal regarding the rejection of its prospecting permits and PRLAs remains pending before the IBLA.

On January 25, 2022, Principal Deputy Solicitor of the Interior Ann Marie Bledsoe Downes issued legal opinion M-37072 ("Downes Opinion") which rescinded the Jorjani Opinion and concluded that the 2019 lease renewals violated BLM regulations, illegally bypassed the Forest Service's statutorily required consent authority, and relied on an insufficient environmental review process. Based on the Downes Opinion and applicable regulations, Deputy Secretary of the Interior Tommy Beaudreau cancelled Twin Metals' Leases. As a result, the lawsuits challenging the improper reinstatement and renewal of the leases were dismissed as moot.

Additionally, in April 2022, the IBLA dismissed as moot the administrative appeal that Twin Metals had filed to challenge the rejection of its MPO because the lease upon which the MPO depended had been cancelled and an MPO must be connected to an existing lease or other authorization in order for BLM to act upon it.

Twin Metals filed the current lawsuit to challenge: (1) the cancellation of the leases; (2) the rejection of the PRLAs; (3) the rejection of the MPO; and (4) the dismissal of Twin Metals' administrative appeal. Applicants now seek to intervene.

## V.    Applicants and Their Interests in this Case

Applicants' interests are tied to the wilderness values of the lands and waters at issue in this case. The Applicants have played an active role in advocating for the protection of the Boundary Waters and the Superior National Forest for decades, and each organization, and the

8

individuals that comprise the environmental organizations, have a strong interest in the outcome of this litigation. Some Applicants and their members have been significantly involved in the protection and preservation of the Boundary Waters since its original designation as a Wilderness Area in 1964, *see* Flint Decl. ¶¶ 4-5; Declaration of Scott Kovarovics ("Kovarovics Decl.") ¶¶ 3-7, and all are deeply invested in its protection as set forth below.

### A.    Piragis Northwoods Company

Applicant Piragis Northwoods Company ("Piragis Northwoods") is a canoe-trip outfitting and guide business located in Ely, Minnesota. *See* Declaration of Steven Piragis ("Piragis Decl.") ¶ 4. Founded in 1979 to serve the needs of wilderness canoe paddlers visiting the Boundary Waters and the outdoor needs of the local population, Piragis Northwoods currently employs 20 full-time, year-round staff. *Id.* In the peak summer months, that number increases to 55 employees. *Id.* Piragis Northwoods' payroll exceeds $1.5 million and contributes to the local economy in Ely through employment and local spending. *Id.* Clients of Piragis Northwoods enjoy fishing in the lakes of the Boundary Waters and also enjoy the natural sights and sounds of the area. *Id.* ¶ 6.

### B.    Northeastern Minnesotans for Wilderness

Applicant Northeastern Minnesotans for Wilderness ("NMW"), based in Ely, Minnesota and founded in 1996, is a non-profit membership organization devoted to protecting and preserving wilderness and wild places in Minnesota's Arrowhead region. Declaration of Rebecca Rom ("Rom Decl.") ¶ 3. NMW advocates for the protection of the Boundary Waters and Voyageurs National Park and fosters education about the value of wilderness and wild places. *Id.* NMW has more than 400,00 supporters across all 50 states. *Id.* ¶ 20, 23. NMW's supporters rely on, appreciate, and benefit from the natural resources in the Superior National Forest, especially the waters, lands, plant communities and wildlife in the Boundary Waters and Voyageurs National

9

Park, and have a long-standing interest in lynx, moose, wolf, and forest conservation. *See* Rom Decl. ¶ 20; Declaration of Amy Freeman ("Amy Freeman Decl.") ¶¶ 4, 7, 9; Declaration of David Freeman ("David Freeman Decl.") ¶¶ 4, 7, 9.

NMW is the founder and lead organization of the Campaign to Save the Boundary Waters ("Campaign"). Rom Decl. ¶¶ 6, 19. The Campaign includes NMW and 35 partner organizations, including many state and national hunting and fishing, habitat conservation, wilderness protection and environmental organizations, with a combined membership of more than 18 million individuals across the United States. *Id.* ¶¶ 6, 19, 24.

### C.    Friends of the Boundary Waters Wilderness

Applicant Friends of the Boundary Waters Wilderness (the "Friends") is a Minnesota non-profit membership organization with offices in Saint Paul and Ely, Minnesota. The Friends was founded in 1976 to lead the effort in advocating for legislation protecting the Boundary Waters, the objective realized with the passage of the Boundary Waters Canoe Area Wilderness Act in 1978. Declaration of Christopher Knopf ("Knopf Decl.") ¶¶ 24-25. The Friends' mission is to permanently protect the Boundary Waters and to connect people of all backgrounds with this priceless wilderness, so that this and future generations benefit from this special place. *Id.* ¶¶ 2, 16. The Friends has pursued this mission for almost 50 years, advocating for the Boundary Waters in the legislative and executive branches as well as the court system. *Id.* ¶¶ 25-31. The Friends and its 4,500-plus members share a belief in maintaining the wilderness character of the Boundary Waters, and pursue a wide range of activities there, including wilderness travel, canoeing, birdwatching, wildlife viewing, photography, fishing, spiritual advancement, as well as ecological,

hydrological, geological, and historical study.  *Id.* ¶¶ 17-23; Declaration of Stephen J. Jay ("Jay Decl.") ¶ 7; Declaration of Pablo Toral ("Toral Decl.") at ¶¶ 4-9.

### D.   Center for Biological Diversity

Applicant Center for Biological Diversity ("the Center") is a non-profit organization with over 89,000 members, with offices in Duluth and Minneapolis, Minnesota, as well as Arizona, California, Oregon, Washington, and a number of other states.  Declaration of David Noah Greenwald ("Greenwald Decl.") ¶ 3.  The Center works to ensure the long-term health and viability of animal and plant species across the United States and elsewhere, and to protect the habitat these species need to survive.  *Id.* ¶ 4.  The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.  *Id.*  The Center works to defend its members' recreational, aesthetic, scientific, and educational interests in protecting and preserving imperiled species and biological diversity for future generations.  *Id.* ¶¶ 4, 6.  The Center has advocated for northeastern Minnesota's animal and plant species in administrative processes and in court, including by commenting on mining-related proposals, petitioning for Endangered Species Act protections for the Minnesota moose population, and joining litigation over proposed mining that would destroy habitat for Canada lynx and gray wolves in the Superior National Forest.  *Id.* ¶¶ 8–10; Declaration of Collette Adkins ("Adkins Decl.") ¶ 3.

