**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| TWIN METALS MINNESOTA LLC & | ) | |
| FRANCONIA MINERALS (US) LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | Case No. 1:22-cv-2506-CRC |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PIRAGIS NORTHWOODS COMPANY, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenor-Applicants. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT-INTERVENOR-APPLICANTS' MOTION TO DISMISS**

NY-2493345

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF CASES ................................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 3

    I.    The Boundary Waters Canoe Area Wilderness. ................................................................ 3

    II.    Federal Mining Leases In the Land Surrounding The Waters. ......................................... 4

    III.    The Government's Issuance of the Hardrock Mineral Leases and its Discretionary Right

    to Renew Those Leases. ................................................................................................... 5

    IV.    Cancellation of Twin Metals' Leases. .............................................................................. 6

    V.    Denial of the PRLAs and MPO. ....................................................................................... 8

STANDARD OF REVIEW ........................................................................................................ 9

ARGUMENT ............................................................................................................................ 11

    I.    This Court Lacks Jurisdiction over Claims I and IV. ...................................................... 11

    A.    The Court Lacks Jurisdiction over Plaintiffs' Claims I and IV Because Both Claims Are

    Founded in Contract. ....................................................................................................... 11

    B.    Plaintiffs' APA Claims Also Are Foreclosed Due to the Existence of Adequate

    Alternative Remedies. ..................................................................................................... 14

    C.    Even if They Provided the Basis of an APA Claim, the Leases Do Not Grant an Indefinite

    Right to Renew. ............................................................................................................... 15

        1.    The Applicable Renewal Clause Is in the 2004 Renewal Leases, Not the 1966 Leases. 15

        2.    Even Under the Renewal Clause of the 1966 Leases, There Is No Automatic and

    Indefinite Right to Renewal. ........................................................................................... 17

NY-2493345

II.    CLAIMS II and III Fail as a Matter of Law and Should Therefore Be Dismissed............ 17

CONCLUSION........................................................................................................................... 19

NY-2493345

# TABLE OF CASES

**Cases**                                                                                    **Page(s)**

*Albrecht v. Comm. on Employee Benefits of Fed. Reserve Employee Benefits Sys.*,
   357 F.3d 62 (D.C. Cir. 2004) ............................................................................12 n.3

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..........................................................................................10

*Barlow & Haun, Inc. v. United States*,
   118 Fed. Cl. 597 (2014) ...............................................................................13 n.4

*Brazos Elec. Power Co-op., Inc. v. United States*,
   144 F.3d 784 (Fed. Cir. 1998) ..........................................................................14

*Brookens v. United States*,
   981 F. Supp. 2d (D.D.C. 2013) ........................................................................10

*C. Sanchez and Son, Inc. v. United States*,
   6 F.3d 1539 (Fed. Cir. 1993) ............................................................................16

*City of Oakland v. Lynch*,
   798 F.3d 1159 (9th Cir. 2015) .........................................................................15

*Coast Fed. Bank, FSB v. United States*,
   323 F.3d 1035 (Fed. Cir. 2006) ........................................................................16

*Grand Lodge of the Fraternal Order of Police v. Ashcroft*,
   185 F. Supp. 2d 9 (D.D.C. 2001) .....................................................................10

*Griffin & Griffin Exploration, LLC v. United States*,
   116 Fed. Cl. 163 (2014) ...............................................................................13 n.4

*Hannifin v. Morton*,
   444 F.2d 200 (10th Cir. 1971) .........................................................................18

*Hettinga v. United States*,
   677 F.3d 471 (D.C. Cir. 2012) .........................................................................10

*Int'l Eng. Co. v. Richardson*,
   512 F.2d 573 (D.C. Cir. 1975) .........................................................................14

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..........................................................................................10

*Mann v. United States*,
   86 Fed. Cl. 649 (2009) .................................................................................13 n.4

NY-2493345

*Miller v. Dist. of Columbia*,
  319 F. Supp. 3d 308 (D.D.C. 2018) ............................................................................10

*Mirv Holdings, LLC v. U.S. Gen. Servs. Admin.*,
  454 F. Supp. 3d 33 (2020) .........................................................................................10

*Nat'l Ctr. for Mfg. Scis. v. United States*,
  114 F.3d 196 (Fed. Cir. 1997) ....................................................................................12

*\*Nat'l Motor Freight Traffic Ass'n v. GSA*,
  25 F. Supp. 3d 52 (D.D.C. 2014) ..........................................................11, 14, 15 n.5

*Oljato Chapter of Navajo Tribe v. Train*,
  515 F.2d 654 (D.C. Cir. 1975) ...................................................................................15

*Perry Capital LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ...................................................................................12

*Petro Mex, LLC v. United States*,
  122 Fed. Cl. 536 (2015) ........................................................................................13 n.4

*Prudential Ins. Co. v. United States*,
  801 F.2d 1295 (Fed. Cir. 1986) .............................................................................12 n.4

*Robbins v. U.S. Bureau of Land Mgmt.*,
  438 F.3d 1074 (10th Cir. 2006) .................................................................................14

*Sharp v. Weinberger*,
  798 F.2d 1521 (D.C. Cir. 1986) .............................................................................12 n.3

*Shell Oil Co. v. United States*,
  751 F.3d 1282 (Fed. Cir. 2014) ..................................................................................16

*Smith v. Orr*,
  855 F.2d 1544 (Fed. Cir. 1988) .............................................................................11 n.2

*\*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ........................................................................ 12, 13, 14

*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Housing & Urban Development*,
  480 F.3d 1116 (Fed. Cir. 2007) ..................................................................................15

*Transohio Savings Bank v. Director, Office of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992) ...................................................................................12

*United Int'l Investigative Serv. v. United States*,
  109 F.3d 734 (Fed. Cir. 1997) ....................................................................................16

