**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**TWIN METALS MINNESOTA LLC**, *et al.*,

        Plaintiffs,

        v.

**UNITED STATES OF AMERICA**, *et al.*,

        Defendants,

**PIRAGIS NORTHWOODS CO.**, *et al.*

        Defendant-Intervenors.

Case No. 22-cv-2506 (CRC)

<u>**MEMORANDUM OPINION**</u>

Plaintiffs, Twin Metals Minnesota LLC and Franconia Minerals LLC (collectively "Twin Metals"), challenge a series of Department of Interior ("Interior") decisions concerning Twin Metals' mining operations in the Superior National Forest in Minnesota. Interior cancelled Twin Metals' leases for an existing mine, rejected Twin Metals' lease applications for a new mine, and denied a proposed mining plan involving both mining sites. The United States, Interior, the Bureau of Land Management, and several Interior officials (collectively "Defendants"), as well as a group of environmental organizations and recreational businesses who joined as Defendant-Intervenors, moved to dismiss Twin Metals' claims for lack of subject matter jurisdiction and failure to state a claim. Finding that the Court lacks jurisdiction over two of Twin Metals' claims and that the remaining two fail to state a claim, the Court grants Defendants' and Defendant-Intervenors' motions in full.

I.    **Background**

A.  Factual Background[1]

1.   *Leases*

On June 14, 1966, International Nickel Company ("INCO"), a predecessor company to Twin Metals, entered into two mineral lease agreements with the United States concerning land in the Superior National Forest in Minnesota (the "1966 Leases").  Compl. ¶ 41.  The leases gave INCO the "exclusive right to mine, remove, and dispose" of copper, nickel, and associated minerals.  Compl., Ex. A, at MNES-01352 § 1(a), MNES-01353 § 1(a).  The two leases concerned different tracts of land but otherwise contained identical provisions.  See generally Compl., Ex. A.  Among those provisions, the leases gave INCO the right to mine for an initial twenty-year term and the right to renew for periods of ten years.  Id. at MNES-01352 § 1(a), MNES-01353 § 1(a).

The Bureau of Land Management ("BLM") renewed the leases in 1989 and 2004 (the "1989 Leases" and "2004 Leases," respectively).  See generally Compl., Exs. B–C.  The 1989 and 2004 Leases differed from the 1966 Leases in an important respect:  The former leases were executed on BLM's Standard Form 3520-7 (1984) and contained different renewal language.  Compl., Ex. B, at MNES-01352 § 1, MNES-01353 § 1.  The leases established a "preferential right in the lessee to renew for successive periods of ten years under such terms and conditions as may be prescribed by the Secretary of the Interior, unless otherwise provided by law at the expiration of any period."  Id.  BLM attached the 1966 Leases to the 1989 Leases.  Compl. ¶ 44.

---

[1]  The Court draws the following facts from the allegations in the complaint, which it must accept as true at the motion to dismiss stage. See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).

Twin Metals was created in 2010 and formally became involved in the Minnesota mining project in 2011 by acquiring Franconia, the company that then owned the leases.  Id. ¶ 50.  In 2012, Twin Metals sought to renew the 2004 Leases, which were set to expire in 2014.  Id.  BLM asked the Solicitor of Interior to provide an opinion on whether BLM had discretion to deny the renewal application.  Id. ¶ 52.

In 2016, Interior Solicitor Hilary Tompkins issued an opinion (the "Tompkins Opinion") concluding that BLM had discretion to grant or deny the lease renewals.  See generally Compl., Ex. D.  The Tompkins Opinion determined that the right to renewal was not controlled by the 1966 Leases, but instead by the language in Standard Form 3520-7 establishing only a "preferential right" to renew.  Id. at 5–8.  The Tompkins Opinion also found that even if the terms of the 1966 Leases governed, they gave Twin Metals a right to renew only if production (i.e., actual mining) had commenced within the initial twenty-year lease period.  Id. at 8–13.  Since production had not begun, the opinion concluded that Twin Metals had no automatic right to renewal and that BLM had the same discretion in determining whether to renew the 2004 Leases as it had when determining whether to grant the initial leases.  Id. at 13.

The same day the Tompkins Opinion was released, BLM informed Twin Metals that it viewed the opinion as binding, thereby initiating a discretionary review of Twin Metals' renewal applications.  Compl. ¶ 53.  As part of BLM's review, BLM asked the U.S. Forest Service ("USFS"), a subdivision of the Department of Agriculture, whether it consented to renewing the leases.  Id.  In December 2016, the USFS Chief refused to consent, and BLM then denied Twin Metals' renewal application citing USFS's refusal as binding on BLM.  Id. ¶¶ 54, 56.