### E.   The Wilderness Society

Applicant The Wilderness Society, founded in 1935, is a national non-profit membership organization devoted to uniting people to protect America's wild places.  Flint Decl. ¶ 4.  It has led the effort to permanently protect nearly 112 million acres of wilderness and ensure sound management of our shared national lands.  *Id.* ¶ 6.  The Wilderness Society has more than 1 million members and supporters, including close to 3,000 members and 2,800 additional supporters in

Minnesota. *Id.* Since its founding, The Wilderness Society has worked to protect the Superior National Forest and Boundary Waters, and the organization played an important role in securing the initial designation of the Boundary Waters Canoe Area Wilderness as a component of the National Wilderness Preservation System in the 1964 Wilderness Act. *Id.* ¶ 5. A member of the Campaign to Save the Boundary Waters, The Wilderness Society and its members have advocated for permanent protection of the Boundary Waters watershed from the threat of sulfide-ore copper mining and has worked to inform the public about threats to the Boundary Waters and the need to protect this pristine wilderness area. *Id.* ¶ 6-9; Nelson Decl. ¶ 3; Declaration of John Ipsen ("Ipsen Decl.") ¶ 12. Members and staff of The Wilderness Society regularly visit the Boundary Waters and surrounding Superior National Forest lands and waters to paddle, hunt, fish, harvest wild rice, and enjoy the splendor of the areas' pristine lakes, rivers, and forests. Flint Decl. ¶¶ 10-11, 18-20; Ipsen Decl. ¶¶ 13-15, 17; Nelson Decl. ¶¶ 5-7, 9, 11-12.

### F.    Izaak Walton League of America

Applicant Izaak Walton League of America ("the League") is a non-profit membership organization founded in 1922 with a mission to conserve, restore, and promote the sustainable use and enjoyment of natural resources including soil, air, woods, waters, and wildlife. Kovarovics Decl. ¶ 2. The League has more than 40,000 members, including 988 members and 16 local chapters located in Minnesota. *Id.* The League and its members in Minnesota and nationwide have been working to conserve and protect land, water, other natural resources, and wilderness values in and around the Superior National Forest, including what is now the Boundary Waters, since the 1920s. *Id.* ¶ 3-4. To achieve these goals, the League and its members have vigorously

12

engaged in legislative advocacy, litigation, administrative processes, and educational efforts, among other strategies. *Id.* ¶¶ 4-7, 10-18; Declaration of Jon Nelson ("Nelson Decl.") ¶ 3.

### G.     Voyageur Outward Bound School

Applicant Voyageur Outward Bound School ("VOBS") is a nonprofit organization that focuses on leadership and outdoor experiential education through multi-week outdoor and wilderness expeditions. Declaration of Jack Lee ("Lee Decl.") ¶¶ 2-3. Since 1964, VOBS' basecamp has been located in Ely, Minnesota, within the Superior National Forest and along the South Kawishiwi River adjacent to the Boundary Waters. *Id.* ¶ 4. VOBS expeditions bring more than 600 people a year into the Boundary Waters. *Id.* ¶ 8. VOBS employs approximately 25 people year-round, all of whom live in and around Ely, Minnesota, and it employs an additional 75 people in Ely during the summer months. *Id.* ¶ 6. VOBS expeditions cater to a wide range of people, including military veterans. *See id.* ¶ 10. The unique healing environment of the Boundary Waters is restorative to veterans and helps participants reflect on their experiences. *Id.* The pristine wilderness setting provided by the Boundary Waters is a critical aspect of the VOBS expeditions. *See id.* ¶ 11.

### H.     Ely Outfitting Company

Applicant Ely Outfitting Company & Boundary Waters Guide Service ("Ely Outfitting"), founded in 2008, is a professional guide and outfitting service based in Ely, Minnesota, that serves the needs of customers and clients around the nation who travel to and explore the Boundary Waters. Declaration of Jason Zabokrtsky ("Zabokrtsky Decl." ¶ 2). A significant percentage of Ely Outfitting's customers enter the Boundary Waters through the South Kawishiwi River, Little Gabbro Lake, Snake River, Little Isabella River, Farm Lake, Lake One, and Fall Lake entry points. *Id.* ¶ 5.

13

### I.    Wenoah Canoe, Inc.

Applicant Wenonah Canoe, Inc. is an independent, family-owned corporation that is one of the largest manufacturers of Kevlar canoes in the world.  *See* Declaration of Michael Cichanowski ("Cichanowski Decl.") ¶ 2.  Founded in the early 1970s in Winona, Minnesota, Wenonah Canoe employed nearly 100 people in 2022 and produced more than 4,000 canoes and kayaks per year.  *Id.* ¶¶ 5-8.  Wenonah Canoe has many customers who frequent the Boundary Waters area, and 25 percent of its canoes are sold in Minnesota.  *See id.* ¶ 10.

### J.    Northstar Canoes

Applicant Northstar Canoes is a canoe-manufacturing business located in Princeton, Minnesota.  Declaration of Ted Bell ("Bell Decl.") ¶ 1.  Founded in 2014, Northstar Canoes manufactures canoes and sells them directly to outfitters and retailers.  *Id.*  Northstar Canoes sells around 450 canoes each year to outfitters, most of which are located in or near the Boundary Waters and in the Midwest.  *Id.* ¶ 5.  The company employs, off and on, about 20 full-time and part-time individuals.  *Id.*  Northstar Canoes' business depends largely on the Boundary Waters— so much so that it focuses about 90 percent of its advertising on the Boundary Waters area.  *Id.* ¶ 6.

### K.    Sawbill Canoe Outfitters, Inc.

Applicant Sawbill Canoe Outfitters, Inc. ("Sawbill") is a family-owned canoe outfitting business located in a remote, off the grid location on the Sawbill Trail north of Tofte, Minnesota. Declaration of Clare Shirley ("Shirley Decl.") ¶¶ 1-2.  Sawbill provides outfitting services to clients entering the Boundary Waters.  *Id.* ¶ 4.  In addition to operating as an outfitting shop and store, Sawbill issues Boundary Waters entry permits and operates as the concessionaire for three Forest Service campgrounds, one of which is located onsite.  *Id.*  Sawbill's customers rely on its

outfitting services and campground both before and after their trips.  *Id.* ¶ 5.  Many customers also choose to stay onsite at the campground and complete day trips into the Boundary Waters.  On average, Sawbill employs 15 full-time employees from May to October.  *Id.* ¶ 4.  Sawbill customers come from all across the United States and from a number of foreign countries.  *Id.* ¶ 5.

### L.      Hungry Jack Outfitters

Hungry Jack Outfitters ("Hungry Jack") is a family-owned accommodation and camping-outfitting business located on the Gunflint Trail north of Grand Marais, Minnesota.  Declaration of David Seaton ("Seaton Decl.") ¶ 6.  Founded in 1983, Hungry Jack is primarily a rental operation that provides canoes, camping gear, and overnight accommodations for people who want to experience the Wilderness.  *Id.* ¶¶ 6-8.  The clients and customers of Hungry Jack come from all across the globe, and from a wide range of socio-economic backgrounds, to visit the Boundary Waters and surrounding areas.  *Id.* ¶ 7.

### M.      Women's Wilderness Discovery

Applicant Women's Wilderness Discovery, LLC ("Women's Wilderness Discovery") was founded in March 2014 as the only female-owned, female-packed, female-guided professional outfitting and guide business in Ely, Minnesota.  Declaration of Peta Barrett ("Barrett Decl.") ¶¶ 5-7.  Women's Wilderness Discovery provides year-round, fully outfitted and guided Boundary Waters canoe camping, winter camping, hiking, and snowshoe trips catered principally to women.  *Id.* ¶ 6.  Women's Wilderness Discovery seeks to provide a safe, positive model for women and girls to enrich their lives through the wilderness experience and outdoor adventure.  *See id.* ¶¶ 5-8.