NY-2493345

*Valambhia v. United Republic of Tanzania*,
    964 F.3d 1135 (D.C. Cir. 2020).........................................................................................10

*Woodies Holdings, LLC v. United States*,
    120 Fed. Cl. 113 (2015) ...............................................................................................13 n.4

*Yee v. Jewell*,
    228 F. Supp. 3d 48 (D.D.C. 2017) .....................................................................................12

**Statutes**

5 U.S.C. § 702............................................................................................................................11

5 U.S.C. § 704............................................................................................................................14

*16 U.S.C. § 508b.............................................................................................................5, 6, 18

16 U.S.C. § 520.....................................................................................................................5, 6, 19

28 U.S.C. § 1346...................................................................................................................15 n.5

*28 U.S.C. § 1491(a)(1)............................................................................................................2, 11

43 U.S.C. § 1732(a) ....................................................................................................................4

Boundary Waters Canoe Area Wilderness Act of 1978,
    Pub. L. No. 95-495, 92 Stat. 1649 (1978)...................................................................4

Federal Land Policy and Management Act Section 204....................................................8

The Wilderness Act of 1964 ....................................................................................................4

**Other Authorities**

*43 C.F.R. § 2310.2(a), (d)................................................................................................2, 9, 18

43 C.F.R. § 3221.4(f).............................................................................................................5, 17

43 C.F.R. § 3507.11(d) .............................................................................................................19

*43 C.F.R. § 3507.19, (b), (c)........................................................................................4, 5, 18, 19

43 C.F.R. § 3592.1(c)...............................................................................................................19

*Fed. R. Civ. P. 12(b)(1), (6)................................................................................... *passim*

Notice of Application for Withdrawal and Segregation of Federal Lands; Cook,
    Lake, and Saint Louis Counties, Minnesota, 86 Fed. Reg. 58,299
    (Oct. 21, 2021) ...................................................................................................................8

NY-2493345

Reorganization Plan No. 3 of 1946, section 402 .......................................................................4, 5

NY-2493345

**INTRODUCTION**

Twin Metals Minnesota LLC and Franconia Minerals (US) LLC (collectively, "Twin Metals")[1] invoke this Court's jurisdiction under the Administrative Procedure Act ("APA") to compel the federal government to permit Twin Metals to develop an ecologically disastrous mine in the watershed of the Boundary Waters Canoe Area Wilderness ("Boundary Waters").  But the APA provides no cause of action for Twin Metals' claims.  Twin Metals' Claims I and IV are, at bottom, breach of contract claims against the United States that fall exclusively within the purview of the U.S. Court of Federal Claims' Tucker Act jurisdiction. In addition, Claims II and III respectively challenge the Bureau of Land Management's ("BLM") rejection of Twin Metals' preference right lease applications ("PRLAs") and proposed mine plan of operations ("MPO"), but Twin Metals fails to allege facts sufficient to state a claim under the APA as to either agency action.  This Court should therefore dismiss Twin Metals' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Twin Metals alleges that the U.S. Department of the Interior ("Interior") and the BLM breached its contract rights under two hardrock mineral leases, and it demands as declaratory and injunctive relief that the leases "remain valid and in force."  Compl. ¶ 18, ECF No. 1.  In other words, Twin Metals claims the federal government is in breach of its contracts and wants this

---

[1] Defendant-Intervenor-Applicants include Piragis Northwoods Company, Northeastern Minnesotans for Wilderness, Friends of the Boundary Waters Wilderness, Center for Biological Diversity, The Wilderness Society, Izaak Walton League of America, Voyageur Outward Bound School, Ely Outfitting Company & Boundary Waters Guide Service, Wenonah Canoe, Inc., Northstar Canoe, Sawbill Canoe Outfitters, Inc., Hungry Jack Outfitters, Women's Wilderness Discovery, River Point Resort and Outfitting Company, and Freemans Explore, LLC (collectively, "Defendant-Intervenor-Applicants").

For the sake of judicial economy, Defendant-Intervenor-Applicants join the Federal Defendants' Motion to Dismiss, ECF No. 14-1, and incorporate herein by reference all arguments set forth in that Motion.

NY-2493345

Court to enforce them.  Twin Metals then builds on those claims to allege that Interior improperly dismissed Twin Metals' administrative appeal challenging Interior's rejection of the company's proposed MPO based on the agency's cancellation—or breach—of the leases.  *See* Compl. ¶ 130. Although Twin Metals purports to base these claims in the APA, the simple truth is that they are thinly disguised contract claims:  the alleged unlawful conduct involves the cancellation of a contract; the rights that Twin Metals seeks to vindicate are contract rights; and the remedy sought for such breach is the reinstatement and performance of the contracts.  As such, these claims can only be properly adjudicated in the Court of Federal Claims under the Tucker Act, not in a federal district court.  *See* 28 U.S.C. § 1491(a)(1) (The Tucker Act states that only the U.S. Court of Federal Claims may "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States.").  The Court should therefore dismiss Claims I and IV pursuant to Rule 12(b)(1).

Twin Metals fares no better with Claims II and III.  Although Twin Metals asserts that the BLM's rejections of Twin Metals' PRLAs and MPO were arbitrary and capricious under the APA, these actions were compelled by regulation, and the BLM had no discretion in its decision to reject Twin Metals' PRLAs and MPO.  The BLM strictly followed its regulations following segregation of the land, *see* 43 C.F.R. § 2310.2(d), and its actions in rejecting Twin Metals' PRLAs cannot be said to be arbitrary and capricious.  The BLM's decision to reject Twin Metals' MPO thus flowed from that decision and, as it was likewise rooted in agency action, cannot be said to be arbitrary and capricious.  Claims II and II of Twin Metals' Complaint should therefore be dismissed pursuant to Rule 12(b)(6).