In 2017, following the change in presidential administrations, Interior restored Twin Metals' project.  Id. ¶ 58.  Principal Deputy Solicitor Daniel Jorjani issued a new opinion (the

"Jorjani Opinion") replacing the Tompkins Opinion.  <u>See generally</u> Compl., Ex. E.  The Jorjani

Opinion found that the terms of the 1966 Leases, not the 2004 Leases, governed and that Twin

Metals had a non-discretionary right to renewal regardless of whether production had begun.  <u>Id.</u>

at 8.  In May 2018, BLM resumed consideration of Twin Metals' application to renew the 2004

Leases, and eventually the government renewed the leases in June 2019 (the "2019 Leases").

Compl. ¶¶ 60, 63; <u>see generally</u> Compl., Ex. G.  The 2019 Leases reverted to the language of the

1966 Leases, establishing "a right in the lessee to renew for successive periods of 10 years."

Compl., Ex. G, at MNES-01352 Part 1, MNES-01353 Part 1.  Per the 2019 Leases, Twin Metals

also had to complete certain milestones within ten years, including receiving approval for its

mining plan of operations ("MPO").  <u>Id.</u> at MNES-01352 § 14(b), MNES-01353 § 14(b).  Under

Interior regulations, MPOs are required before any mining can begin and must "show in detail

the proposed exploration, prospecting, testing, development or mining operations to be

conducted."  43 C.F.R. § 3592.1(a).   Following the Jorjani Opinion, Twin Metals resumed its

project and submitted an MPO in December 2019.  Compl. ¶¶ 72, 74.

     After another change in presidential administrations, in January 2022, Interior Principal

Deputy Solicitor Ann Marie Bledsoe Downes issued an opinion (the "Downes Opinion")

replacing the Jorjani Opinion.  <u>Id.</u> ¶ 94; <u>see generally</u> Compl., Ex. L.  The Downes Opinion

concluded that the 2019 Leases violated BLM regulations in three ways.  *First*, the leases' use of

"customized" renewal terms—i.e., those in the 1966 Leases—violated BLM regulations

governing the use of the standard lease form and the scheme of discretionary renewals.  Compl.,

Ex. L, at 8.  The Downes Opinion reasoned that the 2004 Leases provided the operative terms for

the 2019 renewal, and the 2004 Leases dictated that the regulations "in force" in 2004, which

required use of the standard form, applied.  <u>Id.</u> at 9.  *Second*, the Downes Opinion concluded that

the renewals "bypass[ed] and disregard[ed]" USFS's statutory consent authority.  Id. at 12.  *Third*, the Downes Opinion found that BLM's environmental assessment failed to evaluate reasonable alternatives, including the "alternative of no action."  Id. at 15.  Given these violations, the Downes Opinion concluded that the 2019 Leases were subject to cancellation under 43 C.F.R. § 3514.30.  Id. at 2.  The day after the Downes Opinion was released, Interior cancelled Twin Metals' leases.  See generally Compl., Ex. M.

### 2.  *Preference Right Lease Applications*

Separate from the leases, Twin Metals' predecessor companies also sought to explore nearby tracts of land in the Superior National Forest.  Compl. ¶ 47.  In 2000 and 2001, BLM issued prospecting permits to Twin Metals' predecessors to explore that land.  Id.; see also Defs.' Mot. Dismiss, Exs. 1–3.  Prospecting permits are issued when BLM determines that "prospecting is needed to determine the existence of a valuable deposit," and the permits give the holder an "exclusive right" to "determine if a valuable [hardrock mineral] deposit exists."  43 C.F.R. §§ 3501.10(a), 3505.10(a)(6).  Twin Metals and its predecessors later found deposits and submitted preference right lease applications ("PRLAs") in 2006 and 2013.  Compl. ¶ 49.  BLM may grant preference right leases to holders of prospecting permits who demonstrate the existence of valuable deposits on the land covered by their permits.  43 C.F.R. § 3501.10(c).

On January 5, 2017, USFS submitted a request for BLM to withdraw from public land laws 234,328 acres of the Superior National Forest, including land covered by Twin Metals' PRLAs.  Compl. ¶¶ 57, 78.  Under the Federal Land Policy and Management Act ("FLPMA"), Interior can withdraw federal land from the operation of mining laws, subject to valid existing rights.  43 U.S.C. § 1714.  When another federal agency submits a withdrawal application, Interior must publish a notice in the *Federal Register*, which then triggers an automatic two-year

segregation of the lands from the operation of public land laws.  C.F.R. §§ 2300.0-5(m), 2310.2(a).  On January 19, 2017, BLM published a notice in the *Federal Register* announcing its receipt of USFS's withdrawal application, initiating the mandatory two-year segregation. Compl. ¶ 57.