**N.  River Point Resort and Outfitting Company**

Applicant River Point Resort and Outfitting Company ("River Point") is a tourism and hospitality business located in Ely, Minnesota that has been in operation since 1944. Declaration of Steve Koschak ("Koschak Decl.") ¶¶ 4-5. Owned and operated continually by the Koschak family since its founding, River Point offers lodging in the form of sixteen housekeeping cabins, villas, and chalets, along with auxiliary recreational opportunities such as swimming, boating, kayaking and canoeing, guided fishing, hiking and other family activities. *Id.* ¶ 5. River Point accommodates approximately 2,000 housekeeping guests per season, which runs from mid-May through mid-October. *Id.* As a complement to its lodging and accommodations, River Point also outfits trips in the Boundary Waters. River Point's outfitting business includes more than seventy-five canoes, and it outfits approximately 700 people traveling in the Boundary Waters in the course of a summer. *Id.* ¶ 6. River Point offers both partial and complete outfitting services, which can include meals, routing, maps and permits, and transportation to any of the approximately thirty entry points into the Boundary Waters in the Ely area. *Id.*

River Point's property consists of over thirty-two acres, with one mile of shoreline, in the heart of the Superior National Forest. Prior to construction of the resort, the land had been unoccupied and undeveloped since the time of the Laurel Indians, who lived there about 500 years before the Common Era. *Id.* ¶ 7. The land includes a significant archeological site that was discovered in 1982, the first discovery of a site occupied by the Laurel Indians in the United States. An archeological covenant with the Forest Service protects this site on the south shoreline. *Id.* The Boundary Waters lies five river miles to the northeast of the River Point resort property and is accessible from the River Point property by canoe through Entry Point 32 (South Kawishiwi River). *Id.* ¶ 11. Most River Point customers and clients are attracted to River Point's location on

16

the edge of the Boundary Waters, the area's natural beauty, the clean air, the quiet, and the wilderness setting. *See id.* ¶ 12.

### O.      Freemans Explore, LLC

Applicant Freemans Explore, LLC ("Freemans Explore") is a Minnesota-based wilderness guide company that leads canoe trips in the Boundary Waters Canoe Area Wilderness. *See* David Freeman Decl. ¶ 8. Freemans Explore supports numerous outfitters and local businesses by guiding canoe trips through Boundary Waters adjacent areas, such as the South Kawishiwi River and Gabbro Lake. *See id.* Freemans Explore relies on the pristine water and silence of the Boundary Waters to support its business. *See id.*

## VI.     Applicants' Specific Interests

Applicants have a long record of advocacy for the protection and preservation of the Boundary Waters and Superior National Forest and a history of opposing Twin Metals' mine development and mineral exploration activities. Flint Decl. ¶¶ 4-9; Greenwald Decl. ¶¶ 9-11; Kovarovics Decl. ¶¶ 3-8, 11-18; Knopf Decl. ¶ 29.

Applicants and their members have direct and specific interests in preventing mineral exploration and the development and operation of a mine adjacent to and upstream of the Boundary Waters and the interconnected watersheds of Superior National Forest and Voyageurs. Individual members are property owners and have invested in year-round homes, seasonal cabins, and hospitality businesses such as resorts. Ipsen Decl. ¶ 6, 10; Koschak Decl. ¶¶ 4-7; Declaration of Kimberly Blaeser ("Blaeser Decl.") ¶ 3; Declaration of Linda Tomsich ("Tomsich Decl.") ¶¶ 4, 7; Seaton Decl. ¶ 5; Knopf Decl. ¶¶ 18, 20; Jay Decl. ¶ 20; Declaration of Jonathan Engel ("Engel Decl.") ¶¶ 2-5; LePlatt Decl. ¶¶ 5-7; Huskins Decl. ¶ 4; Declaration of Carla Arneson ("Arneson Decl.") ¶ 5. Property owners spend significant time in areas adjacent to or near the Boundary

17

Waters and the specific sites implicated by Plaintiffs' proposed mining and mineral exploration activity, including Snowbank Lake, White Iron Lake, Burntside Lake, the South Kawishiwi River, and Birch Lake. Ipsen Decl. ¶¶ 6, 14-15; Seaton Decl. ¶¶ 2-3, 5-6; Jay Decl. ¶ 20; Engel Decl. ¶¶ 2-5; LePlatt Decl. ¶ 5-7; Arneson Decl. ¶ 5; Huskins Decl. ¶ 8; Declaration of Jack Leibo ¶ 5-8; Koschak Decl. ¶¶ 7, 9, 10-11; Blaeser Decl. ¶¶ 3-4; Tomsich Decl. ¶¶ 4-7; Seaton Decl. ¶¶ 2-3, 5-6.

In addition to owning property, many of the Applicants' members have staked their livelihoods to these areas and rely on pristine waters, a healthy ecosystem, an abundance of wildlife, and the quiet and serenity of the deep wilderness to effectively conduct their businesses. Amy Freeman Decl. ¶ 8; David Freeman Decl. ¶ 8; Shirley Decl. ¶ 2, 10, 13-19. These business owners engage in many vocations that would be devastated by sulfide-ore mining. They guide canoe trips through the Boundary Waters; operate retail and outfitting operations that provide wilderness paddlers with outfitting services, accommodations, Boundary Waters entry permits, canoes, camping gear, food, knowledge and information about the Boundary Waters, and recreational opportunities such as swimming, boating, kayaking, canoeing, guided fishing, and hiking; provide seasonal, lodge-based dogsled vacations along the edge of the Boundary Waters and dogsled camping trips in the Boundary Waters; and operate cafes and destination gift and souvenir stores, among other things. Amy Freeman Decl. ¶¶ 5, 8; David Freeman Decl. ¶¶ 5, 8; Seaton Decl. ¶¶ 6-10; Zabokrtsky Decl. ¶¶ 2-7; Shirley Decl. ¶¶ 2-4, 7, 13, 17; Koschak Decl. ¶ 4-6; Declaration of Gail Bollis ("Bollis Decl.") ¶ 17-18; Piragis Decl. ¶ 4; Bell Decl. ¶¶ 1-2, 5-6.

The Boundary Waters is the most visited Wilderness Area in the U.S. National Wilderness Preservation System with nearly 250,000 visitors annually. *See* Piragis Decl. ¶ 2. A reduction in visitors due to sulfide-ore copper mining would harm businesses and their owners. Clean water,

18

healthy forest regions, solitude, species diversity, and natural forest habitats—all of which these businesses depend on—would be harmfully impacted by sulfide-ore copper mining. *See* Zabokrtsky Decl. ¶ 11. In short, the Boundary Waters' public perception as a place of wilderness and clean water, which is the foundation of the local businesses, would be forever damaged.