NY-2493345

## BACKGROUND

### I.    THE BOUNDARY WATERS CANOE AREA WILDERNESS.

The Boundary Waters is a 1.1 million-acre, federally protected wilderness located in northern Minnesota, extending nearly 200 miles along the Canadian border. Constituting the northern third of the Superior National Forest, it is the most visited wilderness area in the United States, attracting over 165,000 visitors each year. In addition to serving as outfitters and guides, local businesses surrounding the Boundary Waters provide visitors a variety of services, collectively generating tens of millions of dollars in sustainable annual economic benefits to the region. For example, during the summer, visitors and residents alike hike, fish, camp, harvest wild rice and other edible plants, and traverse long distances through over 1,200 miles of unique lake and stream canoe routes. During the winter, visitors and locals can enjoy snowshoeing, skiing, dogsledding, camping, and ice fishing.

The Boundary Waters is distinct not only for the sheer volume of lakes—over 1,700 in total, ranging from 10 to 10,000 acres in size—but also the extremely high quality of the water. The three-million-acre Superior National Forest, of which the Boundary Waters is a substantial part, holds 20 percent of the fresh water in the entire 193 million-acre National Forest System. These water-rich forests purify water, sustain surface and ground water flow, control erosion, and stabilize streambanks. This water quality is critical to maintaining the habitat of the loons, pike, trout, walleye, grouse, eagles, great gray owls, moose, deer, beavers, bears, wolves, bobcats, lynx, bats, waterfowl, over a hundred species of migratory breeding birds, and many other kinds of wildlife that inhabit the Boundary Waters.

The Boundary Waters is also among the most expansive, wild, untrammeled places in the United States. As the largest wilderness area east of the Rocky Mountains and north of the Everglades, the Boundary Waters has been recognized by the National Geographic Society as one

3

NY-2493345

of "50 Places of a Lifetime" on the entire planet. *See National Geographic Traveler,* "50 Places of a Lifetime" (1999). Recognizing the Boundary Waters' distinct character, Congress and the Executive Branch have consistently taken steps to protect and preserve the unspoiled nature within the Boundary Waters for over a century.

In 1909, President Theodore Roosevelt created the Superior National Forest from previously withdrawn public domain lands, including parts of what was later designated the Boundary Waters. In 1926, the U.S. Department of Agriculture first set aside 640,000 acres in an area that now constitutes the Boundary Waters to be managed as a roadless wilderness area. And in 1938, the U.S. Forest Service established the Superior Roadless Primitive Area along boundaries similar to the modern Boundary Waters. The Wilderness Act of 1964 subsequently designated land in what is now the Boundary Waters as a wilderness. And finally, the Boundary Waters Canoe Area Wilderness Act of 1978 expanded the Wilderness to its current size, banned mining within the Boundary Waters, and established a 220,000-acre Mining Protection Area ("MPA") in the three entry corridors into the Boundary Waters and around the edges of the Trout Lake Unit. Pub. L. No. 95-495, 92 Stat. 1649 (1978). In doing so, Congress explicitly recognized "the special qualities of the area as a natural forest-lakeland wilderness ecosystem of major esthetic, cultural, scientific, recreational and educational value to the Nation." *Id*. § 1. Accordingly, Congress sought, among other measures, to "minimize to the maximum extent possible, the environmental impacts associated with mineral development affecting" the Boundary Waters and MPA. *Id*. § 2.

## II.    FEDERAL MINING LEASES IN THE LAND SURROUNDING THE WATERS.

In 1873, federal public lands in Minnesota were withdrawn from the General Mining Law of 1872. Today, mining in the relevant areas surrounding the Boundary Waters is now governed by a set of statutes enacted in 1946 and 1950 that consider wilderness and other non-mining

interests when determining whether to authorize leasing.  16 U.S.C. §§ 508b, 520; section 402 of Reorganization Plan No. 3 of 1946; 43 C.F.R. § 3507.19(b); 43 U.S.C. § 1732(a).

Most of the land covered by Twin Metals' expired leases is governed by 16 U.S.C. § 508b, which allows the Secretary of the Interior to permit mining activity on certain lands in the national forests in Minnesota that are otherwise withdrawn from the mining laws of the United States.  *Id.* However, the Secretary of the Interior "shall not" permit such activity without the consent of the Forest Service, acting on behalf of the Secretary of Agriculture.  *Id.*

The remaining land at issue is governed by the Weeks Act, 16 U.S.C. § 520.  Under Section 402 of the Reorganization Plan No. 3 of 1946, the Secretary of the Interior may authorize mineral activity on lands covered by the Weeks Act, but only if the Secretary of Agriculture first determines that such activity will not interfere with the primary purposes for which the land was acquired.  The BLM, acting for the Secretary of the Interior, must consider "environmental impacts" of any proposed activity before authorizing mining activity.  43 C.F.R. § 3507.19(b).

III.    **THE GOVERNMENT'S ISSUANCE OF THE HARDROCK MINERAL LEASES AND ITS DISCRETIONARY RIGHT TO RENEW THOSE LEASES.**

On June 1, 1966, the BLM issued two hardrock mineral leases, MNES-01352 and MNES-01353 (the "Leases"), to the International Nickel Company, Inc., for certain lands located in the Superior National Forest south of the Boundary Waters.  *See* Compl. Exs., ECF Nos. 1-1 to 1-25.  The Leases were valid for a "period of twenty (20) years with a right in the Lessee to renew the same for successive periods of ten (10) years each in accordance with regulation 43 C.F.R. § 3221.4(f) and the provisions of this lease."  Compl. Ex. A, ECF No. 1-1.

The Leases were renewed in 1989 and 2004.  BLM first renewed the Leases in 1989 utilizing BLM's standard lease form, Form 3520-7 (December 1984).  *See* Compl. Ex. B, ECF No. 1-2.  The 1989 renewal leases attached the original 1966 Leases and included two "special

5

NY-2493345

stipulations" incorporating specific terms of the original Leases.  *Id*.  The renewal terms of the original 1966 Leases were not among the two "special stipulations."  *Id*.