In September 2018, USFS cancelled the withdrawal application, thereby releasing the segregated land.  Id. ¶ 62.  Though Twin Metals' PRLAs concerned land that had been temporarily segregated from January 2017 until September 2018, BLM did not reject the PRLAs based on the temporary segregation.  Id. ¶ 78.  Instead, in 2018 and 2020, BLM issued "Preliminary Valuable Deposit Determination[s]" ("PVDDs") for the two PRLAs, finding there was "a reasonable prospect of success in developing a profitable mine" on the two parcels.  Id.

In September 2021, however, USFS submitted a second application to withdraw from mining 225,378 acres of the Superior National Forest.  Id. ¶ 85.  These acres were part of the same swath of land proposed for withdrawal in 2017.  Id.  BLM published the segregation notice in the *Federal Register* on October 21, 2021, and that same day BLM rejected Twin Metals' PRLAs.  See generally Compl., Exs. I–J.  In its rejection decision, BLM cited to its regulation, providing that "applications for use of the lands involved in a withdrawal application or a withdrawal proposal, the allowance of which is discretionary, shall be denied."  Compl., Ex. J at 1 (citing 43 C.F.R. § 2310.2(d)).  BLM rejected the PRLAs because their allowance was "within the BLM's discretion."  Id.

### 3.  *Mining Plan of Operations*

Two months after BLM rejected Twin Metals' PRLAs, BLM also rejected the MPO that Twin Metals had submitted in December 2019.  Compl. ¶¶ 74, 90; Compl., Ex. K at 1.  The MPO had included proposed operations on lands in one of the PRLAs BLM rejected.  Compl.,

Ex. K, at 1.  BLM rejected the MPO as "incomplete" because it "no longer accurately reflect[ed] the lands that could be included" in an MPO.  Id. at 1–2 (citing 43 C.F.R. § 3592.1(c)).

Additionally, BLM refused to consider a new MPO that Twin Metals had submitted in November 2021, following the PRLA rejections, which excised the land subject to the PRLA. Id. at 2.  Twin Metals proposed that BLM consider the November 2021 MPO, not as a "new plan," but rather as an "amendment" with "limited changes."  Compl. ¶ 90.  But BLM refused to consider the November 2021 MPO "with" the December 2019 MPO on the grounds that the November 2021 MPO was a "new" plan "with a different description of proposed operations under 43 C.F.R. § 3592.1(c)."  Compl., Ex. K, at 2.

Twin Metals appealed the rejection of its MPO to the Interior Board of Land Appeals ("IBLA").  Compl. ¶ 93.  In April 2022, following the cancellation of the 2019 Leases, IBLA concluded that the MPO appeal was moot since the MPO "depended on the canceled lease" and the IBLA "lack[ed] authority to review the Deputy Secretary's decision to cancel Twin Metals's leases."  Compl., Ex. N, at 7.

  B. Arguments

In August 2022, Twin Metals filed suit against the Defendants in this Court.  See generally Compl.  In December 2022, Defendants filed a motion to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim.  See generally Defs.' Mot. Dismiss.  Fifteen environmental organizations and recreational businesses (collectively "Defendant-Intervenors") then applied to intervene as defendants.  See generally Mot. Intervene. After the Court granted their motion, Defendant-Intervenors filed a motion to dismiss on the same grounds as Defendants' motion.  See generally Def.-Ints.' Mot. Dismiss.  The Court now considers both motions.

### 1. Claims One and Four

Twin Metals' complaint presents four claims.  In its first claim ("Claim One"), Twin Metals asserts that BLM's lease cancellation violated the Administrative Procedure Act ("APA") because the cancellation was arbitrary, capricious, in excess of agency authority, or otherwise contrary to law.  In its fourth claim ("Claim Four"), Twin Metals contends that the dismissal of the MPO appeal violated the APA because the rationale for the dismissal was premised on the invalid lease cancellation.  The Defendants and Defendant-Intervenors move to dismiss Twin Metals' Claim One and Claim Four for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  They assert that the Tucker Act, not the APA, governs these two claims since Twin Metals' objection to the lease cancellation is a disguised contract claim.

### 2. Claims Two and Three

Twin Metals' second and third claims ("Claim Two" and "Claim Three") challenge BLM's rejection of the PRLA and MPO as arbitrary, capricious, in excess of agency authority, or otherwise contrary to law.  The Defendants and Defendant-Intervenors move to dismiss those claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## II.  Legal Standard

### A.  Lack of Subject Matter Jurisdiction

Under Rule 12(b)(1), a motion to dismiss may be granted when there is a "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  The plaintiff carries the burden of establishing subject matter jurisdiction.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

United States agencies "are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity."  Crowley Gov't Servs., Inc. v. Gen. Servs.