Applicants' members enjoy waters that include: the Kawishiwi River, the Basswood River, Birch Lake, the White Iron chain of lakes, Fall Lake, Moose Lake, Newfound Lake, Basswood Lake, Slim Lake, Gabbro Lake, Bottle Lake, the Hegman Lakes, and the border lakes (Lac La Croix, Iron, and Crooked), among others. *See, e.g.*, Adkins Decl. ¶¶ 4-6; Flint Decl. ¶¶ 10-11, 15-19; Greenwald Decl. ¶ 13; Ipsen Decl. ¶¶ 14-15; Nelson Decl. ¶¶ 4-7, 9-12; LePlatt Decl. ¶ 7; Jay Decl. ¶¶ 7, 9-11; Engel Decl. ¶ 7; Arneson Decl. ¶ 4; Toral Decl. ¶ 6-7; Declaration of Kristan Wegerson ("Wegerson Decl.") ¶ 2; Declaration of Kemia Sarraf ("Sarraf Decl.") ¶ 4. Specifically, Applicants' members use the lands and waters of the Boundary Waters and Superior National Forest, including the South Kawishiwi River Area, to paddle, hunt, fish, harvest wild rice, view wildlife, and enjoy the splendor and solitude provided by the areas' pristine lakes, rivers, and forests. Adkins Decl. ¶¶ 4-6; Flint Decl. ¶¶ 10-11, 15-19; Greenwald Decl. ¶ 13; Ipsen Decl. ¶¶ 5-6, 14-15, 17; Nelson Decl. ¶¶ 4-10, 12; Engel Decl. ¶¶ 2, 7; Arneson Decl. ¶¶ 4-5; Huskins Decl ¶ 4; Toral Decl. ¶¶ 9-12. These lakes and rivers, among others, are in the direct path of pollution from Twin Metals' proposed mine.

The Boundary Waters has therapeutic and quantifiable positive impacts on Applicants' members' physical, emotional, and psychological health. Knopf Decl. ¶ 22; Toral Decl. ¶ 20; Declaration of Jeffrey Goldstein ("Jeffrey Goldstein Decl.") ¶¶ 7-8; Blaeser Decl. ¶ 5; Sarraf Decl. ¶ 5. Additionally, persons with disabilities and/or sensory impairments have utilized Wilderness Inquiry, a non-profit program, for therapeutic recreation, which Applicants' members support and

19

have participated in.  Nelson Decl. ¶ 8.  For example, veterans have participated in various programs, such as veterans' dogsled expeditions with Voyageurs Outward Bound School, which uses the wilderness and its soundscape to help veterans transition back to civilian life by offering a chance to heal from the effects of post-traumatic stress disorder, depression, and anxiety.  *See* Declaration of Erik Packard ("Packard Decl.") ¶ 5.  Others simply enjoy the solitude in a primitive setting, the quiet and natural soundscape of the Boundary Waters, and the memories forged with family and friends while in the Boundary Waters.  Adkins Decl. ¶¶ 4-6; Flint Decl. ¶¶ 15-19; Ipsen Decl. ¶¶ 5-6, 13-15; Nelson Decl. ¶¶ 4-9; Huskins Decl. ¶ 4; Jay Decl. ¶ 15; Engel Decl. ¶¶ 2-4; Declaration of Joseph Goldstein ¶¶ 6-7; Jeffrey Goldstein Decl. ¶¶ 5-6; Tomsich Decl. ¶¶ 3, 7, 10. The development of a sulfide-ore copper mining district in the Boundary Waters watershed would inevitably pollute surrounding lakes, groundwater and downstream waters in the Boundary Waters, and both the ecological health and public image of the Boundary Waters as an authentic, pure, natural outdoor recreational paradise would be harmed.  Tomsich Decl. ¶ 11; Jay Decl. ¶ 15.

Sulfide-ore mining would also have long-lasting negative effects on wildlife.  The impact on water quality in the Superior National Forest and Boundary Waters from sulfide-ore mining would have a corresponding impact on species habitat and food chains.  Mine construction would counter proper management of lynx critical habitat within the Superior National Forest, and that habitat would be difficult, if not impossible, to return to its original state if destroyed.  A mining complex would also cause habitat fragmentation and loss of important forest habitat on the edge of the Boundary Waters, harming moose and other species as a result.  Seaton Decl. ¶ 12; Shirley Decl. ¶ 15; Packard Decl. ¶ 7.

The development of a copper-sulfide mine would devastate the interconnected lands and waterways of the Superior National Forest and the Boundary Waters, where Applicants live, work,

20

and recreate. If Twin Metals' requested relief were to be granted, this area may be subject to mineral exploration and mine development. The resulting industrial activity, noise, habitat fragmentation, and pollution would be detrimental to Applicants and their members. Applicants seek to intervene to protect their stated interests.

## ARGUMENT

Federal Rule of Civil Procedure 24 provides for both intervention as a matter of right and permissive intervention. *See Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 9 (D.D.C. 2019). "A party has the right to intervene when it 'claims an interest relating to the property or transaction that is the subject of the action' and 'disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.'" *Id*. (citing Fed. R. Civ. P. 24(a)(2)). "Rule 24 also provides the Court discretion to permit a party to intervene if it "has a claim or defense that shares with the main action a common question of law or fact.'" *Id*. (citing Fed. R. Civ. P. 24(b)(1)(B)). Although a would-be plaintiff-intervenor needs to establish Article III standing by alleging "an injury in fact that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling,'" *id*. (citing *City of Cleveland v. Nuclear Regulatory Comm'n*, 17 F.3d 1515, 1517 (D.C. Cir. 1994)), there is no such requirement for defendant-intervenors. *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("Requiring standing of someone who seeks to intervene as a defendant runs into the doctrine that the standing inquiry is directed at those who invoke the court's jurisdiction."); *Jones v. Prince George's Cnty., Md*., 348 F.3d 1014, 1018 (D.C. Cir. 2003).

Through intervention, Applicants seek to ensure that the full range of their aesthetic, business, conservation, educational, environmental and property interests, which depend upon the

21

protection of the Boundary Waters and Superior National Forest, remain an integral part of the Court's decision-making process.  In light of the significant impact that this case could have on Applicants' unique and unrepresented interests, this Court should grant Applicants intervention in these proceedings for the reasons set forth below.

## I.   Applicants Are Entitled to Intervene as a Matter of Right.

This Court uses a four-part test to evaluate motions to intervene brought pursuant to Federal Rule 24(a)(2): "(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests."  *SEC v. Prudential Sec. Inc.,* 136 F.3d 153, 156 (D.C. Cir. 1998).  Where these factors are met, a district court "must grant" the motion to intervene as of right.  *Roane v. Leonhart,* 741 F.3d 147, 151 (D.C. Cir. 2014).  Applicants satisfy each of the four requirements for intervention as of right.  Applicants have also demonstrated Article III standing.  This Court should grant Applicants leave to intervene as of right.

### A. Applicants' Motion to Intervene Is Timely.

To determine if a motion to intervene is timely, "courts should take into account (a) the time elapsed since the inception of the action, (b) the probability of prejudice to those already party to the proceedings, (c) the purpose for which intervention is sought, and (d) the need for intervention as a means for preserving the putative intervenor's rights."  *WildEarth Guardians v. Jewell*, 320 F.R.D. 1, 3 (D.D.C. 2017) (citing *WildEarth Guardians v. Salazar*, 272 F.R.D. 4, 12 (D.D.C. 2010)).  "The critical factor is whether 'any delay in moving for intervention will prejudice the existing parties to the case.'"  *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 5 (D.D.C. 2008) (citing 7C Charles Alan Wright et al., Federal Practice and

Procedure § 1916 (3d ed. 2007)).  When considering timeliness, courts are instructed to "evaluat[e] all of the circumstances of the case." *Seminole Nation of Okla. v. Norton*, 206 F.R.D. 1, 8 (D.D.C. 2001).