The 2004 renewal leases were also on the BLM's standard 1984 form.  Compl. Ex. C, ECF No. 1-3.  As with the 1989 renewal, the 2004 renewal leases were good for ten years and provided for a "preferential right . . . to renew for successive periods of 10 years under such terms and conditions as may be prescribed by the Secretary of the Interior, unless otherwise provided by law at the expiration of any period."  *Id*.  The 2004 renewal leases attached the original 1966 Leases and included the same two special stipulations included in the 1989 renewals.  *Id*.  Again, the renewal terms of the original 1966 Leases were not among the two "special stipulations."  *Id*.

## IV.    CANCELLATION OF TWIN METALS' LEASES.

Twin Metals filed an application for a third renewal of the Leases on October 21, 2012.  Compl. Ex. D, ECF No. 1-4.  On March 8, 2016, then-Solicitor of the Interior Hilary Tompkins issued an M-Opinion interpreting the leases, which concluded that the BLM retained the discretion whether to grant Twin Metals' application to renew the leases (the "Tompkins Opinion").  *Id.*

On June 3, 2016, in accordance with 16 U.S.C. § 508b and § 520, the BLM requested the Chief of the Forest Service, as the delegee of the Secretary of Agriculture, to provide a decision on whether he consented to the renewal of the MNES-01352 and MNES-01353.  J.A. at 34, *Voyageur Outward Bound Sch. v. United States*, No. 1:18-cv-01463 (D.D.C. 2020), ECF No. 73-2.  On December 14, 2016, the Chief of the Forest Service, Thomas Tidwell, informed BLM via letter that the Forest Service did not consent to renewal of the leases.  *Id.*  Chief Tidwell assiduously explained in that letter the factual and legal justifications behind the Forest Service's decision.  At bottom, the Forest Service found "unacceptable the inherent potential risk that development of a regionally-untested copper-nickel sulfide ore mine within the same watershed as the [Boundary Waters] might cause serious and irreplaceable harm to this unique, iconic, and irreplaceable

6

NY-2493345

wilderness area." *Id.*

After the Forest Service declined to consent to the renewal of the leases, on December 15, 2016, the BLM denied Twin Metals' lease renewal application. Compl. Ex. L, ECF No. 1-12. Both leases then expired.

On December 22, 2017, after a change in presidential administrations, Solicitor Tompkins' successor, then-acting Solicitor of the Interior Daniel Jorjani, issued a new M-Opinion withdrawing and replacing the Tompkins Opinion and concluding that the BLM did not have the discretion to deny Twin Metals' request to renew the expired 2004 leases ("Jorjani Opinion"). Compl. Ex. E, ECF No. 1-5. In May 2018, the BLM subsequently rescinded its earlier decision denying the lease renewals, reinstated the expired 2004 leases, and reinstated Twin Metals' application to renew the leases as pending. Shortly thereafter, a group of concerned citizens, environmental organizations, and local businesses—including many (but not all) of the Defendant-Intervenor-Applicants here—filed lawsuits, which were subsequently consolidated, challenging the reinstatement of the expired leases. *See Voyageur Outward Bound Sch. v. United States*, No. 1:18-cv-01463 (D.D.C. 2020).

In the interim, the BLM proceeded towards authorizing mining activity, including by preparing an environmental assessment of Twin Metals' lease renewal applications. And on May 15, 2019, the BLM unlawfully renewed Twin Metals' leases for a new ten-year period. Compl. Ex. G, ECF No. 1-7. These new leases included several customized terms, including the right to perpetual renewal of the Leases if Twin Metals complies with the Leases' terms and stipulations, and a stipulation allowing tolling of the termination of the leases. Compl. Ex. F, ECF No. 1-6. At no point did the Forest Service withdraw the Tidwell letter. Conscious of the potential environmental effects if mining were allowed to proceed, concerned local and national parties,

7

again including some of the Defendant-Intervenor-Applicants here, challenged the decision to renew the leases. *See Wilderness Society v. Bernhardt.*, No. 1:20-CV-01176 (D.D.C. 2020).

On January 25, 2022, Principal Deputy Solicitor of the Interior Ann Marie Bledsoe Downes issued an M-Opinion ("Downes Opinion") rescinding and replacing the Jorjani Opinion and advising that the leases were improperly renewed and subject to cancellation. The Department of the Interior subsequently cancelled the leases. Compl. Ex. M, ECF No. 1-13.

## V. DENIAL OF THE PRLAS AND MPO.

Alongside the Leases, Twin Metals had also obtained multiple prospecting permits concerning various areas surrounding the Leases. Compl., ECF No. 1.[2] Twin Metals submitted PRLAs based on three such permits in 2006 and 2013. And in December 2019, Twin Metals submitted a proposed mine plan of operations for those areas, or MPO.

On September 29, 2021, the Forest Service submitted an application to the Secretary of Interior, requesting the withdrawal of 225,378 acres of federal land from mining, per the authority under Section 204 of the Federal Land Policy and Management Act. Compl. Ex. H, ECF No. 1-8. On October 21, 2021, BLM Eastern States Director Mitchell Leverette published a Notice of Application for Withdrawal and Segregation of Federal Lands ("Segregation Notice") announcing that the Forest Service's application to withdraw land within the Superior National Forest had been accepted. Notice of Application for Withdrawal and Segregation of Federal Lands; Cook, Lake,

---

[2] In August 2020, a group of local and national environmental organizations – including some of the Defendant-Intervenor Applicants here – filed a lawsuit challenging the BLM's May 2020 decision to renew certain Twin Metals prospecting permits. *Center for Biological Diversity v. Leverette*, No. 1:20-cv-02132-DLF (D.D.C. 2020). In May 2021, BLM entered into a settlement agreement stating that it would reconsider its May 2020 decision to extend certain Twin Metals prospecting permits, which would include reviews under NEPA and the Endangered Species Act. *See* Stipulated Settlement Agreement and Order, *Center for Biological Diversity v. Leverette*, No. 1:20-cv-02132-DLF (D.D.C. 2020), ECF No. 23.