Admin., 38 F.4th 1099, 1105 (D.C. Cir. 2022).  In APA section 702, Congress created a limited

waiver of sovereign immunity.  5 U.S.C. § 702.  In the Tucker Act, Congress also waived

sovereign immunity for actions "founded . . . upon any express or implied contract with the

United States."  28 U.S.C. § 1491(a)(1).  However, when a claim is founded on a contract, the

Tucker Act "'impliedly forbid[s]' contract claims against the Government from being brought in

district court under the waiver in the APA."  Perry Capital LLC v. Mnuchin, 864 F.3d 591, 618–

19 (D.C. Cir. 2017) (quoting Albrecht v. Comm. on Emp. Benefits, 357 F.3d 62, 67–68 (D.C.

Cir. 2004)).

The D.C. Circuit considers two factors in determining whether a case is "in 'its essence'

contractual" and therefore falls within the ambit of the Tucker Act.  Perry Capital, 864 F.3d at

619 (quoting Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982)).  The Circuit's test

considers "the source of the rights upon which the plaintiff bases its claims" and "the type of

relief sought (or appropriate)."  Megapulse, 672 F.2d at 968.  The test seeks to ascertain whether

claims brought in federal court are, in fact, "'disguised' contract claims."  Id. at 969.

In assessing the first prong of the Megapulse test, the D.C. Circuit considers whether the

plaintiff's "rights and the government's purported authority arise from statute, whether the

plaintiff's rights exist prior to and apart from rights created under the contract, and whether the

plaintiff seeks to enforce any duty imposed upon the government by the relevant contracts to

which the government is a party."  Crowley, 38 F.4th at 1107 (cleaned up).

Under the second prong, a claim is founded on a contract if the claim seeks the

"explicitly contractual remedy" of specific performance or the "prototypical contract remedy" of

damages.  Perry, 864 F.3d at 619 (citation omitted).  The classification of a claim depends not

only on how it is pled, but on what relief would be "appropriate."  Megapulse, 672 F.2d at 968.

Under this prong, claims do not fall within the Tucker Act if the complaint requests "non-monetary relief that has 'considerable value' independent of any future potential for monetary relief."  Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs., 56 F.3d 279, 284 (D.C. Cir. 1995) (quoting Francis E. Heydt Co. v. United States, 948 F.2d 672, 677 (10th Cir. 1991)).

B.  Failure to State a Claim

Dismissal under Rule 12(b)(6) is appropriate when the complaint "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss for failure to state a claim, the Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor."  Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015).  "[D]etailed factual allegations" are not necessary, but the complaint must provide "more than labels and conclusions" or "a formulaic recitation of the elements of cause of action."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Banneker Ventures, 798 F.3d at 1129 (internal quotations omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

III.  **Analysis**

A.  Claims One and Four

Before applying the Megapulse analysis to Claims One and Four, the Court must first "characterize [Twin Metals'] asserted right[s]."  Crowley, 38 F.4th at 1108.  In Claim One, Twin Metals identifies two rights that were violated by BLM's cancellation of its leases: (i) its "right to successive renewals of the Leases" and (ii) the right to be free from government action that is "arbitrary, capricious, in excess of agency authority, or otherwise contrary to law."  Compl. ¶¶

109, 114.  Claim Four, which is premised on the violation asserted in Claim One, also alleges a

violation of Twin Metals' procedural rights.  Id. ¶¶ 130–32.

       *1.  Source of the Rights*

Twin Metals asserts that its right to successive lease renewals and its procedural rights

stem from two seemingly non-contractual sources: (i) "mining laws and regulations" and (ii) "the

Government's obligation not to act arbitrarily and capriciously."  Pl. Opp'n at 16.  As best the

Court can tell, the laws Twin Metals is referencing are (i) 43 U.S.C. § 3221.4(f) (1966), which is

referenced in the 1966 Leases, and (ii) the APA.[2]  But neither law gives rise to these asserted

rights.  The rights flow instead from the underlying lease agreements.