Here, all factors support Applicants' motion.  First, Applicants filed their motion in the early stages of this case—soon after the Federal Defendants responded to Twin Metals' complaint.[4]  Courts routinely find that motions to intervene are timely when intervention is sought so soon after responsive pleadings.  *See*, *e.g.*, *Sault Ste. Marie Tribe of Chippewa Indians,* 331 F.R.D. 5, 12 (holding that intervention was timely when applicants filed "just 16 days after the Government filed its answer," with additional intervenors filing just days later, and noting that "neither the filings of these motions nor the Court's consideration of their merits have delayed the case."); *Navistar, Inc. v. Jackson,* 840 F. Supp. 2d 357, 361 (D.D.C. 2012) (finding intervention application timely when it was filed "less than two weeks after Defendants filed their responsive pleadings, and before any discovery or substantive progress had been made in the case").

Second, Applicants' intervention at this juncture of the proceeding will not prejudice any party.  Defendants have not yet filed a certified list of the contents of the agency administrative record, *see* Dkt. 13, and thus no party can claim prejudice based on the timing of Applicants' motion to intervene.  The only rulings in this matter have been procedural.  Without a reasonable claim of prejudice, the Applicants' motion is timely.  *See Roane v. Leohart*, 741 F.3d 147, 152

---

[4] The Federal Defendants filed a Motion to Dismiss on the basis, in part, that that this Court lacks jurisdiction to hear its contractual claims. *See* generally Dkt. 14-1. The Federal Defendants also filed for relief from the requirement under Local Civil Rule 7(n) to file a certified list of the contents of the agency administrative record until its Motion to Dismiss is ruled on. *See* Dkt. 13; See also Minute Order dated 12/16/2022 (granting Defendants' motion). The parties jointly filed a Joint Motion for an Extension of Time by which to complete briefing on the Federal Defendants' Motion to Dismiss, extending the briefing period to February 23, 2023. *See* Dkt. 16.

(D.C. Cir. 2014) (noting that in the absence of prejudice, an applicant's motion to intervene was timely).

Last, the purpose and need for Applicants' intervention supports intervening at this procedural junction. Intervention at this stage is practicable in that if the Federal Defendants' motion dismiss is denied the parties will be in a position to move forward in the litigation without delay.

**B.      Applicants Have Substantial Legally Protected Interests at Stake**

Applicants have substantial, legally protected interests at stake that will be harmed if Twin Metals prevails in this matter and mineral exploration and mine development moves forward. An applicant for intervention must possess an interest relating to the property or transaction that is the subject matter of the litigation. Fed. R. Civ. P. 24(a); *see also Friends of Animals v. Kempthorne*, 452 F. Supp. 2d 64, 69 (D.D.C. 2006) (quoting *Jones v. Prince George's Cnty.*, 348 F.3d 1014, 1018 (D.C. Cir. 2003) ("[P]roposed intervenors of right 'need only an 'interest' in the litigation— not a 'cause of action' or 'permission to sue.'")). This "interest test" is not a rigid standard; rather, it is "a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967); *see also Friends of Animals*, 452 F. Supp. 2d at 69.

Applicants have a substantial and legally protectable interest in defending the Federal Defendants' actions at issue in this case. Plaintiffs' proposed mining and mineral exploration activities are near businesses, property, and homes owned by Applicants' members. Ipsen Decl. ¶¶ 6, 10; LePlatt Decl. ¶¶ 5-7; Huskins Decl ¶ 4; Arneson Decl. ¶ 5; Seaton Decl. ¶¶ 2-3, 5-6; Tomsich Decl. ¶¶ 4, 7. Applicants' members regularly use the area to paddle, hunt, fish, harvest wild rice, and enjoy the splendor of the area's pristine lakes and rivers. Adkins Decl. ¶¶ 4-6; Flint

24

Decl. ¶¶ 10-11, 15-19; Greenwald Decl. ¶ 13; Ipsen Decl. ¶¶ 13-15, 17; Nelson Decl. ¶¶ 4-7, 9-12; Engel Decl. ¶¶ 2, 7; Arneson Decl. ¶¶ 4-5; Huskins Decl ¶ 4; Toral Decl. ¶¶ 9-12; Amy Freeman Decl. ¶¶ 4, 9; David Freeman Decl. ¶¶ 4, 9; Wegerson Decl. ¶¶ 2, 4; Declaration of Peta Barrett ("Barrett Decl.") ¶ 11; Shirley Decl. ¶ 16; Packard Decl. ¶¶ 4-5, 9, 12.   Certain members of Applicant groups also have a substantial business and economic interest in these areas as their businesses depend on visitors who seek out the area for recreation, solitude, clean air, and clean water.  *See, e.g.*, David Freeman Decl. ¶ 4 ("My wife and I own and operate Freemans Explore LLC, through which we guide canoe trips in the Boundary Waters Canoe Area Wilderness. Our business supports numerous outfitters and other local businesses which would also be hurt by the development of the Twin Metals Mine. . . .  Our business relies on the silence and pristine water that the Twin Metals Mine jeopardizes."); Koschak Decl. ¶¶ 5-6, 9, 12, 17-18; Seaton Decl. ¶¶ 5-10, 20; Amy Freeman Decl. ¶ 8; David Freeman ¶ 8; Shirley Decl. ¶¶ 2-10, 13-14, 16-17; Zabokrtsky Decl. ¶¶ 2-5, 11; Piragis Decl. ¶¶ 4, 6; Bell Decl. ¶¶ 2, 4-6; Barrett Decl. ¶¶ 7-11.

The organizational Applicants' missions are to protect and preserve natural resources, public lands, sensitive ecosystems, wilderness and wild places and to advocate especially for the protection of the Boundary Waters, including for the enhancement of their wilderness aspects and to foster education about the value of wilderness and wild places.  Flint Decl. ¶¶ 4-8; Greenwald Decl. ¶¶ 3-4; Kovarovics Decl. ¶¶ 2-7; Knopf Decl. at ¶ 16; Wegerson Decl. ¶ 19.  In addition, these Applicants have demonstrated their interest in preserving the Boundary Waters and South Kawishiwi River Area through their long record of advocacy, including previous participation in litigation regarding the validity of these leases at issue and the corresponding environmental review process.  They have won legal protections for the region's federal public lands and the people and wildlife that depend upon them and continue to protect their interests in the courtroom.

25

Flint Decl. ¶¶ 4-9; Greenwald Decl. ¶¶ 5, 8-10; Kovarovics Decl. ¶¶ 3-7; 11-18; Knopf Decl. ¶¶ 24-31; Rom Decl. ¶ 6. *See Mausolf v. Babbitt*, 85 F.2d 1295, 1296, 1302 (8th Cir. 1996) (agreeing that prospective intervenor conservation groups had "consistently demonstrated [their] interest in the Park's well-being . . . and ha[ve] worked hard over the years, in various proceedings, to protect that interest"). Applicants have also worked more broadly in support of protecting the surrounding area and nearby federal lands from the impacts of mining and other industrial uses for decades. Flint Decl. ¶¶ 4-9; Greenwald Decl. ¶¶ 8-10; Kovarovics Decl. ¶¶ 3-7; 11-18; Knopf Decl. ¶¶ 24-29; Wegerson Decl. ¶ 19.