NY-2493345

and Saint Louis Counties, Minnesota, 86 Fed. Reg. 58,299 (Oct. 21, 2021).  Publication of the Segregation Notice triggered an immediate segregation of the land at issue from operation of the United States mineral and geothermal leasing laws for up to two years, subject to valid existing rights.  43 C.F.R. § 2310.2(a).

Following issuance of the Segregation Notice, the BLM correctly rejected Twin Metals' PRLAs, prospecting permit applications, and 2019 MPO.  Compl. Ex. J, ECF No. 1-10.  Twin Metals challenged these decisions in separate appeals to the Interior Board of Land Appeals ("IBLA").  *Twin Metals Minnesota LLC and Franconia Minerals (US) LLC*, IBLA 2022-32; *Twin Metals Minnesota LLC and Franconia Minerals (US) LLC*, IBLA 2022-0075.

On December 8, 2021, the BLM denied Twin Metals' MPO, which presumed the use of federal lands for mineral leasing activity that was expressly prohibited by the Segregation Notice.  Compl. Ex. I, ECF No. 1-11.  Because the MPO included lands where mining activity was expressly prohibited, the BLM was required to deny the MPO.  *Id*.  Twin Metals' appeal regarding the rejection of its MPO was unsuccessful.  Compl. Ex. N, ECF No.1-14.  Twin Metals' appeal regarding the rejection of its prospecting permits and PRLAs remains pending before the IBLA.

Twin Metals subsequently filed this lawsuit on August 22, 2022, seeking to resurrect its (properly denied) attempts to begin mining near the Boundary Waters.  On December 1, 2022, the Federal Defendants filed their Motion to Dismiss.  In connection with this Motion to Dismiss, Defendant-Intervenor-Applicants have timely moved to intervene.

## STANDARD OF REVIEW

Challenging both federal subject-matter jurisdiction and the facial validity of Plaintiffs' claims, Defendant-Intervenor-Applicants bring this Motion to Dismiss under both Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  To survive a motion to dismiss under Rule

9

12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although it must accept as true all factual allegations in the complaint, the Court does not give effect to statements of law.  *See Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).  If the facts fail "to establish that a plaintiff has stated a claim upon which relief can be granted, a court must grant the defendant's Rule 12(b)(6) motion." *Miller v. Dist. of Columbia*, 319 F. Supp. 3d 308, 312 (D.D.C. 2018) (citations omitted).

The Court is also obligated to dismiss a claim if the Court lacks subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1), and the plaintiff bears the burden of establishing that the Court has jurisdiction by a preponderance of the evidence.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  A motion to dismiss for lack of jurisdiction under Rule 12(b)(1) is subject to the same plausibility standards as a motion under Rule 12(b)(6), including the plaintiff's burden to establish the Court has subject-matter jurisdiction.  *See Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020); *Brookens v. United States*, 981 F. Supp. 2d, 55, 60 (D.D.C. 2013). The Court may also consider "materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Mirv Holdings, LLC v. U.S. Gen. Servs. Admin.*, 454 F. Supp. 3d 33, 40 (D.D.C. 2020) (quoting *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000)).  A plaintiff's "factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001).

NY-2493345

## ARGUMENT

### I.    THIS COURT LACKS JURISDICTION OVER CLAIMS I AND IV.

Twin Metals purports to bring Claims I and IV under the APA, but these claims are merely disguised breach of contract claims that cannot be adjudicated in this Court.  Under the Tucker Act, a plaintiff's contract-based claims against the United States must be brought in the U.S. Court of Federal Claims.  28 U.S.C. § 1491(a)(1).  The Tucker Act vests ***exclusive jurisdiction*** for contract-based claims against the federal government with the Court of Federal Claims, precluding federal district courts from entertaining such claims.  *See Nat'l Motor Freight Traffic Ass'n v. GSA*, 25 F. Supp. 3d 52, 63 (D.D.C. 2014) ("Although plaintiffs describe their claims in declaratory and injunctive terms, a plaintiff may not 'avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA.'" (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)).  Accordingly, this Court should dismiss Claims I and IV for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).

### A.    The Court Lacks Jurisdiction over Plaintiffs' Claims I and IV Because Both Claims Are Founded in Contract.

The APA's limited waiver of sovereign immunity does not extend to claims for relief where another statute "expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.  The Tucker Act is such a statute.  It states:

> The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, ***or upon any express or implied contract with the United States***, or for liquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (emphasis added).

NY-2493345

Because the Tucker Act grants the Court of Federal Claims exclusive jurisdiction over claims arising out of a contract with the United States, the statute forecloses litigants from bringing APA claims that challenge the breach of any such contracts.  It is also well-established that "under § 702 and the Tucker Act, litigants may bring common-law contract claims only as actions for money damages in the Claims Court."  *Transohio Savings Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992); *see also Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 199 (Fed. Cir. 1997) ("[I]f a Tucker Act suit in the Court of Federal Claims provides an adequate remedy, APA review in the district court is not available."); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 893 (D.C. Cir. 1985).[3]

Whether a claim is "founded upon" a contract for purposes of the Tucker Act "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)."  *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Yee v. Jewell*, 228 F. Supp. 3d 48, 56 (D.D.C. 2017).  Here, both the source of Twin Metals' alleged rights and the relief sought sound in contract and are compensable with money damages.  Therefore, these claims belong in the Court of Federal Claims.