*First*, 43 U.S.C. § 3221.4(f) (1966) is not the source of Twin Metals' asserted right to

successive renewals.  The 1966 Leases established "a right in the Lessee to renew the [leases] for

successive periods of ten (10) years each *in accordance with regulation 43 CFR § 3221.4(f)* and

the provisions of this lease."  Compl., Ex. A, at MNES-01352 § 1(a), MNES-01353 § 1(a)

(emphasis added).  At the time of the signing, 43 U.S.C. § 3221.4(f) provided that "a lessee will

be granted a right of renewal, not exceeding 10 years each, under such reasonable terms and

conditions as the Secretary of the Interior may prescribe."  43 U.S.C. § 3221.4(f) (1966).  Even if

the Court assumes that the 2004 Leases adopted the renewal provision of the 1966 Leases, the

language of the 1966 Leases makes clear that they—not the statute—give the lessee a right to

---

[2]  Twin Metals notes that the Downes Opinion cited "various statutes and regulations," namely 16 U.S.C. §§ 508b, 520; the Reorganization Plan No. 3 of 1946; the National Environmental Policy Act; and 43 C.F.R. §§ 1502, 1800, 3500.  Pl. Opp'n at 16.  But none of these statues or regulations provides Twin Metals with the right to non-discretionary lease renewals.  43 C.F.R. § 3511.15(f), the only cited regulation or statute that discusses lease renewals, provides that leases are subject to discretionary renewal.  43 C.F.R. § 3511.15(f) ("Hardrock Minerals [leases] . . . [c]an be renewed for 10 years at the end of the initial term and for following 10 year periods.").

non-discretionary renewals.  By mandating that renewals be "in accordance with" the statute, the leases at most incorporated the statute's terms by reference.  But it is still the underlying leases, not the statute, that confers a right to renewal.

*Second*, procedural obligations that arise from a contractual relationship do not "exist prior to and apart from rights created under [] contract."  Crowley, 38 F.4th at 1107.  In Spectrum Leasing Corp. v. United States, Spectrum challenged the General Service Administration's ("GSA") invocation of a liquidated damages clause in a data-communications contract between the two parties.  764 F.2d 891, 892 (D.C. Cir. 1985).  Spectrum argued that the source of its right to relief was the Debt Collection Act ("DCA") and not the contract.  Id. at 894. The D.C. Circuit rejected this argument, noting "[a]lthough the DCA might impose procedural requirements on the government having some impact on the contract, the Act in no way creates the substantive right to the remedy Spectrum seeks."  Id.; see also Navab-Safavi v. Broad. Bd. of Governors, 650 F. Supp. 2d 40, 71 (D.D.C. 2009) (citations omitted) ("[T]he APA itself does not confer a substantive right to be free from arbitrary agency action, nor does it create any other substantive right that might be violated."), aff'd sub nom. Navab-Safavi v. Glassman, 637 F.3d 311 (D.C. Cir. 2011).  Likewise here.  Twin Metals' asserted right to be free of an arbitrary and capricious interpretation of the lease renewal provisions does not give it a substantive right to enforce those contractual provisions.

Compare the result in Spectrum with cases where parties' rights originate in laws or statutes that provide substantive, rather than procedural, guarantees.  In Megapulse, a navigation-equipment company challenged the Coast Guard's decision to release Megapulse's proprietary data to other private companies.  672 F.2d at 961–62.  Even though Megapulse had entered into a contract with the Coast Guard, the D.C. Circuit determined that the Tucker Act did not apply

because Megapulse's claims were based on alleged violations of the Trade Secrets Act and the Due Process Clause.  Id. at 969.  Likewise, in Crowley, the D.C. Circuit concluded the Tucker Act did not apply because the rights asserted in the complaint arose from violations of the Transportation Act and Contract Dispute Act's finality clause.  38 F.4th at 1108.

Voyageur Outward Bound School v. United States, an APA case brought by environmental groups challenging the Jorjani Opinion, also illustrates the distinction between Tucker Act and APA claims.  444 F. Supp. 3d 182 (D.D.C. 2020), vacated and dismissed as moot, No. 20-5097, 2022 WL 829754 (D.C. Cir. Mar. 17, 2022).  In Voyageur, the Tucker Act did not apply because the plaintiffs, as neither parties to nor intended beneficiaries of the Twin Metals' leases, had no "legal rights" stemming from the leases.  Id. at 197 (analyzing the source of the plaintiffs' rights for standing purposes).  The plaintiffs did not seek to "*enforce* the mining leases."  Id. at 198.  Instead, they sought "to enforce [their] *own* rights—given to [them] by Congress, enforceable through the APA."  Id.  Namely, as the court recognized, the plaintiffs sought to enforce rights given to them by the "mining authorization statute for the Superior National Forest, the Federal Land Policy Management Act, the Boundary Waters Canoe Area Wilderness Act, and the National Forest Management Act."  Id. (determining that the plaintiffs fell within the "zone of interests" of those statutes).