This long-term advocacy work, in addition to Applicants' members' business, educational, environmental and property interests in the Boundary Waters and Superior National Forest, including the area adjacent to Twin Metals' proposed mine and prospecting activities, fulfills the interest requirement of Rule 24(a). *Nat. Res. Def. Council v. EPA*, 99 F.R.D. 607, 609 (D.D.C. 1983) (granting intervention as of right to industry groups where a ruling for Plaintiffs that could "nullify" the groups' efforts).

### C.      Applicants' Interests May be Impaired as a Result of this Litigation

Applicants' legally protected interests in the Boundary Waters and the Superior National Forest area face a threat of impairment if Twin Metals prevails in this litigation. An applicant for intervention as of right must be "so situated that the disposition of the action *may* as a practical matter impair or impede the applicant's ability to protect that interest." Fed. R. Civ. P. 24(a) (emphasis added). Such an inquiry "'is not limited to consequences of a strictly legal nature.'" *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1498 (9th Cir 1995) (quoting *Nat. Res. Def. Council v. Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1345 (10th Cir. 1978)). Rather, applying this impairment requirement, the Court should "'look[] to the 'practical consequences'

26

of denying intervention…." *Fund for Animals v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003).  If

an Applicant "would be substantially affected in a practical sense by the determination made in an

action, he should, as a general rule, be entitled to intervene."  Fed. R. Civ. P. 24, Notes of Advisory

Committee on Rules—1966 Amendment.  Even a "possibility" of impairing Applicants' interest

suffices.  *Foster v. Gueory*, 655 F.2d 1319, 1325 (D.C. Cir. 1981).

Twin Metals' complaint alleges that Federal Defendants erred in determining that its leases

were invalid and in rejecting its MPO, PRLAs, and prospecting permits.  *See* Compl. ¶¶ 109-132.

As a remedy, Twin Metals seeks an order from this Court that effectively allows it to proceed with

mine development and mineral exploration activities.  *Id.* ¶ 133.  Such mine development and

mineral exploration activities would irreparably harm Applicants' interests.  Applicants' members

depend on and regularly use these pristine areas of the Superior National Forest and the Boundary

Waters for a variety of aesthetic, business, environmental, recreational, and other purposes.  *See,*

*e.g.*, Adkins Decl. ¶ 5 ("I regularly camp at the Forest Service's South Kawishiwi campground . .

. and will continue to do so most summers going forward.");  *Id.* ¶¶ 4, 6, 12; Flint Decl. ¶¶ 10-12,

14-19; Ipsen Decl. ¶¶ 6, 10, 13-15; Nelson Decl. ¶¶ 3-9, 12; Engel Decl. ¶¶ 2, 7; Arneson Decl. ¶¶

4-5; Huskins Decl ¶ 4; Toral Decl. ¶¶ 9-12.  If Twin Metals' relief were granted, Applicants' and

their members' interests would be impaired due to Twin Metals' proposed activities and the loss

of protection for the Boundary Waters and the South Kawishiwi River Area—without any ability

to redress the harms before this Court.  Adkins Decl. ¶¶ 7, 9, 11-12; Flint Decl. ¶ 20 ("Industrial

exploration activity and an eventual mine on the Superior National Forest adjacent to the Boundary

Waters would tarnish my enjoyment of the area.");  Greenwald Decl. ¶ 13; Ipsen Decl. ¶¶ 10-11,

14-18; Nelson Decl. ¶¶ 9-18; Declaration of Robert Tammen ¶ 11-22; LePlatt Decl. ¶ 19; Liebo

Decl. ¶¶ 8-13; Jay Decl. ¶¶ 25-28; Engel Decl. ¶¶ 16-17; Arneson Decl. ¶¶ 6-8; Huskins Decl ¶¶

27

7-8; Toral Decl. ¶ 18; Piragis Decl. ¶¶ 7-10; Bell Decl. ¶¶ 8-9. Applicants aim to prevent such impairment through their participation in this case, where Applicants intend to explain the harm that Twin Metals' prayer for relief would cause to Applicants, their members, and the environment which could help prevent Twin Metals' requested relief from being granted.

In practical terms, denying intervention here would mean that no party with such a long-standing and unwavering interest in the Boundary Waters would be before the Court. Granting Twin Metals' requested relief would not only irreparably harm Applicants by damaging their members' aesthetic, recreational, business, and environmental interests that are tied to the Boundary Waters and the South Kawishiwi River area, but also would undermine the missions of Applicants' organizations that seek to protect the environmental and wilderness values of the area. *See, e.g.*, *Nat. Res. Def. Council v. EPA*, 99 F.R.D. at 609 (granting intervention as of right to industry groups that could "nullify" the group's efforts); Flint Decl. ¶¶ 4-9, 13-14; Greenwald Decl. ¶¶ 8, 14-15; Kovarovics Decl. ¶¶ 2-7, 11-20; Knopf Decl. ¶¶ 2, 16; Koschak Decl. ¶ 3; Packard ¶¶ 2-3.

For these reasons, Applicants have demonstrated that their interests will be impaired and intervention in this matter should be granted.

D.      **The Existing Parties Do Not Adequately Represent Applicants' Interests**

Finally, an applicant for intervention of right must show that its interests may be inadequately represented by the existing parties to the litigation. The adequate representation element is "not onerous" and is satisfied if the applicant shows that the representation of its interests "may be" inadequate. *Fund for Animals*, 322 F.3d at 735 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). Indeed, a petitioner "ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee[.]"

28

*Id.* (quoting *United States v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980)). Applicants meet this requirement because neither Twin Metals nor the Federal Defendants provide adequate representation of their interests.

Twin Metals' interests, of course, are directly adverse to those of Applicants. Twin Metals seeks to vacate the decisions that prevent it from developing a sulfide-ore copper mine, while Applicants have advocated against the Twin Metals mine and mineral exploration activities and aim to protect the area from the impacts of these actions. Twin Metals clearly does not represent Applicants' interests.

Nor do the Federal Defendants adequately represent Applicants' interests. The D.C. Circuit has "often concluded that governmental entities do not adequately represent the interest of aspiring intervenors." *Fund for Animals*, 322 F.3d at 736 (citing *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 912-13 (D.C. Cir. 1977)); *see also Smuck v. Hobson*, 408 F.2d 175, 181 (D.C. Cir. 1989); *Friends of Animals*, 452 F. Supp. 2d 64; *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 317-18 (D.C. Cir. 2015); *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986). For several reasons, the same conclusion should be reached here.

The federal government's representation is inadequate where proposed intervenors identify "local and individual interests not shared by the general citizenry." *Mausolf*, 85 F.3d at 1298 (quoting *Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 1001 (8th Cir. 1993)); *see also Safari Club Int'l v. Salazar,* 281 F.R.D. 32, 42 (D.D.C. 2012) ("[P]roposed intervenors' interests may be 'more narrow and parochial' than that of Federal Defendants, whose perspective is necessarily on the broader public interest.") (citation omitted). Here, Applicants identified specific environmental, business, and property interests of its individual members that are not shared by all Americans. *See*, *e.g.*, Lee Decl. ¶¶ 19-20 ("The potential pollution and destruction

29

to the Boundary Waters . . . by adjacent mining operations presents what VOBS has concluded is a potentially lethal and unacceptable risk to its business and to its mission of changing lives through challenge and discovery in a wilderness setting."). Federal Defendants have a duty to represent the broader public interest, and no duty extends to represent local economic and property interests. *Mausolf*, 85 F.2d at 1296, 1302 (unlike the conservation groups, "the Government is 'obliged to represent . . . all of its citizens.'") (quoting *Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir. 1992)).