First, Twin Metals' claims are founded upon alleged rights under contracts with the United States,[4] which the allegations in the Complaint make clear.  From the Complaint's opening

---

[3] *See also Albrecht v. Comm. on Employee Benefits of Fed. Reserve Employee Benefits Sys.*, 357 F.3d 62, 68–69 (D.C. Cir. 2004) ("[T]he Tucker Act 'impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not.'" (citation omitted)); *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (Scalia, J.) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or specific performance in contract cases.").

[4] "[T]hough a lease may concern and convey a property interest, it is also very much a contract." *Prudential Ins. Co. v. United States*, 801 F.2d 1295, 1298 (Fed. Cir. 1986) (holding that Claims

12

paragraph, Plaintiffs emphasize that the case seeks recourse from the alleged "evisceration of Twin Metals' mineral rights." Compl. ¶ 1. Indeed, Plaintiff Franconia Minerals (US) LLC is a party to this case because "[it] is the owner by assignment of any and all rights, titles, and interests in the two federal hardrock mineral leases at issue here, MNES-01352 and MNES-01353." *Id.* ¶ 20. Twin Metals attributes the original 1966 Leases as the source of its alleged right. *Id.* ¶¶ 41, 64. And as the Federal Defendants note, the Complaint's extensive discussion of the agencies' M-Opinions necessarily involves the interpretation and application of the leases' terms. Mot. to Dismiss at 15–16, ECF No. 14.

Second, the relief Twin Metals seeks is "the classic contractual remedy." *Spectrum Leasing Corp.*, 764 F.2d at 894–95 (concluding a claim was essentially contractual because the relief sought amounted to specific performance). Specifically, Twin Metals asks this Court to declare the government's cancellation of the leases unlawful, "[d]eclare that Plaintiffs' Leases remain valid," "[d]eclare that Plaintiffs' PRLAs are still pending, Twin Metals' relevant mineral rights have vested, and Twin Metals is entitled to preference right leases as related to those minerals." Compl. ¶¶ 134–35. In other words, Twin Metals seeks declaratory relief and an injunction requiring the government to comply with its alleged obligations under the leases—i.e.,

---

Court possessed Tucker Act jurisdiction to adjudicate alleged violations of terms of a lease with the United States). For that reason, numerous decisions of the Court of Federal Claims address disputes over the terms of leases for real property as breach of contract actions, including disputes over the terms of BLM leases of mineral rights. *See, e.g.*, *Petro Mex, LLC v. United States*, 122 Fed. Cl. 536 (2015) (adjudicating oil and gas leaseholder's claim that terms of lease did not allow BLM to terminate lease); *Woodies Holdings, LLC v. United States*, 120 Fed. Cl. 113 (2015) (adjudicating lessor's claim that terms of lease required Government to reimburse lessor for portions of local property tax paid for the property); *Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597 (2014) (adjudicating leaseholders' claims that BLM's suspension of their rights to explore for and produce oil and gas violated terms of leases); *Griffin & Griffin Exploration, LLC v. United States*, 116 Fed. Cl. 163 (2014) (adjudicating oil and gas leaseholders' claim that terms of leases prevented BLM from canceling the leases); *Mann v. United States*, 86 Fed. Cl. 649 (2009) (adjudicating leaseholder's claim that BLM breached terms of geothermal lease).

13

Twin Metals asserts the federal government is in breach of its contracts.  But the Tucker Act "impliedly forbid[s] federal courts from ordering declaratory or injunctive relief . . . for contract claims against the government," including this Court.  *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) (internal quotation omitted); *Nat'l Motor Freight Traffic Ass'n*, 25 F. Supp. at 61 ("Where 'an action against the United States . . . is at its essence a contract claim,' it 'lies within the Tucker Act and . . . a district court has no power to grant injunctive relief in such a case.'  The APA does not permit a plaintiff to circumvent the Tucker Act and the jurisdiction of the Court of Federal Claims." (cleaned up) (quoting *Megapulse*, 672 F.2d at 967)).

Because the Tucker Act provides the Court of Federal Claims with exclusive jurisdiction over claims founded upon a contract with the federal government, and because "the source of [Plaintiffs'] right to relief" is the terms of a contract, this Court lacks jurisdiction over Claims I and IV of Twin Metals' Complaint.  *See Spectrum Leasing Corp.*, 764 F.2d at 894–95; *Brazos Elec. Power Co-op., Inc. v. United States*, 144 F.3d 784, 788 (Fed. Cir. 1998) (holding that APA suit for equitable relief could not proceed where dispute sounded in contract and money damages under the Tucker Act would provide adequate relief).  Claims I and IV should therefore be dismissed pursuant to Rule 12(b)(1).

**B.      Plaintiffs' APA Claims Also Are Foreclosed Due to the Existence of Adequate Alternative Remedies.**

Twin Metals' purported APA claims fail for a second independent reason:  review under the APA is available only where "there is no other adequate remedy in a court."  5 U.S.C. § 704; *see Int'l Eng. Co. v. Richardson*, 512 F.2d 573, 580 (D.C. Cir. 1975) ("judicial review is inappropriate where there exists some 'other adequate remedy in a court'" (quoting 5 U.S.C. § 704)).  As explained above, an adequate remedy—indeed, the exclusive remedy—for the alleged breach of Twin Metals' leases is available in the Court of Federal Claims under the Tucker Act.

14

The availability of an action for money damages under the Tucker Act "is presumptively 'an adequate remedy' for § 704 purposes." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Housing & Urban Development*, 480 F.3d 1116, 1126 (Fed. Cir. 2007) (availability of money damages under Tucker Act precluded APA suit) (citation omitted).  Therefore, § 704 of the APA provides an additional basis for dismissal of Plaintiffs' APA claims.  *See id.*; *City of Oakland v. Lynch*, 798 F.3d 1159, 1167 (9th Cir. 2015) (affirming dismissal of APA claim where plaintiff's participation in pending forfeiture action provided an adequate remedy); *Oljato Chapter of Navajo Tribe v. Train*, 515 F.2d 654, 664 (D.C. Cir. 1975) (affirming dismissal of APA claim where adequate remedy existed under Clean Air Act).