Other than Twin Metals' claims that the lease cancellation and MPO appeal denial violated its rights under 43 U.S.C. § 3221.4(f) and the APA, it points to no other source of its asserted rights.  The Court thus finds that the only sources of Twin Metals' asserted rights are the underlying leases.

2.   *Relief Sought or Appropriate*

The relief Twin Metals seeks is also properly understood as contractual relief.  In its prayer for relief, Twin Metals requests that the Downes Opinion, lease cancellations, and MPO rejection be vacated; the leases be declared valid; and the MPO declared still pending.  Compl. ¶¶ 133–134, 136.  Though couched as requests for declaratory relief, Twin Metals' requests would require Interior to perform its obligations under the leases.  In other words, the relief Twin Metals seeks amounts to the "classic contractual remedy" of specific performance.  Crowley Gov't Servs., Inc., 38 F.4th at 1110.

Moreover, even though Twin Metals does not request monetary damages, damages would be "appropriate."  Megapulse, 672 F.2d at 968.  The "plain language of a complaint . . . does not necessarily settle the question of Tucker Act jurisdiction . . . . because plaintiffs can bypass Tucker Act jurisdiction by converting complaints which 'at their essence' seek money damages from the government into complaints requesting injunctive relief or declaratory actions." Kidwell, 56 F.3d at 284.  The real harms alleged in the complaint are twofold: (i) Twin Metals spent money on the mining project in "reasonable reliance on the 2017 Jorjani Opinion and the 2019 lease renewal," and (ii), as a result of the Downes Opinion, Twin Metals cannot recoup its "investment of hundreds of millions of dollars."  Compl. ¶¶ 2, 110.  The Tucker Act, not the APA, allows plaintiffs to recover for these kinds of harms, in the form of expectancy, reliance, and other monetary damages.  See Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380–84 (Fed. Cir. 2001).

Claims One and Four also do not request "non-monetary relief that has 'considerable value' independent of any future potential for monetary relief."  Kidwell, 56 F.3d at 284.  Twin Metals asserts that its nonmonetary relief is akin to that requested in Crowley.  Pl. Opp'n at 21.

14

In that case, Crowley sought injunctive and declaratory relief to prevent GSA from auditing

payments owed to Crowley under its contract with the United States Transportation Command.

Id. at 1102.  The D.C. Circuit held that preventing the GSA from auditing Crowley would impart

significant non-monetary relief for Crowley's "business operations and professional reputation."

Id. at 1111.  But unlike Crowley, Twin Metals is not contesting an agency's interference in a

contract Twin Metals formed with a separate party.  Twin Metals is instead challenging Interior's

interpretation of its own leases with Twin Metals.  And, of course, Interior's interpretation harms

Twin Metals' business operations.  That's what happens when one party to a contract interprets it

in a way her counterpart dislikes.  If a company could escape Tucker Act jurisdiction simply

because its business suffered as a result of unfavorable contract interpretation, the Tucker Act

would be meaningless.

      For the foregoing reasons, the Court finds that it lacks subject matter jurisdiction over

Claims One and Four and dismisses them.

      B.  <u>Claims Two and Three</u>

            *1. PRLAs Rejection (Claim Two)*

      Recall that BLM rejected Twin Metals' PRLAs after USFS submitted its withdrawal

application in September 2021 and BLM segregated the land covered by Twin Metals' PRLAs in

October 2021.  Compl., Ex. J.  Twin Metals challenges these actions as arbitrary and capricious

and contrary to law under APA § 706.  Compl. ¶ 124.

      Under the applicable regulations, Interior is required to reject "discretionary" applications

for use of land subject to segregation unless the applications are listed in the *Federal Register*

notice "as permissible during the segregation period."  43 C.F.R. § 2310.2(c)-(d)

("[A]pplications for the use of lands involved in a withdrawal application or a withdrawal

proposal, the allowance of which is discretionary, *shall be denied*" (emphasis added)).

Defendants contend that because Twin Metals' PRLAs were not listed in the notice and were

discretionary applications, BLM was required to reject them.  Defs.' Mot. Dismiss at 20.  And

because BLM had no discretion in the decision to reject the PRLAs, the decision could not be

arbitrary and capricious.  Id. at 24.

     Twin Metals disputes that the PRLAs were discretionary applications and also contends

that the land covered by the PRLAs was not subject to segregation in the first instance.  Pl.

Opp'n at 23–29; 34–36.  The FLPMA, the statute governing land segregation, exempts "valid

existing rights" from segregation.  Pub. L. No. 94-579, § 701(h), 90 Stat. 2743, 2786 (1976).

Twin Metals asserts that because it had "succeeded in discovering valuable minerals on the

prospecting permit areas," it had earned a valid existing right, namely the "right to convert its

prospecting permits into preference right leases."  Pl. Opp'n at 26.