Applicants have been involved in all prior litigation over the reinstatement and renewal of the leases at issue and, with that practical understanding are positioned to provide a defense of the government action at issue in this case that more fully explains the invalidity of the leases at issue. Thus, even though Applicants' and Federal Defendants' interests in upholding the decisions at issue in this matter "can be expected to coincide" to some extent, Applicants will provide a "vigorous and helpful supplement" to Federal Defendants' defense beyond that offered by Federal Defendants. *Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 321 ("[E]ven when the interest of a federal agency and potential intervenor can be expected to coincide, 'that does not necessarily mean adequacy of representation is ensured for purpose of Rule 24(a)(2).'" (quoting *Costle*, 561 F.2d at 912).

Indeed, the D.C. Circuit "look[s] skeptically on government entities serving as adequate advocates for private parties" because a party "should not need to rely on a doubtful friend to represent its interests, when it can represent itself." *Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 321. Here, Federal Defendants and Applicants have clashed in litigation over management and protection of the Boundary Waters and Superior National Forest before, including litigation related to this particular mine in *Voyageur Outward Bound School, et al. v. United States, et al.*,

30

Case No. 20-5097 (D.C. Cir. April 20, 2020) (consolidated cases), *The Wilderness Society, et al. v. Bernhardt, et al.*, Case No. 20-cv-01176 (D.D.C. May 6, 2020), and *Friends of the Boundary Waters Wilderness v. Bureau of Land Management*, Case No. 20-cv-00438 (D. Minn. Feb. 4, 2020). Based on this history, Applicants have a legitimate reason to be concerned over the Federal Defendants' representation of their interests in this round of litigation. *See Safari Club Int'l*, 281 F.R.D. at 42 ("[W]hile the interests of . . . defendant-intervenors are clearly aligned with the Federal Defendants in this action, they have a legitimate basis for concern over the adequacy of the representation of their interests, in view of the prior lengthy litigation by these proposed intervenors against the [Federal Defendants]. . . ."). Applicants should not have to rely on the Federal Defendants, who have changed positions in the past—and at one time were adverse parties—to represent their interests in this litigation.

Applicants satisfy all requirements for intervention as of right.

## II.      In the Alternative, the Court Should Grant Applicants' Request for Permissive Intervention

In the alternative, Applicants request that the Court grant permissive intervention under Federal Rule 24(b). The Court may grant permissive intervention under Rule 24(b) "[o]n timely motion" to anyone who "has a claim or defense that shares with the main action a common question of law or fact." *Friends of Earth v. Haaland*, No. CV 21-2317 (RC), 2022 WL 136763, at *6 (D.D.C. Jan. 15, 2022) (citing Fed. R. Civ. P. 24(b)(1)(B)). An Intervenor-Applicant must "ordinarily present (1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *Id.*.

Applicants merit permissive intervention. First, Applicants have established an independent ground for subject-matter jurisdiction. Applicants' defenses all raise questions of federal law that fall within this Court's well-established federal-question jurisdiction. *See* 28

31

U.S.C. § 1331 (setting forth federal question jurisdiction); *Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 10 (D.D.C. 2007). Second, this motion is timely. This case is at a preliminary stage and no significant milestones have occurred. *See* Section I.A., *supra*.

Last, Applicants' defenses necessarily share questions of law and fact in common with the central issues in this case. Like the Federal Defendants, Applicants seek to ensure that the leases at issue remain cancelled and Twin Metals' MPO, PRLAs, and prospecting permit applications all remain rejected. "That they share this defense in common with the Department is sufficient under Rule 24(b)(1)." *Sault Ste. Marie Tribe of Chippewa Indians*, 331 F.R.D. 5, 14; *Nuesse*, 385 F.2d 694, 704-05 (explaining that Rule 24(b)'s common claim or defense requirement "is not interpreted strictly so as to preclude permissive intervention"); *100Reporters LLC v. U.S. Dep't of Justice*, 307 F.R.D. 269, 286 (D.D.C. 2014) (finding that "similarities between the issues presented" by the intervenors and the Department of Justice showed a common question of law or fact)). Further, because Applicants will represent interests in this litigation that may not otherwise be advanced by the parties, *see* Section I.D., *supra*, Applicants' participation will facilitate this Court's equitable resolution of this dispute.

Accordingly, Applicants fulfill all criteria for intervention under Rule 24(b), and permissive intervention is appropriate.

## III.    Applicants Have Standing to Intervene as Defendants

Although the D.C. Circuit does not require defendant-intervenors to establish standing,[5] Applicants could readily establish standing. Article III standing requires: (1) injury in fact; (2) a

---

[5] The law in this circuit is that defendant-intervenors need not demonstrate standing. *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("Requiring standing of someone who seeks to intervene as a defendant runs into the doctrine that the standing inquiry is directed at those who invoke the court's jurisdiction."); *Jones v. Prince George's Cnty., Md*., 348 F.3d 1014, 1018 (D.C. Cir. 2003).

causal relationship between the injury and the challenged action, such that the injury can be fairly traced to the challenged action; and (3) the likelihood that a favorable decision will redress the injury. *Sierra Club v. EPA*, 755 F.3d 968, 975-76 (D.C. Cir. 2014); *Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Applicants can demonstrate standing in one of two ways: "on its own behalf, as an organization, or on behalf of its members, as associational standing." *Cowtown Found., Inc. v. U.S. Dep't of Agric.*, No. CV 22-1258 (RC), 2022 WL 16571189, at *6 (D.D.C. Nov. 1, 2022). Standing for at least one applicant supports a grant of intervention to all co-applicants filing together. *See, e.g.*, *Mil. Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998) (granting intervention to all co-applicants based on a finding for one named intervenor-applicant).

Applicants have associational standing.  Under this standard, an association "must demonstrate that at least one member would have standing under Article III to sue in his or her own right, that the interests it seeks to protect are germane to its purposes, and that neither the claim asserted, nor the relief requested requires that an individual member participate in the lawsuit." *Nat. Res. Def. Council v. EPA*, 489 F.3d at 1370 (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977)).