### C. Even if They Provided the Basis of an APA Claim, the Leases Do Not Grant an Indefinite Right to Renew.

Even if disputes over the proper interpretation and breach of a lease with the federal government were reviewable under § 702 of the APA, which they are not,[5] Claims I and IV still would fail.  None of the leases provide for indefinite renewal, and therefore Twin Metals is not entitled to the relief it seeks.

#### 1. The Applicable Renewal Clause Is in the 2004 Renewal Leases, Not the 1966 Leases.

The leases Twin Metals claim the Secretary was required to renew are the 2004 renewal leases, not the long-expired 1966 Leases, and the plain terms of the renewal leases provide for only a preferential right to renew.

---

[5] Although the Little Tucker Act provides federal district courts with limited jurisdiction over breach of contract claims against the federal government for less than $10,000, *see* 28 U.S.C. § 1346, Twin Metals' Complaint proclaims it "has spent approximately $550 million in developing the project," well exceeding the $10,000 jurisdictional threshold.  Compl. ¶ 6; *see generally Nat'l Motor Freight Traffic Ass'n v. GSA*, 25 F. Supp. 3d at 64–65 (discussing parameters of same).

15

A contract, including a lease, is read in accordance with its express terms and the plain meaning thereof. *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993). It must also be interpreted to give effect to all provisions and to avoid an interpretation that renders a clause meaningless. *United Int'l Investigative Serv. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997). Extrinsic evidence may be used to interpret a lease only when the lease is ambiguous. *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2006); *Shell Oil Co. v. United States*, 751 F.3d 1282, 1295 (Fed. Cir. 2014). Extrinsic evidence may not be used to create an ambiguity where the meaning is clear. *Coast Fed. Bank*, 323 F.3d at 1038.

The renewal provision of the 2004 leases is clear and unambiguous. It states there is only a "***preferential*** right in the lessee to renew for successive periods of 10 years." Compl. Ex. C, ECF No. 1-3 (emphasis added). The Department of Interior has long interpreted a preferential right to renew as one that "gives the renewal lease applicant the legal right to be preferred against other parties ***should the Secretary, in the proper exercise of his discretion, decide to continue leasing***." Compl. Ex. D, ECF No. 1-4 (emphasis added).

The renewal provision in the 2004 renewal leases—and not the renewal provision of the superseded 1996 Leases—governs. The 2004 renewal leases contain two special stipulations that incorporate by reference only two provisions from the 1966 Leases. Compl. Ex. C, ECF No. 1-3. Both of those provisions relate to production royalties, not renewal.[6] The plain terms of the governing leases, which provide only for a preferential right to renew, therefore defeat Twin Metals' claims.

---

[6] The 2004 renewal leases also contain a number of provisions that are inconsistent with those in the 1966 Leases. Compl. Ex. C, ECF No. 1-3. For instance, the 2004 renewal leases call for a $5,000 bond, while the 1966 Leases called for a $10,000 bond. Compl. Exs. A, C, ECF Nos. 1-1, 1-3. The 1966 and 2004 leases also have materially different assignment/transfer provisions. *Id.*

16

NY-2493345

### 2. Even Under the Renewal Clause of the 1966 Leases, There Is No Automatic and Indefinite Right to Renewal.

Even if the renewal term of the 1966 Leases applied, Twin Metals still would not be entitled to the perpetual right to renewal that it claims.

The 1966 Leases provided that renewal of the leases beyond the primary term is subject to 43 C.F.R. § 3221.4(f) (1966) and the provisions of the lease. Compl. Ex. A, ECF No. 1-1. Section 5 of the 1966 Leases specifically described the conditions with which the lessee had to comply to establish a right to renew. *Id.* The main condition for lease renewal was commencement of actual production. *Id*. Since 1986, the Solicitor's Office has interpreted this provision to mean that the Secretary has the discretion to renew the lease to extend the time to commence production, but there is no *right* to a further renewal when production has not begun by the end of the first renewal period. Compl. Ex. D, ECF No. 1-4. This conforms with 43 C.F.R. § 3221.4(f), which required the lessee to show diligence in performing the lease activities (rather than prospecting activities) in its lease renewal application.

In short, nothing in the 1966 Leases gave Plaintiffs a perpetual and unconditional, non-discretionary right to renewal. Instead, any non-discretionary right of renewal was conditioned on starting production. Because Plaintiffs do not allege that they had begun production by the end of the first twenty-year lease renewal, they failed to trigger the condition precedent to any renewal right under the 1966 Leases.

## II. CLAIMS II AND III FAIL AS A MATTER OF LAW AND SHOULD THEREFORE BE DISMISSED.

Twin Metals' Claims II and III must be dismissed pursuant to Rule 12(b)(6) because they fail to state a claim upon which this Court may grant relief.

In Claim II, Twin Metals asserts—without basis—that the BLM's rejection of its PRLAs was arbitrary and capricious under the APA, in violation of the BLM's permitting regulations. The

17

factual record is clear, however, that Twin Metals' PRLAs were *applications* for discretionary uses on lands. As a matter of law, these are not vested rights, and thus the BLM was compelled by its binding regulations to deny those applications following the segregation of those lands from the operation of mineral leasing laws. *See* 43 C.F.R. § 2310.2(d) ("[A]pplications for the use of lands involved in a withdrawal application or a withdrawal proposal, the allowance of which is discretionary, *shall* be denied." (Emphasis added)). Simply put, following segregation, the BLM lacked the discretion to do anything *but* reject the PRLAs. As a result, the rejection cannot be considered arbitrary and capricious, and Claim II fails to state a claim upon which relief can be granted, requiring its dismissal.