     The two issues—whether the applications were discretionary and whether Twin Metals

had "valid existing rights" to explore the land—coalesce into a single question:  Did the

government have discretion to deny Twin Metals' PRLAs?  This one question addresses both

issues because under the FLMPA, "valid existing rights" are rights not subject to revocation or

denial at "the discretion of the federal government."  Cnty. of Okanogan v. Nat'l Marine

Fisheries Serv., 347 F.3d 1081, 1085 (9th Cir. 2003).

     The applicable statutory and regulatory scheme make plain that the government had

discretion to deny Twin Metals' PRLAs.  The starting point is 16 U.S.C. § 508b, which governs

applications to develop mineral resources in the Superior National Forest in Minnesota.[3]

---

[3] The Reorganization Plan No. 3 of 1946 governs PRLAs for mineral development in
land originally acquired by the Department of Agriculture.  Reorganization Plan No. 3 of 1946

In contrast to other mineral development statutes, § 508b has no provision granting the holders of prospecting permits a lease right upon the discovery of valuable deposits.  See 16 U.S.C. § 508b.  The Mineral Leasing Act, which applies to the development of deposits like oil, gas, and phosphates, does entitle prospectors to a lease upon the discovery of deposits.  See 30 U.S.C. § 211(b) ("[If] the permittee shows to the Secretary that valuable deposits of phosphate have been discovered within the area covered by his permit, the permittee *shall* be entitled to a lease for any or all of the land embraced in the prospecting permit." (emphasis added)); § 223 (similar entitlement language for oil and gas discoveries).  Section 508b has no such entitlement provision.[4]

Instead, several provisions of § 508b and the corresponding regulations give the government discretion to deny PRLAs, underscoring that the right to a lease is not a valid existing right.  The statute gives the Secretary of the Interior leeway to grant leases according to regulations and terms that "he may deem to be for the best interests of the United States."  16 U.S.C. § 508b.  Additionally, the statute conditions Interior's acceptance of PRLAs on the Department of Agriculture's consent.  The statute provides "that the development and utilization of [] mineral deposits shall not be permitted by the Secretary of the Interior except with the

---

Part IV Sec. 402.  Because Twin Leases' submitted PRLAs for public domain land, 16 U.S.C. § 508b governs instead.  See Pl. Opp'n at 29.  However, § 508b is a narrowly applicable law:  It governs mineral resources only in Minnesota's national forests.  Id.  Few cases have had occasion to interpret the statute, so comparisons to other statutes are helpful.

[4]  Twin Metals contends that Congress intended for § 508b to form "part of a broader system of entitlements, through which the government rewarded prospectors for their significant time and expense upon the discovery of a valuable deposit."  Pl. Opp'n at 32 (citing 1 AM. L. OF MINING § 20.06).  But this is belied by the text of the statute, which, again, unlike similar mineral leasing statutes, contains no entitlement provision.  See Claybrook v. Slater, 111 F.3d 904, 908 (D.C. Cir. 1997) ("If statutory language is clear . . . it is both unnecessary and inappropriate to track legislative history.").

consent of the Secretary of Agriculture." Id. 43 C.F.R. § 3507.19 likewise provides that BLM

will reject PRLAs if "the surface managing agency does not consent to the lease." 43 C.F.R. §

3507.19(c); see also 43 C.F.R. § 3501.1(b)(3) (listing 16 U.S.C. § 508b as one of the relevant

statutory authorities for part 3500 of Title 43 of the C.F.R.).

Twin Metals contends that at the leasing stage the agency does not have discretion to

deny leases, but rather discretion only to define the specific terms of leases and ensure

compliance with applicable law.  Pl. Opp'n at 35.  For this proposition, however, Twin Metals

cites to cases concerning coal leases and interpreting a since-repealed section of the Mineral

Leasing Act, which used the entitlement language absent from § 508b.  See id. at 34–35; see

also, e.g. Nat. Res. Def. Council, Inc. v. Berklund, 458 F. Supp. 925, 934 (D.D.C. 1978), aff'd,

609 F.2d 553 (D.C. Cir. 1979) ("The language 'shall be entitled' could not be clearer, and on its

face it obligates the Secretary to issue a coal lease to the permittee.").  But, § 508b has no such

"shall be entitled" language.

The Court thus determines that the PRLAs are discretionary applications, and, as a

consequence of USFS's withdrawal application, Interior was required to reject the PRLAs.