Applicants' members have concrete recreational, aesthetic, business, educational, and professional interests in the waters, forest, land, wildlife, and wilderness area that are protected by the Federal Defendants' actions at issue in this matter.  Adkins Decl. ¶¶ 4-9, 11-12; Flint Decl. ¶¶ 10-20; Greenwald Decl. ¶ 13; Ipsen Decl. ¶¶ 10-11, 14-18; Nelson Decl. ¶¶ 10-18 ("I fear the impact of mining on the quiet of the wilderness with the noise coming from a mine and further mineral exploration.  I worry about being able to swim and drink the water, or even eating the fish I catch, because of mining pollution . . . I know the noise, dust, and lights of a mining operation

33

will change animal behavior in a large area around a mining operation.  All of these things will change the wilderness and ruin the experience for me."); Cichanowski Decl. ¶¶ 13-14; Sarraf Decl. ¶¶ 7-8; Tomsich ¶¶ 8-11; Bollis ¶¶ 14-16, 18-19; Piragis Decl. ¶¶11-17.  ("If allowed, sulfide-ore copper mining development in the watershed of the Boundary Waters would inevitably pollute surrounding lakes' groundwater and downstream waters in the Boundary Waters.  The development of a mine would taint the quality and reputation of the Boundary Waters as a hunting and fishing paradise and harm my enjoyment of the Boundary Waters as a place to travel through, hunt and fish."); Zabokrtsky Decl. ¶¶ 11-17.

The threat of harm to these interests represents a concrete, imminent injury-in-fact, fairly traceable to this litigation and redressable by a favorable decision.  *See Lujan*, 504 U.S. at 560-61; *Friends of the Earth, Inc.*, 528 U.S. at 183; *Crossroads*, 788 F.3d at 317-18 (allowing intervention to prevent injury where "unfavorable decision would remove the party's benefit" and where "a plaintiff seeks relief, which, if granted, would injure the prospective intervenor").  If Twin Metals receives the relief requested, it will diminish the Applicants' members' ability to use and enjoy the Boundary Waters and South Kawishiwi Area.  Adkins Decl. ¶¶ 7, 9-12; Flint Decl. ¶¶ 13-15, 18, 20; Greenwald Decl. ¶¶ 13-14; Ipsen Decl. ¶ 16 (explaining that, if Twin Metals were to prevail, "I would no longer be able to experience the solitude that I have sought and enjoyed in the Boundary Waters.  It would make me leave the area to find another place free of the noise of industry."); *Id.* ¶¶ 6, 10-11, 14-15, 17-19; Nelson Decl. ¶¶ 11, 13-14, 16-18; Piragis Decl. ¶¶ 12-17; Barrett Decl. ¶¶ 11-15.  Protecting these interests is both germane and an important part of Applicants' organizational missions.  Flint Decl. ¶¶ 4-9; Greenwald Decl. ¶¶ 3-4, 8, 15; Kovarovics Decl. ¶¶ 2-10; Knopf Decl. ¶¶ 25-31; Koschak Decl. ¶ 3; Barrett Decl. ¶ 3.

In addition to and independent from associational standing, Applicants have organizational

standing in their own right due to their concrete institutional interests in the subject matter of this action, the harm Twin Metals' suit causes or is likely to cause to Applicants' interests, and this Court's authority to redress this harm by denying relief to Twin Metals. *See Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 113 (D.D.C. 2009) ("A plaintiff suffers an organizational injury if the alleged violation 'perceptibly impair[s]' its ability to carry out its activities."); *Nat'l Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1433 (D.C. Cir. 1995) (holding that organizational standing is proper where the challenged conduct has directly harmed an organization's ability to provide services)). In pursuance of their core missions, Applicants expend resources and engage in frequent activities to gather information on, to educate the public about, and to protect the interests of their members regarding conservation of federal lands and wilderness areas throughout the country and in the northeastern Minnesota region, including the Boundary Waters, Superior National Forest and South Kawishiwi River Area. If the focal point of this advocacy—the wilderness values and natural resources of the area—is significantly degraded by industrial mining operations, it would irreparably compromise Applicants' missions. Applicants seek to avoid the harm to their organizations' ability to fulfill their core missions that diminishment or significant degradation of the natural resources and wilderness values in this area would cause.

In sum, Applicants have demonstrated standing as they have identified a specific injury they and their members will suffer if Plaintiffs' suit is successful and the mining project is allowed to proceed. *See Lujan*, 504 U.S. at 560-61.

## CONCLUSION

For all the foregoing reasons, Applicants Piragis Northwoods Company, Inc., Northeastern Minnesotans for Wilderness, Friends of the Boundary Waters Wilderness, Center for Biological Diversity, The Wilderness Society, Izaak Walton League of America, Voyageur Outward Bound

School, Ely Outfitting Company & Boundary Waters Guide Service, Wenonah Canoe Inc., Northstar Canoe, Sawbill Canoe Outfitters, Inc., Hungry Jack Outfitters, Women's Wilderness Discovery, River Point Resort and Outfitting Company, and Freemans Explore, LLC respectfully request that this Court grant their motion for intervention as of right or, in the alternative, permissive intervention.

Date:  December 22, 2022

*s/ J. Alex Ward*

Ward, J. Alex (DC 463927)
Smith, Robin A. (DC 1685989)
Nunez, Krista A. (DC 888324984)
Forrest, Haydn (DC 1657388)
Iko, Roke (DC 1658876)
MORRISON & FOERSTER LLP
2100 L Street NW
Suite 900
Washington, DC 20037
Tel: 202-887-1574
Fax: (202) 791-8585
alexward@mofo.com
rsmith@mofo.com
knunez@mofo.com
hforrest@mofo.com
riko@mofo.com

Yang, Hannah (NY 5955240) (*pro hac vice* pending)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
Tel.: (212) 336-4196
Fax: (212) 468-7900
hyang@mofo.com

*Attorneys for Plaintiffs Northeastern Minnesotans for Wilderness, Voyageur Outward Bound School, Piragis Northwoods Company, Ely Outfitting Company & Boundary Waters Guide Service, Wenonah Canoe Inc., Northstar Canoe, Sawbill Canoe Outfitters, Inc., Hungry Jack Outfitters, Women's Wilderness Discovery, River Point Resort and Outfitting Company, and Freemans Explore, LLC*

36

s/ Adam J. Ratchenski

Adam J. Ratchenski (Dist. D.C. Bar No. IL0116)
Julie M. Goodwin (IL No. 6295501) (*pro hac vice* forthcoming)
EARTHJUSTICE
311 S. Wacker Drive
Suite 1400
Chicago, IL 60606
Tel.: (312) 500-2194
Fax: (312) 667-8961
aratchenski@earthjustice.org
jgoodwin@earthjustice.org

*Attorneys for Defendant-Intervenor Applicants Center for Biological Diversity, The Wilderness Society, Izaak Walton League of America*

s/ Stephen P. Safranski

Richard B. Allyn (MN #0001338) (*pro hac vice* forthcoming)
Stephen P. Safranski (MN #0331326) (*pro hac vice* forthcoming)
Bryan J. Mechell (MN #0389151) (*pro hac vice* forthcoming)
Eric P. Barstad (MN #0398979) (*pro hac vice* forthcoming)
ROBINS KAPLAN LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel.: (612) 349-8500
Fax: (612) 339-4181
RAllyn@robinskaplan.com
SSafranski@robinskaplan.com
BMechell@robinskaplan.com
EBarstad@robinskaplan.com

s/ Meegan F. Hollywood

Meegan F. Hollywood (Dist. D.C. Bar No. NY0206)
ROBINS KAPLAN LLP
399 Park Avenue
Suite 3600
New York, NY 10022
Tel.: (212) 980-7400
Fax: (212) 980-7499
MHollywood@robinskaplan.com

37

*Attorneys for Defendant-Intervenor Applicant Friends of the Boundary Waters Wilderness*