Twin Metals' faulty premise that the pending preference right leases or the prospecting permit applications constitute valid existing rights has no legal basis and does not provide support for Claim II and, as explained below, Claim III by extension. *See Hannifin v. Morton*, 444 F.2d 200, 203 (10th Cir. 1971) (finding that, while a prospecting permit application lends the applicant a hope or expectation, it is not a valid existing right). The BLM was legally required to deny Twin Metals' pending applications upon initiation of the segregation. *See* 43 C.F.R. § 2310.2(d).

Likewise, any additional prospecting permits, upon which Twin Metals based its PRLAs, cannot constitute valid existing rights because the issuance of any future preference right lease is a discretionary action that would be precluded by the segregation. *See* 43 C.F.R. § 3507.19 (providing that Forest Service consent is a condition precedent requirement for consideration of a preference right lease application); *see also* 16 U.S.C. § 508b ("[T]he Secretary of the Interior is authorized . . . to permit the prospecting for and the development and utilization of such mineral resources: *Provided*, That the development and utilization of such mineral deposits shall not be permitted by the Secretary of the Interior except with the consent of the Secretary of Agriculture.");

18

*id.* § 520 ("The Secretary of Agriculture is authorized . . . to ***permit*** the prospecting, development, and utilization of the mineral resources . . . upon such terms and for specified periods or otherwise, as he may deem to be for the best interests of the United States." (Emphasis added); 43 C.F.R. § 3507.11(d) ("Prospecting permits for minerals BLM administers under the authority of Reorganization Plan No. 3 of 1946 do not entitle you to a preference right lease."); 43 C.F.R. § 3507.19(c) ("We will also reject your [preference right lease] application if the surface managing agency does not consent to the lease.").

Twin Metals also fails to state a claim alleging the BLM's decision to reject its MPO was arbitrary and capricious under the APA in violation of the BLM's permitting regulation. Twin Metals' Claim III, which concerns the rejection of its MPO, is wholly dependent upon its flawed Claim II that asserts its PRLAs were rejected arbitrarily and capriciously. But as explained above, the BLM had no discretion to do anything other than reject the PRLAs. Once the BLM did so, the remaining MPO became invalid, as it depended on lands subject to the rejected PRLAs. Because the MPO assumed use of the lands that could not be included in a potential mine, the proposed MPO was invalid and incomplete under the BLM's regulations, which require a complete description of the proposed operations. *See* 43 C.F.R. § 3592.1(c). Claim III thus also fails to state a claim upon which relief can be granted and should be dismissed pursuant to Rule 12(b)(6).

## CONCLUSION

For the reasons set forth above, the Court should grant Defendant-Intervenor-Applicants' Motion to Dismiss and dismiss with prejudice Plaintiffs' Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Dated: December 22, 2022                Respectfully submitted,

                                                   *s/ J. Alex Ward*
                                                   Ward, Joseph Alexander (DC 463927)

19

NY-2493345

Smith, Robin A. (DC 1685989)
Nunez, Krista A. (DC 888324984)
Forrest, Haydn (DC 1657388)
Iko, Roke (DC 1658876)
MORRISON & FOERSTER LLP
2100 L Street NW
Suite 900
Washington, DC 20037
Tel: (202) 887-1574
Fax: (202) 791-8585
alexward@mofo.com
rsmith@mofo.com
knunez@mofo.com
hforrest@mofo.com
riko@mofo.com

*s/ Hannah Yang*

Yang, Hannah (NY 5955240) (*pro hac vice* pending)
Yang, Hannah ((NY 5955240) (*pro hac vice* pending)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019-9601
Tel.: (212) 336-4196
Fax: (212) 468-7900
hyang@mofo.com

*Attorneys for Defendant-Intervenor-Applicants Piragis Northwoods Company, Northeastern Minnesotans for Wilderness, Voyageur Outward Bound School, Ely Outfitting Company & Boundary Waters Guide Service, Wenonah Canoe, Inc., Northstar Canoe, Sawbill Canoe Outfitters, Inc., Hungry Jack Outfitters, Women's Wilderness Discovery, River Point Resort and Outfitting Company, and Freemans Explore, LLC*

*s/ Adam J. Ratchenski*

Adam J. Ratchenski (Dist. D.C. Bar No. IL0116)
Julie M. Goodwin (IL No. 6295501) (*pro hac vice* forthcoming)
EARTHJUSTICE
311 S. Wacker Drive
Suite 1400
Chicago, IL 60606
Tel.: (312) 500-2194
Fax: (312) 667-8961

20

NY-2493345

aratchenski@earthjustice.org
jgoodwin@earthjustice.org

*Attorneys for Defendant-Intervenor-Applicants Center for Biological Diversity, The Wilderness Society, and Izaak Walton League of America*


*s/ Stephen P. Safranski*

Stephen P. Safranski (MN #0331326) (*pro hac vice* forthcoming)
Richard B. Allyn (MN #0001338) (*pro hac vice* forthcoming)
Bryan J. Mechell (MN #0389151) (*pro hac vice* forthcoming)
Eric P. Barstad (MN #0398979) (*pro hac vice* forthcoming)
ROBINS KAPLAN LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel.: (612) 349-8500
Fax: (612) 339-4181
SSafranski@robinskaplan.com
RAllyn@robinskaplan.com
BMechell@robinskaplan.com
EBarstad@robinskaplan.com


*s/ Meegan F. Hollywood*

Meegan F. Hollywood (Dist. D.C. Bar No. NY0206)
ROBINS KAPLAN LLP
399 Park Avenue
Suite 3600
New York, NY 10022
Tel.: (212) 980-7400
Fax: (212) 980-7499
MHollywood@robinskaplan.com

*Attorneys for Defendant-Intervenor-Applicant Friends of the Boundary Waters Wilderness*

21