Because Interior had "no discretion" in rejecting the PRLAs, its decision could not be "arbitrary

and capricious."  US Magnesium, LLC v. EPA., 630 F.3d 188, 193 (D.C. Cir. 2011); see also

Native Village of Eklutna v. Dep't of Interior, No. 19-cv-2388 (DLF), 2021 WL 4306110, at *10

(D.D.C. Sept. 22, 2021) ("[T]he [agency] lacked discretion to reach any other determination on

the proposed lease, which precludes the decision from being arbitrary and capricious.").  Twin

Metals has thus failed "to state a claim upon which relief can be granted," so the Court dismisses

Claim Two pursuant to Federal Rule of Civil Procedure 12(b)(6).  Twombly, 550 U.S. at 552.

## 2.   *MPO Rejection (Claim Three)*

Twin Metals also fails to state a claim that BLM's rejection of the MPO violated the APA.  Twin Metals advances three theories, but none "state[s] a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678.

Twin Metals' first basis for challenging the MPO rejection is premised on the invalidity of the PRLAs rejection.  Compl. ¶ 126.  ("Th[e] conclusion [to deny the MPO] was incorrect because the PRLAs Rejection was not legally valid.").  In its rejection decision, BLM concluded that because the MPO "no longer accurately reflect[ed] the lands that could be included in" an MPO, the MPO failed to "include a complete description of the proposed operations as required under BLM's regulations at 43 C.F.R. § 3592.1(c)."  Compl., Ex. K at 1–2.  Twin Metals does not dispute that, should the PRLAs rejection be deemed valid, BLM properly applied § 3592.1(c) in denying the MPO.  As the Court has upheld the PRLAs rejection, Twin Metals' first challenge falls short.

Second, Twin Metals contends that the MPO rejection violated the APA because BLM "refused to consider Twin Metals' MPO as including its 2021 revision, which excised the PRLAs from the proposed project."  Compl. ¶ 127.  This challenge also fails.  Under the relevant regulation—43 C.F.R. § 3592.1(a)—BLM is required to "promptly approve [an MPO] or indicate what additional information is necessary to conform to the provisions of the established requirements."  43 C.F.R. § 3592.1(a).  BLM met these obligations.  In its December 2021 rejection letter, BLM informed Twin Metals that it was "in the process of reviewing" the MPO Twin Metals submitted on November 24, 2021.  Compl., Ex. K at 2.  BLM also directed Twin Metals to "resubmit" any materials from the December 2019 MPO application that were "relevant to BLM's consideration" of the November 2021 MPO.  Id.  Twin Metals' real

objection appears to be that BLM "refused to consider [the November 2021 MPO] as an amendment," but that is not required by the regulation.  Pl. Opp'n at 43.  The regulation merely requires BLM to indicate what additional information is necessary, which it did in its December 2021 rejection letter.

Finally, Twin Metals asserts that BLM's denial of the MPO and refusal to consider the November 2021 MPO as an amendment were "pretextual."  Id. at 44.  The complaint alleges that BLM sought "to run out the clock on the ten-year term for Twin Metals' Leases" and that "[b]y rejecting the MPO, Defendants believed their actions would cause the ten-year term to begin running again."  Compl. ¶ 92.  These facts fail to provide "more than labels [or] conclusions" of pretext.  Twombly, 550 U.S. at 555.  In one of the pretext cases cited by Twin Metals, the agency's decision was "contrived," leading to a "significant mismatch" between its decision and stated rationale.  Dep't of Commerce v. New York, 139 S.Ct. 2551, 2575 (2019) (finding the agency decision's stated rationale "contrived" because the agency "went to great lengths to elicit the [necessary] request [for its rationale] from DOJ (or any other willing agency)").  In the other case, the complaint contained evidence showing that the agency's on-the-ground conduct directly contradicted the stated reason for its challenged decision.  Brnovich v. Biden, 630 F. Supp. 3d 1157, 1176 (D. Ariz. 2022) (finding a pretext argument survived a motion to dismiss because the government cited "insufficient agency resources" as the reason for its decision while "actively [seeking] to decrease [its available] resources").  Twin Metals' complaint fails to allege that BLM "went to great lengths" to "contrive[]" a reason to reject the MPO.  In fact, BLM's stated reason—that the MPO did "not include a complete description of the proposed operations"— flowed directly from the PRLAs rejection.  Nor does the complaint allege that BLM's conduct contradicted its stated rationale for denying the MPO.

20

Accordingly, the Court finds that Twin Metals' third claim fails to state a claim and dismisses the claim under Federal Rule of Civil Procedure 12(b)(6).

**IV.  Conclusion**

For the foregoing reasons, the Court will grant Defendants' and Defendant-Intervenors' Motions to Dismiss in full.  A separate Order shall accompany this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 6, 2023